# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

No. 08-536 L
(Filed: February 11, 2011)

| | |
|---|---|
| ************************************** <br><br> LOVE TERMINAL PARTNERS, et al.,    * <br>      * <br>      Plaintiffs,      * <br>      * <br>      * <br> v.      * <br>      * <br>      * <br> THE UNITED STATES,      * <br>      * <br>      Defendant.      * <br> ************************************** | Failure to State a Claim Upon Which Relief Can Be Granted; RCFC 12(b)(6); Partial Summary Judgment; RCFC 56; Fifth Amendment Taking; Physical and Regulatory Takings; Loretto; Wright Amendment Reform Act of 2006; Ripeness; Williamson County Reg'l Planning Comm'n; Fallini; Omnia Commercial Co.; Objections to Proposed Findings of Fact; Discovery; RCFC 56(f); No Genuine Issue of Material Fact; Judicial Estoppel; Statutory Construction; Canon of Constitutional Avoidance; Unfunded Mandates Reform Act |

Roger J. Marzulla, Washington, DC, for plaintiffs.  Lucy J. Wiggins, of counsel.

James D. Gette, United States Department of Justice, Washington, DC, for defendant.  Paul Samuel Smith, of counsel.

## OPINION AND ORDER

**SWEENEY**, Judge

      Before the court are Defendant's Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim ("motion") and Plaintiffs' Cross-Motion for Summary Judgment on Partial Liability ("cross-motion").  In this action, plaintiffs Love Terminal Partners, L.P. and Virginia Aerospace, LLC ("Love Terminal Partners" and "Virginia Aerospace," respectively; "plaintiffs," collectively) allege that the Wright Amendment Reform Act of 2006 ("WARA") prohibited the use of 26.8 acres of Dallas Love Field Airport ("Love Field") to which they hold long-term lease rights and effected a taking without just compensation in contravention of the Fifth Amendment to the United States Constitution.  Defendant moves, pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), to dismiss the complaint, asserting that plaintiffs have failed to plead any facts that, if true, prove that the government placed regulatory limitations upon plaintiffs' use of the leased property.  Furthermore, defendant contends that any impact the WARA had upon plaintiffs constitutes a consequential loss for which compensation is unavailable.  Plaintiffs seek partial summary judgment on liability, contending that the WARA constituted a per se, physical taking of six air passenger gates that Love Terminal Partners constructed on the leased property.  For the reasons discussed below, defendant's motion is denied and plaintiffs' cross-motion is granted.

Due to the length of this opinion, the court provides the following table of contents:

I. FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    A.  Love Field and Dallas-Fort Worth International Airport ("DFW"). . . . . . . . . . . . . . . 4
    B.  Congressional Involvement, 1979-1996.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1.  The Wright Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        2.  The Shelby Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    C.  Love Terminal Partners' Construction of a New Terminal at Love Field. . . . . . . . . . 8
    E.  Efforts to Amend or Repeal the Wright Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . 10
        1.  Congress Recommends a Local Solution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.  Enactment of the WARA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    F.  Plaintiffs' Legal Challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    G.  Plaintiffs Default on the Master Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    H.  Plaintiffs' Property Interests.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II. PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    A.  Nature of a Fifth Amendment Takings Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        1.  Physical Takings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2.  Regulatory Takings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        3.  The <u>Lucas</u> "Antecedent Inquiry".. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    B.  Ripeness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    C.  RCFC 12(b)(6) Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    D.  Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    A.  Plaintiffs' Takings Claim Is Ripe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    B.  Defendant's Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        1.  The Parties' Exhibits Are Not "Matters Outside the Pleadings" That Require
            Conversion of Defendant's Motion to a Motion for Summary
            Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        2.  Plaintiffs Have Identified a Property Interest That Was Allegedly Taken. . . . 37
        3.  Plaintiffs Have Alleged Government Appropriation of Their Ownership in the
            Leaseholds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        4.  Plaintiffs' Complaint States a Takings Claim.. . . . . . . . . . . . . . . . . . . . . . . . . . 40
            a.  Plaintiffs' Complaint States a Claim for a Physical Taking. . . . . . . . . 40
            b.  Plaintiffs Are Entitled to Offer Evidence in Support of Their
               Regulatory Takings Theory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    C.  Plaintiffs' RCFC 56 Cross-Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
        1.  Defendant's Discovery-Related Objections Are Insufficient Under
            RCFC 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
        2.  Principles of Statutory Construction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

3.  The Doctrine of Judicial Estoppel Does Not Apply to Plaintiffs' Contrary
        Positions Advanced Before the Northern District of Texas and the Court of
        Federal Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    4.  Numerous Provisions of the WARA Contain Language Utilized in the
        Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        a.  The WARA Contains Identical Provisions to Those Set Forth in the
            Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        b.  The WARA Explicitly References the Contract. . . . . . . . . . . . . . . . . 64
        c.  Section 5 of the WARA Codifies Under Federal Law Specific
            Obligations Set Forth in the Contract. . . . . . . . . . . . . . . . . . . . . . . 65
            i.  The WARA Requires That Dallas Reduce the Number of Gates
                at Love Field. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
            ii.  The WARA Requires That Dallas Allocate the Number of
                Gates in Accordance With the Contract. . . . . . . . . . . . . . . 66
            iii.  The WARA Requires That Dallas Manage Love Field in
                Accordance With the Contract. . . . . . . . . . . . . . . . . . . . . . . 72
            iv.  The WARA Requires That Dallas Demolish the Lemmon
                Avenue Terminal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
            v.  The WARA Specifies how Dallas May Fund the Reduction of
                Gates at Love Field. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
            vi.  The WARA's Limitations Upon the DOT and the FAA Do Not
                Affect the Determination That the WARA Incorporates the
                Contract Into Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . 75
    5.  Incorporation of the Contract Into the WARA Does Not Create Constitutional,
        Contractual, or Statutory Conflicts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
        a.  The Canon of Constitutional Avoidance Is Not Implicated in
            This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
        b.  Incorporation of the Contract Into the WARA Creates No Conflict for
            Dallas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
        c.  Incorporation of the Contract Does Not Result in an "Unfunded
            Mandate". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    6.  The WARA's Legislative History Confirms That Congress Intended to
        Incorporate the Contract Into Federal Law. . . . . . . . . . . . . . . . . . . . . . . 85
    7.  Plaintiffs Are Entitled to Partial Summary Judgment. . . . . . . . . . . . . . . . . 89

V.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

# I. FACTUAL BACKGROUND[1]

## A. Love Field and Dallas-Fort Worth International Airport ("DFW")

The history of Love Field is defined, in large measure, by the rivalry between the City of Dallas ("Dallas") and the City of Fort Worth ("Fort Worth"). In 1917, the Dallas Chamber of Commerce purchased the land that now constitutes Love Field and leased it to the United States Army. Royce Hanson, Civic Culture and Urban Change Governing Dallas 37 (2003). Following World War I, the Dallas Chamber of Commerce developed Love Field into an aviation-oriented industrial park and, in 1927, sold Love Field to Dallas. Id. at 38. Love Field then began servicing Dallas as its municipal airport.

During the 1950s and early 1960s, Dallas and Fort Worth, which are separated by approximately thirty miles, City of Dallas, Tex. v. Sw. Airlines Co., 494 F.2d 773, 774 (5th Cir. 1974), aff'g 371 F. Supp. 1015 (N.D. Tex. 1973), operated competing airports, Am. Airlines, Inc. v. U.S. Dep't of Transp., 202 F.3d 788, 793 (5th Cir. 2001), and were "bitter rival[s] for the business of commercial aviation and commercial air carriers," Sw. Airlines Co., 371 F. Supp. at 1019; see also H.R. Rep. No. 109-600, pt. 2, at 4 (2006) (noting that Dallas and Fort Worth "engaged in a protracted airport rivalry"). In 1962, the Civil Aeronautics Board ("CAB"), the predecessor to the United States Department of Transportation ("DOT"), explored the benefits of designating a specific airport as the single point through which all interstate air carrier service to Dallas and Fort Worth would be provided. Sw. Airlines Co., 371 F. Supp. at 1020. Two years later, the CAB determined that the competition between the two cities' airports was harmful and ordered Dallas and Fort Worth to reach a voluntary agreement designating one airport through which CAB-regulated carriers would serve both communities. See id.

The cities were unable to designate one of the existing airports to serve the region. Instead, they reached a compromise by agreeing to construct a new airport, DFW, that would be located halfway between Dallas and Fort Worth. In 1968, Dallas and Fort Worth adopted a Regional Airport Concurrent Bond Ordinance ("1968 Bond Ordinance"), which provided that both cities would take all necessary steps to provide for the orderly and efficient phase-out at

---

[1] The facts set forth below are derived from the complaint ("Compl."); the parties' briefs; exhibits attached to defendant's motion ("Def.'s Mot. Ex.") and plaintiffs' cross-motion ("Pls.' Ex."); prior decisional law from the United States District Court for the Northern District of Texas ("Northern District of Texas"), the United States Court of Appeals for the Fifth Circuit, and Texas state courts; legislative materials; law review articles; and other secondary materials that provide relevant background information. See, e.g., Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb Inc., 798 F.2d 862, 865 (7th Cir. 1983) (discussing the difference between taking judicial notice of materials as a substitute for evidence and utilizing materials for background information).

Love Field and transfer of services to DFW.[2]  In 1970, the eight air carriers that serviced the Dallas and Fort Worth communities agreed to transfer their operations to DFW.[3]

Southwest Airlines Company ("Southwest"), however, chose to stay at Love Field.  In 1971, Southwest commenced intrastate air service from Love Field to the Cities of Houston and San Antonio pursuant to a certificate issued by the Texas Aeronautics Commission ("TAC").[4] Because it was running solely intrastate flights from Love Field, Southwest was exempt from CAB certification, did not execute a use agreement, see supra note 3, and refused to transfer its operations to DFW, Am. Airlines, Inc., 202 F.3d at 793.  On October 20, 1971, Southwest advised the DFW Board that it intended to remain at Love Field.  Southwest's refusal to transfer its operations to DFW spawned litigation between Southwest and the cities, both of which maintained that permitting Southwest to remain at Love Field would financially threaten DFW. In 1973, the Northern District of Texas ruled that Dallas and Fort Worth could "not lawfully exclude" Southwest from Love Field "so long as Love Field remains open as an airport." Sw. Airlines Co., 371 F. Supp. at 1035.  As a result, Dallas, Fort Worth, and the DFW Board could not consolidate passenger service at DFW as envisioned by the 1968 Bond Ordinance.  H.R. Rep. No. 109-600, pt. 1, at 2.  DFW ultimately opened for commercial air service in 1974.

In 1975, Dallas adopted Ordinance 14505 in order to exclude all commercial airlines from Love Field.  S. Rep. No. 109-317, at 2.  Ordinance 14505 imposed a fine of $200 per landing at–or takeoff from–Love Field by certificated airlines.  Southwest sued and successfully

---

[2] "The central component of the [1968] Bond Ordinance was that Dallas and Fort Worth agreed to phase out passenger air service at their existing airports, including Dallas Love Field." H.R. Rep. No. 109-600, pt. 1, at 1.

[3] These eight air carriers included: American Airlines, Inc. ("American"); Braniff Airways, Inc. ("Braniff"); Continental Airlines, Inc.; Delta Air Lines, Inc. ("Delta"); Eastern Air Lines, Inc.; Frontier Airlines, Inc.; Ozark Air Lines, Inc.; and Texas International Airlines, Inc. Sw. Airlines Co., 371 F. Supp. at 1021 n.1; accord S. Rep. No. 109-317, at 2 n.1 (2006).  Each air carrier signed letter agreements and then executed use agreements with the DFW Airport Board ("DFW Board") in which it agreed to relocate its services to DFW in conformity with the 1968 Bond Ordinance.  Am. Airlines, Inc., 202 F.3d at 793; Sw. Airlines Co., 371 F. Supp. at 1021.

[4] Prior to November 12, 1971, Southwest operated out of Love Field, but the TAC certificate authorized Southwest "to serve the Dallas-Fort Worth region through 'any' airport in the area." Sw. Airlines Co., 371 F. Supp. at 1021.  On November 12, 1971, the TAC "directed all TAC certificated airlines not to change the airports from which they were then conducting their intrastate services unless they first obtained written approval from the TAC to do so." Id. Accordingly, Southwest remained at Love Field.  As of 2007, Southwest serviced approximately ninety-five percent of the passenger traffic at Love Field.  Love Terminal Partners, L.P. v. City of Dallas, Tex., 527 F. Supp. 2d 538, 543-44 (N.D. Tex. 2007).

enjoined Dallas from enforcing the ordinance, which "flew squarely in the face" of the order previously entered by the Northern District of Texas in Sw. Airlines Co. Sw. Airlines Co. v. Tex. Int'l Airlines, Inc., 396 F. Supp. 678, 680 (N.D. Tex. 1975), aff'd, 546 F.2d 84 (5th Cir. 1977).

## B.  Congressional Involvement, 1979-1996

Congress deregulated the airline industry and fostered competition by enacting the Airline Deregulation Act of 1978.  Southwest "viewed deregulation as an opportunity to become an interstate air carrier," S. Rep. No. 109-317, at 2, and announced plans to commence interstate service from Love Field to the City of New Orleans, Louisiana.  It submitted an application to the CAB, which granted the application over the objections of DFW and American after concluding that it lacked the authority to deny it.[5]  Id.; Am. Airlines, Inc., 202 F.3d at 793.  After the CAB granted Southwest's application, "[m]any Texas officials, particularly those in Fort Worth, worried that Southwest and other airlines would begin to fly all over the country from Love Field, thus drawing traffic away from DFW and endangering DFW's financial stability."  Eric A. Allen, Comment, The Wright Amendment: The Constitutionality and Propriety of the Restrictions on Dallas Love Field, 55 J. Air L. & Com. 1011, 1018-19 (1990).  Litigation over air service at Love Field seemed imminent.

## 1.  The Wright Amendment

Congress, with the consent of Dallas and Fort Worth, intervened in order to end the "continuous disagreement, frequent litigation, and constant uncertainty" associated with Love Field.  S. Rep. No. 109-317, at 16.  The Senate Report indicated the unique nature of Congress's involvement in Love Field, emphasizing that it was the "only time" Congress intervened in such a manner.  Id.  After the CAB permitted Southwest to commence interstate service from Love Field, Texas Congressman Jim Wright of Fort Worth, the Majority Leader of the United States House of Representatives, introduced an amendment to the International Air Transportation Competition Act of 1979 that was intended to protect the economic vitality of DFW by prohibiting interstate commercial air service from Love Field.  Ultimately, a compromise agreement, known as the "Wright Amendment," was reached.  The Wright Amendment authorized flights from Love Field to locations within Texas and four contiguous states–Arkansas, Louisiana, New Mexico, and Oklahoma–and limited interstate air transportation provided by commuter airlines to the operation of aircraft with a passenger capacity of fifty-six passengers or less.  The agreement was codified into section 29 of the International Air Transportation Competition Act of 1979.

The Wright Amendment (1) allowed Love Field to remain open, (2) limited the region Southwest served out of Love Field, and (3) generally banned interstate service from the airport.

---

[5]  Southwest's application was "in contravention of the intention of [Dallas and Fort Worth] as expressed in the [1968] Bond Ordinance."  H.R. Rep. No. 109-600, pt. 1, at 2.

It authorized travel to the four exempted states only if those flights did not "provide any through service or ticketing with another air carrier" and did not "offer for sale transportation to or from, and the flight or aircraft d[id] not serve, any point which [was] outside any such State."[6]  Pub. L. No. 96-192, § 29, 94 Stat. 35, 48-49 (1980).  The Wright Amendment "was intended to provide 'a fair and equitable settlement'" to the "unique" situation presented by Love Field and was "not to be construed 'as a harbinger of any similar proposals for any other airport or area.'"  H.R. Rep. No. 109-600, pt. 1, at 2.  Congress did not modify the Wright Amendment until 1996, S. Rep. No. 109-317, at 3, after which time several amendments loosened air travel restrictions at Love Field, Pls.' Opp'n Def.'s Mot. & Pls.' Cross-Mot. Summ. J. Partial Liability ("Pls.' Cross-Mot.") 5.

## 2. The Shelby Amendment

In 1996, Legend Airlines, Inc. ("Legend") sought to provide long-haul air service to and from Love Field using larger airplanes configured to comply with the Wright Amendment's fifty-six seat limitation.  Although Legend "filed a petition to operate pursuant to the exception in the Wright Amendment that appeared to permit unrestricted interstate service by airlines operating aircraft with a seating capacity of less than 56 passengers," the DOT Office of General Counsel determined that the Wright Amendment exception applied only to aircraft that had been originally configured to hold fewer than fifty-six passengers.  S. Rep. No. 109-317, at 3.  Following this determination, Alabama Senator Richard Shelby sought to expand the Love Field service area to include five additional states.  John Grantham, A Free Bird Sings the Song of the Caged: Southwest Airlines' Fight to Repeal the Wright Amendment, 72 J. Air L. & Com. 429, 448 (2007).  The final bill, however, contained only three states, id., and Congress ultimately adopted the "Shelby Amendment" as part of the Department of Transportation and Related Agencies Appropriations Act of 1998.

---

[6]  In other words, "air carriers [we]re prohibited from advertising or listing 'connecting' flights from an authorized Love Field flight to a point beyond the Love Field service area."  Allen, supra, at 1012.  The Love Terminal Partners, L.P. court explained the Wright Amendment's impact:

> The market for commercial airline services in North Texas is a series of sub-markets.  Because the Wright Amendment restricts long-haul flights, American is the dominant carrier at DFW . . . and is able to charge above-market premiums for flights to and from DFW . . . .  Southwest controls the majority of gates at Love Field and is able to charge premiums for short-haul flights to and from Love Field.  Consequently, two separate monopolists have forced consumers to pay artificially inflated prices for commercial air travel to and from North Texas.

527 F. Supp. 2d at 544; see also H.R. Rep. No. 109-600, pt. 2, at 6 ("The Wright Amendment expressly protects DFW from competition from Love Field and establishes a monopoly on long-haul air travel at DFW, dominated by American Airlines.").

The Shelby Amendment defined the phrase "passenger capacity of 56 passengers or less" contained in the Wright Amendment to "include[] any aircraft, except aircraft exceeding gross aircraft weight of 300,000 pounds, reconfigured to accommodate 56 or fewer passengers if the total number of passenger seats installed on the aircraft does not exceed 56." Am. Airlines, Inc., 202 F.3d at 794 (alteration in original).  Therefore, the Shelby Amendment permitted longer-haul flights on larger airplanes so long as the airplanes were reconfigured to accommodate fifty-six or fewer passengers.  The Shelby Amendment also added Alabama, Kansas, and Mississippi to the list of states that airlines could serve directly from Love Field.  S. Rep. No. 109-317, at 3.

After passage of the Shelby Amendment, Southwest offered flights from Love Field to Mississippi and Alabama. Am. Airlines, Inc., 202 F.3d at 794-95.  Legend also announced plans to offer long-haul service to states outside the Love Field service area using reconfigured aircraft.  Shortly thereafter, the Love Field air service controversy reignited.  Fort Worth and American sought to enjoin enforcement of the Shelby Amendment, and the ensuing litigation prevented Legend from offering service from Love Field until 1999. Love Terminal Partners, L.P., 527 F. Supp. 2d at 544.

## C.  Love Terminal Partners' Construction of a New Terminal at Love Field

Braniff commenced express and freight services from Love Field in 1929.  On June 10, 1955, Dallas executed a long-term lease ("Master Lease") with Braniff, granting Braniff the exclusive use of approximately thirty-six acres, together with the nonexclusive right to use runways, taxiways, and other airport facilities, at Love Field.[7]  Compl. ¶ 5; see also Def.'s Reply Supp. Mot. Dismiss & Opp'n Pls.' Mot. Partial Summ. J. ("Def.'s Reply") Ex. 1 (containing the Master Lease).  The Master Lease permitted the use of the premises solely for air transportation purposes.

On August 11, 1999, Love Terminal Partners, a Delaware limited partnership with its principal place of business in Dallas, subleased approximately nine acres encompassed under the Master Lease for the purpose of providing commercial air passenger service at Love Field.[8]

---

[7]  The thirty-six acres were later reduced to approximately 26.8 acres.  Compl. ¶ 5.

[8]  The sublease

> included "the non-exclusive right to use the Airport and all landing areas, runways, taxiways, ramp and apron areas, improvements, fixtures, appurtenances, services and facilities as may from time to time be installed thereon for the general operation of the Airport . . . ."  In its sublease[, Love Terminal Partners] agreed to abide by all of the provisions of the [M]aster [L]ease, including the limitation of use to air transportation purposes.

Compl. ¶ 6 (first alteration in original).  Alan Naul, president of Love Terminal Partners, stated

Compl. ¶¶ 1, 6.  Thereafter, Love Terminal Partners constructed a luxury airline passenger terminal ("Lemmon Avenue Terminal"), which included "parking, concessions, state-of-the-art facilities for accommodating air travelers, and six passenger gates,"[9] id. ¶ 7, at a cost of approximately $20 million, Pls.' Ex. 1 at 2 (Naul Decl. ¶ 4).  According to plaintiffs, the luxury and regional jet business was a significant part of their business plan.  Plaintiffs state that they constructed the Lemmon Avenue Terminal to cater to the market for first-class airplanes flying out of Love Field with destinations to Los Angeles, New York, and Washington, DC.  Dallas, plaintiffs allege, eventually "incorporated the six gates" at the Lemmon Avenue Terminal into a master plan for expansion of Love Field ("Love Field Master Plan").  Compl. ¶ 7.

Love Terminal Partners licensed the Lemmon Avenue Terminal to Legend.  Plaintiffs acknowledge that Legend's ability to commence air transportation services was undermined by the several years of litigation of which it was a part.  Legend ultimately filed for bankruptcy protection in 2000.  Thereafter, the Lemmon Avenue Terminal reverted back to Love Terminal Partners.

On December 12, 2003, Virginia Aerospace, a Virginia limited liability corporation with its principal place of business in Dallas, acquired the Master Lease, subject to the Love Terminal Partners sublease, to provide commercial passenger airline service at Love Field in conjunction with Love Terminal Partners.  Plaintiffs ultimately "planned to expand the terminal and related air passenger services beyond the 9 acres subleased by [Love Terminal Partners] as air traffic at Love Field increased."  Id. ¶ 3.  In 2006, plaintiffs entered into negotiations with Pinnacle Airlines, Inc. ("Pinnacle") to assign their leasehold interests in the Lemmon Avenue Terminal.  Such an agreement "would have introduced a new competitive airline to the Love Field market, increased competition by using a terminal that was not subject to control by Dallas, and introduced competition into markets monopolized by Southwest and Dallas."  Love Terminal Partners, L.P., 527 F. Supp. 2d at 544.  Although plaintiffs and Pinnacle worked to complete the transfer of plaintiffs' interests in the leases on the land and the Lemmon Avenue Terminal, they ultimately failed to reach an agreement.[10]

--------

that the "sole purpose in leasing the terminal premises was to construct and operate . . . a private commercial airline terminal to provide luxury air passenger service at Love Field."  Pls.' Ex. 1 at 2 (Decl. Alan Naul ("Naul Decl.") ¶ 4).

  [9]  Lemmon Avenue provided "uninhibited access to the . . . facility, and allow[ed] passengers using the facility to bypass the congestion associated with the older, less well-situated terminal[] owned by the city of Dallas."  Pls.' Ex. 1 at 2 (Naul Decl. ¶ 5).  Mr. Naul opined that the Lemmon Avenue Terminal was "one of the newest in the nation, and the only privately owned terminal at a public airport."  Id.

  [10]  In an antitrust lawsuit filed in the Northern District of Texas, see infra Part I.F, plaintiffs alleged that negotiations with Pinnacle, which would have produced an agreement valued at approximately $100 million, were "almost complete" in June 2006, but ultimately fell

Plaintiffs also negotiated with other airlines, including JetBlue Airways.  Nevertheless, defendant asserts that plaintiffs "do not allege that there has been any regularly scheduled commercial air service utilizing the Lemmon Avenue Terminal since Legend's dissolution." Def.'s Mot. Dismiss Pls.' Compl. Failure State Claim ("Def.'s Mot.") 4.  According to plaintiffs, the September 11, 2001 terrorist attacks significantly and adversely affected their business as well as air transportation generally.

## E.  Efforts to Amend or Repeal the Wright Amendment

In late 2004, Southwest initiated a new campaign to repeal the Wright Amendment.  In response, the Senate Committee on Commerce, Science, and Transportation conducted a hearing, after which Missouri Senator Kit Bond lobbied for through-ticketing to states outside of the Love Field service area.  Ultimately, Congress added only Missouri to the list of Wright Amendment exempted states.  See Transportation, Treasury, Housing and Urban Development, the Judiciary, the District of Columbia, and Independent Agencies Appropriations Act of 2006, Pub. L. No. 109-115, § 181, 119 Stat. 2396.  Shortly thereafter, American opened additional ticket counters and gates at Love Field.

Thereafter, several bills were introduced in Congress concerning the repeal or modification of the Wright Amendment.  See H.R. 6228, 109th Cong. (2006); H.R. 5830, 109th Cong. (2005); H.R. 5576, §§ 901-906, 109th Cong. (2006).  Southwest advocated for a complete repeal of the Wright Amendment.  American, by contrast, "lobbied for . . . , at a minimum, continuation of the Wright Amendment restrictions."  Love Terminal Partners, L.P., 527 F. Supp. at 545.

### 1.  Congress Recommends a Local Solution

In March 2006, members of Congress, recognizing "decades of litigation and contentious debate among local communities, airports and airlines over the establishment and development of DFW, the subsequent use of Love Field, and proposed legislative changes to the Wright Amendment," H.R. Rep. No. 109-600, pt. 1, at 3, recommended that Dallas and Fort Worth jointly propose a solution to the problems caused by Wright Amendment, Love Terminal Partners, L.P., 527 F. Supp. at 545; accord S. Rep. No. 109-317, at 3.  Dallas and Fort Worth passed resolutions requesting that Congress "not act concerning the Wright Amendment" until the cities could propose a solution.  Love Terminal Partners, L.P., 527 F. Supp. 2d at 545; see also S. Rep. No. 109-317, at 3 (stating that both cities requested that Congress "provide them time to develop a local solution").  On June 16, 2006, the mayors of Dallas and Fort Worth, together with other officials, announced an agreement, issuing a "Joint Statement Among the

_____

through after Mayor Laura Miller publicly announced that Dallas intended to demolish the Lemmon Avenue Terminal.  Love Terminal Partners, L.P., 527 F. Supp. 2d at 554-55.  Plaintiffs alleged that Mayor Miller "made this statement before any public meeting was convened on the issue . . . ."  Id. at 555.  Pinnacle subsequently terminated the negotiations.  Id.

10

City of Dallas, the City of Fort Worth, Southwest Airlines, American Airlines, and DFW International Airport to Resolve the 'Wright Amendment' Issues" ("Joint Statement").[11]  See Def.'s Mot. Ex. A.

The Joint Statement memorialized the signatories' commitment to seeking the enactment of legislation that would amend and ultimately repeal the Wright Amendment.  Among other provisions, the Joint Statement indicated that the signatories agreed that international commercial passenger service would be limited exclusively to DFW, and "[t]hrough ticketing to or from a destination beyond the 50 United States and the District of Columbia [would] be prohibited from Dallas Love Field."  Id. at 1 (Joint Statement ¶ 1(a)).  The Joint Statement signatories sought "to eliminate all the remaining restrictions on service from [Love Field] after eight years from the enactment of legislation," id. (Joint Statement ¶ 1(b)), and to reduce "as soon as practicable" the number of gates available for passenger air service at Love Field from thirty-two to twenty, id. (Joint Statement ¶ 3).  Dallas agreed to acquire "the portions of the lease on the Lemmon Avenue facility[,] up to and including condemnation, necessary to fulfill the obligations under this agreement" and to "demoli[sh] . . . the Legend gates immediately upon acquisition of the lease to ensure the facility can never again be used for passenger service."  Id. at 2 (Joint Statement ¶ 5).  The signatories also agreed that the Joint Statement was predicated on Congress enacting legislation to implement the terms of the agreement.

On July 11, 2006, the Joint Statement signatories executed a "Contract Among the City of Dallas, the City of Forth Worth, Southwest Airlines Co., American Airlines, Inc., and DFW

---

[11]  Plaintiffs, in Love Terminal Partners, L.P., asserted that

> [Dallas, Fort Worth, American, Southwest, and the DFW Board] had already begun conspiring . . . to divide the North Texas markets for commercial air passenger service.  In August 2005[,] Southwest and Dallas secretly discussed destroying the [Lemmon Avenue] Terminal.  The conspiracy proceeded in secret throughout 2005 and into February 2006.  By early February 2006, [Dallas, Fort Worth, American, Southwest, and the DFW Board] had agreed that the [Lemmon Avenue] Terminal should be destroyed to ensure the success of the scheme to divide the North Texas markets and to insulate Southwest from increased competition . . . .  [N]egotiations [continued] through a series of closed-door discussions . . . .
>
>         After several months of secret negotiations, Dallas, Fort Worth, [the] DFW Board, Southwest, and American issued . . . a [Joint Statement].

527 F. Supp. 2d at 545.  But see H.R. Rep. No. 109-600, pt. 1, at 3-4 (explaining that Dallas and Fort Worth approached Southwest and American separately, engaged in several months of deliberations, and formulated a consensus proposal that culminated in the parties' execution of the Joint Statement).

International Airport Board Incorporating the Substance of the Terms of the June 15, 2006 Joint Statement Between the Parties to Resolve the 'Wright Amendment' Issues" ("Contract," also referred to by the parties as the "Local Agreement"). <u>See</u> Pls.' Ex. 2. By executing the Contract, Dallas, Fort Worth, American, Southwest, and the DFW Board "bound themselves to the terms of the Joint Statement, with certain modifications." <u>Love Terminal Partners, L.P.</u>, 527 F. Supp. 2d at 545. The Contract indicated that

> [t]he Parties hereby represent to the Congress of the United States, and to the Citizens of the Dallas-Fort Worth [area] that they have approved of and support the proposed local solution. The Parties each separately covenant that they will not now or in the future, support, encourage or participate in any effort to defeat or modify or amend the legislation that is described in this Agreement.

Pls.' Ex. 2 at 6 (Contract art. I ¶ 14).

### 2. Enactment of the WARA

On July 13, 2006, two days after execution of the Contract, Texas Senator Kay Bailey Hutchison introduced S. 3661, "A bill to amend section 29 of the International Air Transportation Competition Act of 1979 regulating air transportation to and from Love Field, Texas." S. Rep. No. 109-317, at 14. Senator Hutchison's bill was enacted, as amended, as the WARA on October 13, 2006. Pub. L. No. 109-352, 120 Stat. 2011 (2006). As enacted, the WARA expanded service by permitting

> [a]ir carriers and, with regard to foreign air transportation, foreign air carriers, [to] offer for sale and provide through service and ticketing to or from Love Field, Texas, and any United States or foreign destination through any point within Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri, or Alabama.

§ 2(a), 120 Stat. at 2011. The WARA repealed the Wright Amendment in its entirety after a period of eight years. <u>Id.</u> § 2(b), 120 Stat. at 2011. It also addressed specific Contract provisions concerning the future of Love Field. Section 5 of the WARA, "Love Field Gates," provides:

> (a) IN GENERAL. – The city of Dallas, Texas, shall reduce as soon as practicable, the number of gates available for passenger air service at Love Field to no more than 20 gates. Thereafter, the number of gates available for such service shall not exceed a maximum of 20 gates. The city of Dallas, pursuant to its authority to operate and regulate the airport as granted under chapter 22 of the Texas Transportation Code and this Act, shall determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006. To

accommodate new entrant air carriers, the city of Dallas shall honor the scarce
resource provision of the existing Love Field leases.

(b) REMOVAL OF GATES AT LOVE FIELD. – No Federal funds or passenger
facility charges may be used to remove gates at the Lemmon Avenue facility,
Love Field, in reducing the number of gates as required under this Act, but
Federal funds or passenger facility charges may be used for other airport facilities
under chapter 471 of title 49, United States Code.[12]

Id. § 5(a)-(b), 120 Stat. at 2012 (footnote added).  The statute was not intended to affect general
aviation service at Love Field.[13]  Id. § 5(c), 120 Stat. at 2012.  The Love Terminal Partners, L.P.
court held "plainly and unambiguously incorporates all the rights and obligations of the
Contract."[14]  527 F. Supp. 2d at 558.

### F.  Plaintiffs' Legal Challenges

After execution of the Contract but before Congress enacted the WARA, plaintiffs filed
an antitrust lawsuit in the Northern District of Texas.  Mr. Naul explained:

In an all-out effort to save our business, on July 17, 2006, [plaintiffs] sued the
City of Dallas and the other parties to the July 11, 2006 agreement in the federal
district court for the Northern District of Texas, alleging that the July 16, 2006
agreement (codified a few months later in the [WARA]) was invalid under the
Sherman Antitrust Act [of 1890, 15 U.S.C. §§ 1-7 (2006),] as an agreement in
restraint of trade.  Separately, [plaintiffs] also filed suit in Texas State court,
alleging that the July 11, 2006 agreement had been negotiated in secret, in

---

[12]  Chapter 471 of title 49 of the United States Code governs airport development.  See 49
U.S.C. §§ 47101-47175 (2006).

[13]  Specifically,

[n]othing in this Act shall affect . . . flights to or from Love Field by general
aviation aircraft for air taxi service, private or sport flying, aerial photography,
crop dusting, corporate aviation, medical evacuation, flight training, police or fire
fighting, and similar general aviation purposes, or by aircraft operated by any
agency of the Federal Government or by any air carrier under contract to any
agency of the Federal Government.

Pub. L. No. 109-352, § 5(c), 120 Stat. at 2012.

[14]  The government contends that this holding by the Northern District of Texas was
incorrect.

> violation of the Texas Open Meetings Act [("TOMA"), Tex. Gov't Code Ann.
> §§ 551.001-.146 (West 2004 & Supp. 2007)].

Pls.' Ex. 1 at 2-3 (Naul Decl. ¶ 7) (footnotes omitted).  The Love Terminal Partners, L.P. court
determined that the parties' conduct in connection with the adoption of both the Joint Statement
and the Contract "represent[ed] the culmination of [their] efforts to petition Congress," 527 F.
Supp. 2d at 552, holding that the WARA "compel[led the signatories to the Contract] to
implement the terms of the Contract," id. at 560, and that the Joint Statement and Contract–as
well as the signatories' activities leading up to execution of the Joint Statement and Contract that
it determined were directed toward lobbying the government for legislative action–were immune
from antitrust liability under the Noerr-Pennington doctrine,[15] id. at 558.  A year later, the Court

---

[15]  The Noerr-Pennington doctrine is derived from two United States Supreme Court
("Supreme Court") decisions: Eastern Railroad Presidents Conference v. Noerr Motor Freight,
Inc., 365 U.S. 127 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657
(1965).  In Noerr Motor Freight, Inc., the Supreme Court determined that the Sherman Antitrust
Act of 1890 did "not apply to mere group solicitation of governmental action," observing that

> [t]he right of the people to inform their representatives in government of their
> desires with respect to the passage or enforcement of laws cannot properly be
> made to depend upon their intent in doing so.  It is neither unusual nor illegal for
> people to seek action on laws in the hope that they may bring about an advantage
> to themselves and a disadvantage to their competitors.

365 U.S. at 139.  The Supreme Court reasoned that "disqualify[ing] people from taking a public
position on matters in which they are financially interested would . . . deprive the government of
a valuable source of information" and "deprive the people of their right to petition in the very
instances in which that right may be of the most importance to them."  Id.  It therefore held that
the legality of efforts directed toward obtaining governmental action was "not at all affected by
any anticompetitive purpose it may have had."  Id. at 140.

    Four years later, the Pennington Court reaffirmed that "Noerr shields from the Sherman
Act a concerted effort to influence public officials regardless of intent or purpose," explaining
that "efforts to influence public officials do not violate the antitrust laws even though intended to
eliminate competition" since such conduct "is not illegal, either standing alone or as part of a
broader scheme itself violative of the Sherman Act."  381 U.S. at 670.  As the United States
Court of Appeals for the Federal Circuit ("Federal Circuit") recognized, the Noerr-Pennington
doctrine "immunizes, under the First Amendment, solicitation of government action even though
the sole purpose of the solicitation is to restrain competition."  Rodime PLC v. Seagate Tech.,
Inc., 174 F.3d 1294, 1307 (Fed. Cir. 1999); see also City of Columbia v. Omni Outdoor Adver.,
Inc., 499 U.S. 365, 379-80 (1991) (explaining that "federal antitrust laws . . . do not regulate the
conduct of private individuals in seeking anticompetitive action from the government").
Moreover, immunity under the Noerr-Pennington doctrine applies even when private parties

of Appeals of Texas affirmed the dismissal of plaintiffs' state claim.[16]  Love Terminal Partners, L.P., 256 S.W.3d at 895, 897.  According to Mr. Naul, "[t]he dismissal of both lawsuits . . . dashed [plaintiffs'] hopes for saving the[ir] business."  Pls.' Ex. 1 at 3 (Naul Decl. ¶ 9).

## G.  Plaintiffs Default on the Master Lease

While their lawsuits were pending, plaintiffs made monthly lease payments of approximately $45,000 to Dallas.  Id. (Naul Decl. ¶ 8).  Plaintiffs also paid approximately $100,000 per month in expenses associated with utilities, maintenance, insurance, and security services for the Lemmon Avenue Terminal.[17]  Id. (Naul Decl. ¶ 8).  Mr. Naul stated that

> [t]he failure of [plaintiffs'] legal challenges meant, as we well knew, that
> [plaintiffs] would never be allowed to use this property for air passenger service,
> that at least part (and probably all) of the terminal would be demolished (since it
> is hard to conceive how or why one would demolish the gates and leave the
> building standing).  [Plaintiffs] had no other prospect of deriving any significant
> income (other than some minor parking charges) from any of the [26.8] acres.

conspire with government officials to effectuate an anticompetitive outcome.  Omni Outdoor Adver., Inc., 499 U.S. at 382-83; see also id. at 383 (rejecting the need to create a "'conspiracy' exception to Noerr," indicating that "antitrust laws regulate business, not politics," and reasoning that "[t]he same factors which . . . make it impracticable or beyond the purpose of the antitrust laws to identify and invalidate lawmaking that has been infected by selfishly motivated agreement with private interests likewise make it impracticable or beyond that scope to identify and invalidate lobbying that has produced selfishly motivated agreement with public officials").

[16]  The Court of Appeals of Texas rejected plaintiffs' argument that the Joint Statement violated the TOMA and was therefore void, reasoning that the TOMA expressly provided that an action "'by a governmental body in violation of this chapter is voidable'–not void or void ab initio. . . .  If an action is void or void ab initio, the transaction is a nullity.  If, however, conduct is merely voidable, the act is valid until adjudicated and declared void."  Love Terminal Partners, L.P. v. City of Dallas, 256 S.W.3d 893, 897 (Tex. App. 2008) (quoting Tex. Gov't Code Ann. § 551.141) (footnote & citations omitted).  Furthermore, the Court of Appeals of Texas noted that, before the WARA was enacted, "there had been no adjudication declaring the Love Field Agreement void.  When the [WARA] incorporated the [C]ontract, Dallas' obligations, including demolition of the [Lemmon Avenue] Terminal, became a matter of federal law."  Id. Accordingly, the court determined that, "since Dallas' performance is now compelled by federal law, any challenge to the Love Field Agreement is moot."  Id.

[17]  According to Mr. Naul, plaintiffs incurred expenses for security "because there is direct access from the [Lemmon Avenue] Terminal to the runway and other sensitive airport facilities . . . ."  Pls.' Ex. 1 at 3 (Naul Decl. ¶ 8).

Id. (Naul Decl. ¶ 9).

On October 18, 2006, less than one week after enactment of the WARA, the Dallas City Council passed a resolution ("Dallas City Council Resolution") authorizing Dallas to acquire the Master Lease and the Love Terminal Partners sublease. Pls.' Ex. 6. The Dallas City Council acknowledged that "certain tracts of property on Lemmon Avenue at Love Field have, among other things, six gates that have not been used for commercial air passenger service since late 2000 . . . ." Id. at 2 (Dallas City Council Resolution Whereas ¶ 12). It determined that acquisition of "all or a portion of the leasehold interests, if any, on the Lemmon Avenue tracts in order to comply with the provisions of [the WARA]" was in the public interest. Id. (Dallas City Council Resolution Whereas ¶ 13). Accordingly, the Dallas City Council directed the city manager and city attorney

> to promptly take all necessary steps to ensure that the City of Dallas complies with the provisions of [the WARA] and all other applicable laws, including taking all appropriate steps to acquire, including the exercise of the right of eminent domain, if such becomes necessary, all or a portion of the leasehold interests, if any, from Virginia Aerospace . . . , Love Terminal Partners . . . , and all other persons claiming an interest in certain tracts of property at Love Field with addresses of 7701 and 7777 Lemmon Avenue.

Id. (Dallas City Council Resolution § 1). Acquisition of this property, the Dallas City Council indicated, was "for municipal and public purposes and a public use and that public necessity require[d] the acquisition." Id. (Dallas City Council Resolution § 2).

Plaintiffs learned that Dallas obtained an appraisal valuating their leaseholds. According to Mr. Naul, the appraisal valued the property "at next to nothing," which was not surprising to him because "the sole economic use of the terminal and leased area [wa]s for air passenger service and, under the [WARA], that use [wa]s forbidden." Pls.' Ex. 1 at 4 (Naul Decl. ¶ 10). Plaintiffs

> did not believe that [they] could obtain an appraisal showing significant value for the lease and terminal, given the provisions of the [WARA], and [they] therefore saw no reason to continue paying rent and other monthly charges during a condemnation proceeding, which would likely result in little, if any, compensation to [them].

Id. "Seeing no alternative," plaintiffs determined in March 2008 that they "must stop the financial hemorrhage of about $145,000 per month in rent and expenses for the . . . leases and terminal." Id. (Naul Decl. ¶ 11). To that end, plaintiffs informed Dallas of their intent to cease rental payments and to extricate themselves from the monthly costs of utilities, maintenance, insurance, and security. Id.

16

In a May 13, 2008 letter to plaintiffs, Daniel T. Weber, Director of Aviation for Dallas, advised that plaintiffs' failure to provide security and other services at the Lemmon Avenue Terminal and related facilities constituted a breach of the Master Lease:

> We understand from your May 8, 2008, letter that . . . Virginia Aerospace . . . and Love Terminal Partners . . . no longer have tenants, staff, or utilities on the leased premises. This is a serious concern to the City of Dallas . . . .

> The City is obligated under its Federal grants with the Federal Aviation Administration . . . to keep Love Field and all the facilities which are necessary to serve the aeronautical users of the airport . . . "operated at all times in a safe and serviceable condition." . . . [T]hese obligations extend to [plaintiffs'] use of the leased premises. [At] a minimum, the leased premises must be kept safe and secure. [Plaintiffs] must ensure that all locks are working properly, all secured areas are kept secure, and the absence of utilities on the leasehold does not compromise the security or safety of Love Field. Failure to comply with these standards will both violate Federal requirements and constitute a breach of Virginia Aerospace's and Love Terminal Partners' lease obligations.

Pls.' Ex. 5 at 1. On May 22, 2008, Dallas notified plaintiffs that their failure to make monthly lease rental payments for April 2008 and May 2008 constituted a breach of the Master Lease, and further advised that, "[i]n the event that the delinquent rental payments [were] not paid to the City . . . , the City [would] proceed to enforce any and all of the rights and remedies that it may have under the terms of the Lease, or that the City may have in law or equity." Pls.' Ex. 3 at 3.

Following significant discussions between the parties, Dallas, on November 20, 2008, informed plaintiffs that their lease rights were terminated and demanded that plaintiffs vacate the premises for failure to pay rent. Dallas then instituted eviction proceedings against plaintiffs. On December 9, 2008, Dallas obtained a final judgment granting it possession of the premises. Plaintiffs estimate that, from June 2006 until they surrendered possession of the premises in December 2008, they spent approximately $3.8 million in rent and other expenses.

### H. Plaintiffs' Property Interests

The property interests plaintiffs claim they possess are threefold. First, plaintiffs assert ownership interests in leaseholds. Love Terminal Partners asserts a leasehold interest in nine acres of land encompassed under the Master Lease that it subleased in order to provide commercial air passenger service at Love Field. Virginia Aerospace asserts a leasehold interest in the Master Lease, subject to the Love Terminal Partners sublease. These leaseholds, plaintiffs contend, granted them the right to exclude others from entry upon the property encompassed therein. Second, plaintiffs assert a property right to engage in commercial air passenger service at Love Field, as authorized under their respective leases. Third, Love Terminal Partners asserts

17

an ownership interest in the Lemmon Avenue Terminal, which it constructed in 1999 and over which it asserted an exclusive right to use, rent, alter, renovate, and lease space within that facility.

## II.  PROCEDURAL HISTORY

Plaintiffs filed their complaint in the United States Court of Federal Claims ("Court of Federal Claims") on July 23, 2008.  On January 5, 2009, while briefing on the government's motion was pending, plaintiffs moved the court to schedule a site inspection of the premises encompassed by the Master Lease because Dallas planned to demolish the Lemmon Avenue Terminal.  Pls.' Mot. Schedule Site Inspection Before Demolition Leased Premises 1; see also id. Ex. 1 (containing a December 24, 2008 letter from Christopher Caso, Assistant City Attorney, representing that Dallas "agree[d] to postpone the demolition of any structures on the property prior to the judge's inspection").  The court granted the motion, see Order, Jan. 5, 2009, and, on March 25, 2009, toured the Love Field facilities, as well as the Lemmon Avenue Terminal and other structures on the leased premises, with counsel, Messrs. Naul and Caso, and other officials representing Dallas and Love Field.  Plaintiffs advised the court that demolition of the Lemmon Avenue Terminal gates commenced in August 2009 and was completed in September 2010.

## III.  LEGAL STANDARDS

### A.  Nature of a Fifth Amendment Takings Claim

"The chief and one of the most valuable characteristics of the bundle of rights commonly called 'property' is 'the right to sole and exclusive possession–the right to exclude strangers, or for that matter friends, but especially the Government.'"  Mitchell Arms, Inc. v. United States, 7 F.3d 212, 215 (Fed. Cir. 1993) (quoting Hendler v. United States, 952 F.2d 1364, 1374 (Fed. Cir. 1991)).  The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  This provision "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Armstrong v. United States, 364 U.S. 40, 49 (1960).  The Takings Clause does not prohibit the taking of property.  Rather, it proscribes a taking without just compensation.  Brown v. Legal Found. of Wash., 538 U.S. 216, 235 (2003); see also First English Evangelical Lutheran Church of Glendale v. County of L.A., 482 U.S. 304, 315 (1987) (explaining that the Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking").  "Real property, tangible property, and intangible property all may be the subject of takings claims."  Conti v. United States, 291 F.3d 1363, 1338-39 (Fed. Cir. 2002) (citations omitted).  Lease rights are recognized property rights that are subject to the Takings Clause.  See Lynch v. United States, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation.  Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."); see also U.S. Trust Co. of N.Y. v. New Jersey, 431

18

U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978) ("As a general proposition, a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for the value thereof." (citing Lemmons v. United States, 496 F.2d 864, 873 (Ct. Cl. 1974))). The Court of Federal Claims possesses jurisdiction over takings claims against the United States. See Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("[T]he 'just compensation' required by the Fifth Amendment has long been recognized to confer upon property owners whose property has been taken for public use the right to recover money damages from the government."); Russell v. United States, 78 Fed. Cl. 281, 289 (2007) ("The Takings and Just Compensation Clauses of the Fifth Amendment do constitute a money-mandating source and claims under these clauses are within the jurisdiction of the court.").

The Supreme Court "has recognized that the government may 'take' private property by either physical occupation or regulation." Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1135 (Fed. Cir. 2004); see also Yee v. City of Escondido, Cal., 503 U.S. 519, 522-23 (1992) (describing "two distinct classes" of takings: (1) physical occupation of property; and (2) regulation of the use of property); Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009) ("A 'taking' may occur either by physical invasion or by regulation."); Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1378 (Fed. Cir. 2008) ("A compensable taking can occur not only through the government's physical invasion or appropriation of private property but also by government regulations that unduly burden private property interests[.]" (citation omitted)), aff'g 75 Fed. Cl. 642 (2007), cert. denied, 129 S. Ct. 626 (2008). The analysis employed with respect to cases involving a physical occupation, "for the most part, involves the straightforward application of per se rules," whereas "regulatory takings jurisprudence . . . is characterized by 'essentially ad hoc, factual inquires,' designed to allow 'careful examination and weighing of all the relevant circumstances.'"[18] Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002) (quoting Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124 (1978)); see also Yee, 503 U.S. at 523 ("The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions."). Nevertheless, courts have recognized that "there is no bright line between physical and regulatory takings."[19] Estate of Hage, 82 Fed. Cl. at 208.

---

[18] A categorical taking, which is also referred to as a per se taking, see Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 477-78 (2009), may also result from regulatory restrictions placed on property. See infra Part III.A.2.

[19] Indeed, Estate of Hage v. United States is one such example. In that case, the plaintiffs owned land and operated a ranch in central Nevada that was used for grazing cattle and livestock. 82 Fed. Cl. 202, 205 (2008). The Nevada Department of Wildlife received permission from the United States Forest Service ("Forest Service") to release elk into the region where the plaintiffs' ranch was located. Id. at 206. The plaintiffs objected, contending that the elk drank water and ate forage that belonged to them. Id. Thereafter, the Forest Service erected electric fences that

The Federal Circuit "has developed a two-step approach to takings claims." Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002); accord Acceptance Ins. Cos., 583 F.3d at 854.  First, a plaintiff must identify the property interest that was allegedly taken.  Nw. La. Fish & Game Pres. Comm'n v. United States, 79 Fed. Cl. 400, 408 (2007); see also Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) ("[A] court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'").  Second, "[o]nce a property right has been established, the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public." Members of Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing Conti, 291 F.3d at 1339); see also Ammon, 209 F.3d at 1374 ("If a plaintiff possesses a compensable property right, . . . a court determines whether the governmental action at issue constituted a taking of that 'stick.'" (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995))).  Courts "do not reach this second step without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

"Whether a compensable taking has occurred is a question of law based on factual underpinnings." Maritrans Inc. v. United States, 342 F.3d 1344, 1350 (Fed. Cir. 2003).  While takings cases involve fact-intensive inquiries, see Penn Cent. Transp. Co., 438 U.S. at 124; see also Ammon, 209 F.3d at 1374 (noting that the second step of the court's analysis is "an intensely factual inquiry"), such inquiries are "not standardless," Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982).

---

excluded the plaintiffs' cattle from waters and nearby forage owned by the plaintiffs. Id.  Years later, the Forest Service, finding that certain lands were "overgrazed," ordered the plaintiffs to remove their cattle. Id. at 206-07.  Eventually, the Forest Service twice impounded the plaintiffs' cattle, selling them at auction and retaining the proceeds. Id.

Addressing the plaintiffs' takings claim, the Court of Federal Claims determined that a physical taking occurred as a result of the government's construction of fences around streams in which the plaintiffs had established a vested water right, explaining that the Forest Service's activities constituted a "'physical ouster' which deprived Plaintiffs of the use of their property." Id. at 211.  It also determined that various Forest Service policies deprived the plaintiffs of access to their lands and effected a regulatory taking. Id. at 211-12.  The "severe reduction in water flow to Plaintiffs' patented lands," the court concluded, "deprived them of the water they needed for irrigation[,] making the ranch unviable and which they could have sold in the market." Id. at 212.  A regulatory taking, the court determined, also resulted from the Forest Service preventing the plaintiffs from accessing, and limiting their ability to maintain, various ditches. Id. at 212-13.

### 1. Physical Takings

A physical taking constitutes "a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property." Boise Cascade Corp., 296 F.3d at 1353; see also Loretto, 458 U.S. at 426 ("[A] permanent physical occupation authorized by government is a taking . . . ."); Hendler, 952 F.2d at 1375 ("A physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking . . . ."). A physical taking occurs when "government encroaches upon or occupies private land for its own proposed use." Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001); see also Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 832 (1987) (explaining that a "permanent physical occupation" occurs "where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises"). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 322 (citing United States v. Pewee Coal Co., 341 U.S. 114, 115 (1951)); see also Yee, 503 U.S. at 522 ("Where the government authorizes a physical occupation of property (or actually takes title) the Takings Clause generally requires compensation."). A permanent physical occupation "is a per se physical taking . . . because it destroys, among other rights, a property owner's right to exclude." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1356 (Fed. Cir. 2006), aff'd on other grounds, 552 U.S. 130 (2008); accord Kaiser Aetna v. United States, 444 U.S. 164 (1979) (characterizing the right to exclude others as "one of the most essential sticks in the bundle of rights that are commonly characterized as property").

"A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property–perhaps the most fundamental of all property interests." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539 (2005). Permanent, however, "does not mean forever, or anything like it." Hendler, 952 F.2d at 1376. "[T]he concept of permanent physical occupation does not require that in every instance the occupation be exclusive, or continuous and uninterrupted." Id. at 1377. In fact, the Federal Circuit noted that "[a]ll takings are 'temporary,' in the sense that the government can always change its mind at a later time . . . ." Id. at 1376. Moreover, the physical occupation "need not occur directly, but can be found in a physical injury to real property substantially contributed to by a public improvement." Applegate v. United States, 35 Fed. Cl. 406, 414 (1996).

The inquiry in a physical takings case "is limited to whether the claimant can establish a physical occupation of his property by the Government." Id. In Loretto, the Supreme Court explained: "[W]hen the 'character of the governmental action' is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." 458 U.S. at 434-35 (citation omitted). While physical takings precedents are not necessarily applicable to cases in which a regulatory taking has been alleged, Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 323, "a pure physical taking rarely exists 'because

21

our government and its agents rarely seize or occupy property without some arguable legal or regulatory authority,'"[20] Roth v. United States, 73 Fed. Cl. 144, 148 (2006) (quoting Store Safe Redlands Assocs. v. United States, 35 Fed. Cl. 726, 728 (1996)).

## 2. Regulatory Takings

A regulation that restricts the use of property or unduly burdens private property interests is not a physical taking. Huntleigh USA Corp., 525 F.3d at 1378; Tuthill Ranch, Inc., 381 F.3d at 1137. The Federal Circuit characterizes a regulatory taking as one in which "the government prevents the landowner from making a particular use of the property that otherwise would be permissible." Forest Props., Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999) (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 (1992)). Until the Supreme Court's decision in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922), "it was generally thought that the Takings Clause reached only a 'direct appropriation' of property or the functional equivalent of a 'practical ouster of [the owner's] possession.'" Lucas, 505 U.S. at 1014 (quoting Transp. Co. v. Chicago, 99 U.S. 635, 642 (1879); Legal Tender Cases, 79 U.S. (12 Wall.) 457, 551 (1870)) (alteration in original) (citation omitted). "Beginning with Mahon, . . . the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster–and that such 'regulatory takings' may be compensable under the Fifth Amendment." Lingle, 544 U.S. at 537; see also Members of Peanut Quota Holders Ass'n, 421 F.3d at 1330 ("While a taking often occurs as a result of a physical invasion or confiscation, the Supreme Court has long recognized that 'if a regulation goes too far it will be recognized as a taking.'" (quoting Mahon, 260 U.S. at 415)).

---

[20] Indeed, the physical taking of property that occurred in Loretto, namely, the installation of cable television devices in apartment buildings, was authorized by a state law regulating landowners by preventing interference with the installation of cable television equipment on their property. See 458 U.S. at 421, 423-24; see also Penn Cent. Transp. Co., 438 U.S. at 122 (stating that the Fifth Amendment "is made applicable to the States through the Fourteenth Amendment" (citing Chicago, B. & Q. R.R. Co. v. Chicago, 166 U.S. 226, 239 (1897))). The Supreme Court did not question whether the statute in question served a legitimate public purpose and therefore fell within the state's police powers. Instead, it addressed whether "an otherwise valid regulation so frustrate[d] property rights that compensation must be paid." Loretto, 458 U.S. at 425; see also Lingle, 544 U.S. at 539 (explaining that a "common touchstone" in takings jurisprudence is the "severity of the burden that government imposes upon private property rights"). In fact, the Supreme Court has upheld land-use regulations that either destroyed or adversely affected recognized property interests "in instances in which a . . . tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land . . . ." Penn Cent. Transp. Co., 438 U.S. at 125.

Regulatory takings are subdivided into two categories: (1) categorical and (2) noncategorical.[21]  Huntleigh USA Corp., 525 F.3d at 1378 n.2.  A categorical taking is one in which "all economically viable use, i.e., all economic value, has been taken by the regulatory imposition."  Palm Beach Isles Assocs. v. United States, 231 F.3d 1354, 1357 (Fed. Cir. 2000); see also Lucas, 505 U.S. at 1015 (indicating that categorical treatment is appropriate "where regulation denies all economically beneficial or productive use of land").  Thus, "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Lucas, 505 U.S. at 1019.  A categorical taking, like a permanent physical invasion of property, is deemed a per se taking under the Fifth Amendment.  See Lingle, 544 U.S. at 538; see also Res. Invs., Inc., 85 Fed. Cl. at 477 (stating that "[g]overment regulation goes 'too far,' and effects a total or 'categorical' taking, when it deprives a landowner of all economically viable use of his 'parcel as a whole'").

A noncategorical taking "fall[s] short of eliminating all economically beneficial use of property."  Consumers Energy Co. v. United States, 84 Fed. Cl. 152, 156 (2008) (citing Palazzolo, 533 U.S. at 617).  A noncategorical taking is the "consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use . . . ."  Palm Beach Isles Assocs., 231 F.3d at 1357.  "Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors . . . ."  Palazzolo, 533 U.S. at 617 (citing Penn Cent. Transp. Co., 438 U.S. at 124).  As Justice Brennan explained in Penn Central Transportation Co., the Supreme Court had "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government," 438 U.S. at 124, and instead focused "largely 'upon the particular circumstances [in that] case,'" id. (quoting United States v. Cent. Eureka Mining Co., 357 U.S. 155, 168 (1958) (alteration in original)).  Nevertheless, the Penn Central Transportation Co. Court extrapolated from prior decisions "several factors that have particular significance," namely: (1) economic impact of the regulation on the plaintiff; (2) extent to which the regulation has interfered with distinct investment-backed expectations; and (3) character of the governmental action.[22]  438 U.S. at 124; see also Lingle, 544 U.S. at 540 (stating that the Penn Central Transportation Co. inquiry "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests").  Such a test for regulatory

---

[21]  Regulatory takings may be temporary or permanent, though these takings "'are not different in kind.'  Both require compensation."  Kemp v. United States, 65 Fed. Cl. 818, 823 n.2 (2005) (quoting First English Evangelical Luteran Church of Glendale, 482 U.S. at 318) (citation omitted).

[22]  "The Penn Central [Transportation Co.] factors–though each has given rise to vexing subsidiary questions–have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules."  Lingle, 544 U.S. at 539.

takings requires a comparison of "the value that has been taken from the property with the value that remains in the property . . . ."  Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987).  While the Supreme Court's regulatory takings jurisprudence "cannot be characterized as unified," courts "aim[] to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."  Lingle, 544 U.S. at 539.

### 3.  The Lucas "Antecedent Inquiry"

A plaintiff must demonstrate title to a property right that has been purportedly taken. Good v. United States, 39 Fed. Cl. 81, 84 (1997).  In Lucas, the Supreme Court explained: "Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1027.  This approach, the Lucas Court indicated, "accords . . . with our 'takings' jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property."  Id.

A "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers[.]" Id.; see also Hendler v. United States, 38 Fed. Cl. 611, 615 (1997) ("Because a property owner does not have a right to use his property in a manner harmful to public health or safety, the government's exercise of its powers to protect public health or safety does not constitute a compensable taking of any of the owner's property rights."), aff'd, 175 F.3d 1374 (Fed. Cir. 1999).  Moreover, a taking does not occur if the government's common law nuisance and property principles prohibit the desired land use:

> Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership.  A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts–by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally . . . .

Id. at 1029; accord Severance v. Patterson, No. 09-0387, 2010 WL 4371438, at *23 (Tex. Nov. 5, 2010) ("Property owners may not use their property in a way that unreasonably interferes with the property rights of others.").  The Lucas Court rejected as inconsistent with the Takings Clause the notion that a landowner's title "is somehow held subject to the 'implied limitation' that the State may subsequently eliminate all economically valuable use . . . ." 505 U.S. at 1028. Moreover, the government bears the burden of "identify[ing] background principles of nuisance

and property law that prohibit" the plaintiff's use of the property.  Id. at 1031.

## B. Ripeness

"When considering a Fifth Amendment takings claim, the court first must consider whether plaintiffs' claims have ripened."  Benchmark Res. Corp. v. United States, 74 Fed. Cl. 458, 463 (2006).  Where applicable, the ripeness doctrine may constrain a court's ability to adjudicate a case.  See id. ("In holding a claim to be unripe, the court essentially is refusing to exercise jurisdiction over the case.").  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . .'"  Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 807 (2003) (quoting Abbot Labs. v. Gardner, 387 U.S. 136, 148-49 (1967)).  The ripeness doctrine is derived from both "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."[23]  Id. at 808 (citing Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)).  Courts, when addressing ripeness, must make a fact-specific determination of "whether the issues are fit for judicial decision" and "whether there is sufficient risk of suffering immediate hardship."  Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1580-81 (Fed. Cir. 1993).  "[T]he question of ripeness may be considered on a court's own motion."  Nat'l Park Hospitality Ass'n, 538 U.S. at 808 (citing Reno, 509 U.S. at 57 n.18).

As the Court of Federal Claims recognized in McDonald v. United States, a takings cause of action, whether physical or regulatory, "first accrues when 'all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'"  37 Fed. Cl. 110, 114 (1997) (quoting Hopland Band of Pomo Indians v. United States, 844 F.2d 1573, 1577 (Fed. Cir. 1988)); see also Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994) (indicating that a claim accrues when the government, "by some specific action, took a private property interest for a public use without just compensation"); Goodrich v. United States, 63 Fed. Cl. 477, 480 (2005) ("When a taking is pleaded, a claim accrues when the taking occurs.").  A determination of when a takings claim accrues is governed by an objective standard.  Otay Mesa Prop. L.P. v. United States, 86 Fed. Cl. 774, 785 (2009) (citing Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995)), appeal docketed, No. 2011-5008 (Fed. Cir. Oct. 13, 2010).  With respect to a physical takings claim, "if the United States has entered into possession of the property[,] . . . [i]t is that event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued and the Government's obligation to pay interest accrues."  United States v. Dow, 357 U.S.

_____

[23]  Congress created the Court of Federal Claims under Article I of the Constitution.  28 U.S.C. § 171(a).  Courts established under Article I are not bound by the "case or controversy" requirement of Article III.  Zevalkink v. Brown, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  However, the Court of Federal Claims and other Article I courts traditionally apply the "case or controversy" justiciability doctrines in their cases for prudential reasons.  See id.; CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000).  These doctrines include ripeness, standing, mootness, and political questions.  Fisher, 402 F.3d at 1176 (panel portion).

17, 22 (1958).  However, "[t]here is . . . some doubt regarding the date of the accrual of a physical taking claim versus the date at which such a claim becomes ripe for litigation."  Barlow & Haun, Inc. v. United States, 87 Fed. Cl. 428, 435 (2009); see also Caldwell v. United States, 391 F.3d 1226, 1234 (Fed. Cir. 2004) ("It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.").

A regulatory takings claim will not accrue until the claim is ripe.  Royal Manor, Ltd. v. United States, 69 Fed. Cl. 58, 61 (2005).  "A regulatory taking claim is ripe (and thus accrues) when 'the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.'"  Barlow & Haun, Inc., 87 Fed. Cl. at 435 (quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 191 (1985)).  "When the taking is effected by legislation, the taking accrues on the enactment of the legislation introducing the physical taking."  Kemp, 65 Fed. Cl. at 822 (citing Fallini, 56 F.3d at 1382-83); see also Whitney Benefits, Inc. v. United States, 752 F.2d 1554, 1558 (Fed. Cir. 1985) ("The complaint alleges a legislative taking, effective to accrue the claim on the date of the enactment of the statute . . . ."); Entines v. United States, 39 Fed. Cl. 673, 679 (1997) ("When the government takes private property pursuant to legislative directive, any resulting takings claims accrue when the legislation becomes effective.").  A takings claim predicated upon an act of Congress accrues on the date of the legislative enactment because "it is fundamental jurisprudence that the [a]ct's objective meaning and effect were fixed when the [a]ct was adopted.  Any later judicial pronouncements simply explain, but do not create, the operative effect."  Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564, 1570 (Fed. Cir. 1993).

## C.  RCFC 12(b)(6) Motion to Dismiss

An RCFC 12(b)(6) motion tests the sufficiency of a complaint.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007); see also RhinoCorps Ltd. Co. v. United States, 87 Fed. Cl. 481, 492 (2009) ("A motion made under Rule 12(b)(6) challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced.").  The purpose of RCFC 12(b)(6) "is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity."  Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citing Neitzke v. Williams, 490 U.S. 319, 326-27 (1989)).  When considering an RCFC 12(b)(6) motion, the court "must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail."  Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982)).  A failure to allege a cause of action upon which relief can be granted warrants a judgment on the merits rather than a dismissal for want of jurisdiction.  Litecubes, LLC v. N. Light Prods., Inc., 523 F.3d 1353, 1361 (Fed. Cir. 2008).

The Supreme Court clarified the degree of specificity with which a plaintiff must plead facts sufficient to survive a Rule 12(b)(6) motion in Bell Atlantic Corp., stating that "a plaintiff's

obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  550 U.S. at 555 (citation & quotation marks omitted).  While a complaint need not contain "detailed" factual allegations, those "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."[24]  Id.  In other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp., 550 U.S. at 556).  This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.; see also id. (stating that a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (citing Bell Atl. Corp., 550 U.S. at 555)). Neither allegations "that are 'merely consistent with' a defendant's liability," id. (quoting Bell Atl. Corp., 550 U.S. at 557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are sufficient, id. (citing Bell Atl. Corp., 550 U.S. at 555).

The court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant."  United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (citations & quotation marks omitted); accord Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001).  Courts "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record" when deciding a motion to dismiss.  Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  However, materials appearing in the record of the case may also be taken into account without converting a motion to dismiss into one for summary judgment.  5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004); cf. RCFC 12(d) ("If, on a motion under RCFC 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56.").  Courts have "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion" and rely upon that material.  5C Wright & Miller, supra, at § 1366.  Such discretion generally is exercised when the proffered material is "likely to facilitate the disposition of the action."  Id.

### D.  Motion for Summary Judgment

Plaintiffs filed a cross-motion for partial summary judgment pursuant to RCFC 56. Issues of statutory interpretation and other matters of law may be adjudicated on a motion for

---

[24]  In so holding, the Supreme Court determined that the "no set of facts" language set forth in Conley v. Gibson, 355 U.S. 41, 45 (1957), had "earned its retirement."  Bell Atl. Corp., 550 U.S. at 563.

summary judgment.  Santa Fe Pac. R.R. Co. v. United States, 294 F.3d 1336, 1340 (Fed. Cir. 2002).  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Sharp v. United States, 580 F.3d 1234, 1237 (Fed. Cir. 2009).  The moving party, which bears the initial burden of demonstrating the absence of genuine issues of material fact, Celotex Corp., 477 U.S. at 323, discharges its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case," A Olympic Forwarder, Inc. v. United States, 33 Fed. Cl. 514, 518 (1995).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Cloutier v. United States, 19 Cl. Ct. 326, 328 (1990) ("A material fact is one which will make a difference in the result of a case."), aff'd, 937 F.2d 622 (Fed. Cir. 1991).  "[W]hen establishing entitlement to judgment as a matter of law, the movant must present material facts to support the legal elements of its claim."  Liquidating Tr. Ester Duval of KI Liquidation, Inc. v. United States, 89 Fed. Cl. 29, 38 (2009).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.  The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions.  Celotex Corp., 477 U.S. at 324.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial, id., and must come forward with "specific facts showing that there is a genuine issue for trial," RCFC 56(e).

The court must view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  If the nonmoving party produces sufficient evidence to raise a genuine issue of fact material to the outcome of the case, then the motion for summary judgment should be denied.  Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001).  Even where the facts are not disputed, the moving party still must demonstrate that it is entitled to judgment as a matter of law.  Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co., 475 U.S. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).  Following "adequate time for discovery," entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

## IV.  DISCUSSION

Defendant asserts that plaintiffs fail to allege facts that support a finding that the government effected a physical or regulatory taking of plaintiffs' property interest.  According to defendant, no physical taking has occurred in this case because the United States did not acquire plaintiffs' airport facilities and lease rights.  Moreover, defendant argues, no regulatory taking occurred because the WARA does not limit plaintiffs' use of the property.  In support of its argument, defendant notes that the statute omits any reference to plaintiffs or their property.

Plaintiffs counter by arguing that the WARA requires Dallas to acquire all or part of their lease and demolish the six gates Love Terminal Partners constructed at the Lemmon Avenue Terminal. Additionally, plaintiffs argue that the government's enactment of the WARA effected a per se taking that destroyed all the economically beneficial use of their leased property, including the terminal, and their right to fly commercial passenger flights from their terminal. According to plaintiffs, these allegations state a Fifth Amendment takings claim that survives defendant's motion.

Plaintiffs further argue that they are entitled to summary judgment because the WARA requires Dallas to demolish passenger gates built by Love Terminal Partners at the Lemmon Avenue Terminal, actions they contend constitute a physical taking. Prior to the enactment of the WARA, Love Terminal Partners possessed the right to exclude Dallas from demolishing its passenger gates. It has been long recognized that the right to sole, exclusive possession, in other words, the right to exclude, is "one of the most valuable characteristics of the bundle of rights commonly called 'property . . . .'" Mitchell Arms, Inc., 7 F.3d at 215 (quoting Hendler, 952 F.2d at 1374). Love Terminal Partners, plaintiffs assert, lost that right when the WARA mandated demolition of its passenger gates as part of the overall plan to reduce the number of available gates at Love Field from thirty-two to twenty and ensure that the Lemmon Avenue Terminal gates could never be used for air passenger service. According to plaintiffs, the WARA's requirement that the Love Field passenger gates be demolished effected a legislative taking that entitles them to just compensation.

## A. Plaintiffs' Takings Claim Is Ripe

As an initial matter, the court addresses defendant's argument that plaintiffs' claim is unripe. Ripeness, of course, is an issue that the court may address sua sponte. Coalition for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs, 464 F.3d 1306, 1316 (Fed. Cir. 2006); supra Part III.B. Defendant emphasizes that, at the time plaintiffs filed their complaint,

> the Lemmon Avenue Terminal ha[d] not been physically impacted by anyone. Thus, any allegation by Plaintiffs that the possible future demolition of the facility may result in a taking of their property for which they are entitled to compensation fails for lack of ripeness. . . . To the extent that Plaintiffs are alleging a taking of their property resulting from the possible future destruction of the Lemmon Avenue Terminal, the Court must also dismiss the claim pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction.

Def.'s Mot. 11 n.7. Defendant maintains that the mere passage of the WARA effectuated no taking because no physical occupation or intrusion of plaintiffs' property had occurred. According to defendant, Dallas would need to take specific action that interfered with the property before a taking would occur. As mentioned above, such action occurred with the demolition of the Lemmon Avenue Terminal gates that began in August 2009 and concluded in

September 2010.

Plaintiffs argue that their complaint alleges a legally cognizable legislative taking because enactment of the WARA deprived them of, among other things, the right to exclude, thereby constituting a per se, physical taking.  They assert that the date Dallas demolished the Lemmon Avenue Terminal gates is not relevant to the takings analysis because a statute that precludes a property owner of the right to exclude is a per se taking and, consequently, a legislative taking is ripe on the day legislation containing such a provision becomes law.  According to plaintiffs, any question of ripeness in this case is resolved by the Federal Circuit's decision in Fallini.[25]  The court agrees with plaintiffs.

In Fallini, Nevada cattle ranchers alleged that the government effected a taking of their property by requiring them to provide water to wild horses living in the area.[26]  56 F.3d at 1379. Although the Fallinis alleged in their complaint that the uncompensated taking commenced in 1971, the Fallinis did not file suit until 1992.[27]  Id. at 1381.  In support of their contention that their suit was timely filed, the Fallinis argued, among other things, that every drink taken by a wild horse since 1971 "constituted a separate taking."  Id.  The Federal Circuit determined that the Fallinis could not overcome the six-year limitations bar set forth in 28 U.S.C. § 2501.  Id. at 1381, 1383.

---

[25]  Plaintiffs also cite Loretto and Kemp, the latter of which relies upon Fallini, as well as several other cases, in support of their position.  Loretto did not directly address issues of ripeness.  Defendant notes that Fallini addressed a statute of limitations issue.

[26]  The Fallinis alleged that the Wild Free-Roaming Horses and Burros Act, which "prohibited the removal, destruction, or harassment of wild horses and burros found on public lands, and . . . authorized the Secretary of the Interior to issue regulations providing for the management of the wild horses and burros," effected a taking of their property because they were (1) required to provide water to wild horses and (2) prohibited from fencing their water sources in a way "that would permit cattle access to the water but prevent wild horses from having access."  Fallini, 56 F.3d at 1380.  The Court of Federal Claims granted summary judgment to the government, but the Federal Circuit vacated on statute of limitations grounds, never reaching the merits.  Id.

[27]  On October 3, 1983, the Fallinis sent a bill to the Bureau of Land Management seeking compensation for the water consumed by the wild horses.  Fallini, 56 F.3d at 1381.  That date, the Federal Circuit indicated, represented when the "'permanent nature' of the taking was evident to the Fallinis . . . ."  Id. at 1382.  Nevertheless, the Fallinis, in order to overcome the statute of limitations bar, advanced the theory that they experienced a continuous taking throughout the previous decade and that the taking "did not stabilize until November 28, 1986, a date slightly less than six years before the filing of their suit."  Id. at 1381.  The Federal Circuit rejected this argument.  Id. at 1382.

Analogizing the Fallinis' argument to a taking of real property, the Federal Circuit explained that when the government enacts legislation requiring a beachfront property landowner to allow others to walk along the beach, thereby creating an easement across the landowner's property, a separate and distinct taking of property does not occur each time a pedestrian utilizes the easement.  Id. at 1382 (citing Nollan, 483 U.S. at 831[28]).  The Federal Circuit reasoned that the "only governmental action" that constituted a taking was "the government's directive forbidding the Fallinis from shooing the horses away from the water that the Fallinis have produced at their developed water sources," not the recurrence of "every new drink taken by every wild horse."  Id. at 1383.  That directive occurred, the Federal Circuit indicated, in 1971 when Congress enacted the Wild Free-Roaming Horses and Burros Act, which the Fallinis themselves identified as the "governmental action that prevented them from fencing the horses away from their water sources . . . ."  Id.  Because the Fallinis "admit[ted] that they suffered injury from the date of enactment" of the Wild Free-Roaming Horses and Burros Act, the Federal Circuit concluded that, "[f]or purposes of claim accrual, such a taking occurs on the date of enactment of the legislation."  Id. at 1382-83.  Although defendant here contends that no physical taking would ever occur if Dallas did not access plaintiffs' property, Fallini suggests otherwise, instructing that, for purposes of determining when a taking occurred, a court must focus upon the date of "enactment of the statute" and not the individual intrusions upon the property committed thereafter.[29]  Id. at 1383; see also id. (noting that the proper focus, for statute of limitations purposes, was upon the time of the government's action, not the time of the consequences flowing therefrom (citing Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980))).

The Fallini court left open the question of what governmental action would constitute a taking if an intrusion occurred by an agent or instrumentality of the government.  Id.; supra note 29.  That situation arose in Kemp, which, like Fallini, raised a statute of limitations issue.  See 65 Fed. Cl. at 822.  Unlike Fallini, Kemp involved actions taken by the National Park Service ("NPS") to acquire the plaintiff's property following the enactment of a federal statute

---

[28]  The government distinguishes Nollan, arguing that the Supreme Court did not address the issue of ripeness and that, as was the case in Loretto, physical entry onto the property at issue had already occurred.  Here, the government emphasizes that no one has entered upon plaintiffs' property at the time plaintiffs filed their complaint.

[29]  The Fallini court noted that "[i]f the horses were agents or instrumentalities of the United States government, the analysis of what governmental action constituted the alleged taking might well be different.  But the horses are not agents of the Department of the Interior . . . ." 56 F.3d at 1383; see also Colvin Cattle Co. v. United States, 468 F.3d 803, 809 (Fed. Cir. 2006) ("[B]ecause wild horses are outside the government's control, they cannot constitute an instrumentality of the government capable of giving rise to a taking."); Mountain States Legal Found. v. Hodel, 799 F.2d 1423, 1428 (10th Cir. 1986) (en banc) (emphasizing the "fallacy" in an argument that "wild horses are, in effect, instrumentalities of the federal government whose presence constitutes a permanent governmental occupation of . . . property").

authorizing the expansion of Rocky Mountain National Park.[30]  Id. at 819; see Act of Dec. 22, 1980, Pub. L. No. 96-560, § 111(a), 94 Stat. 3265-274 (revising the boundaries of Rocky Mountain National Park).  The plaintiff alleged that the government used her property once the Act became law and did so for approximately nineteen years.  Kemp, 65 Fed. Cl. at 823; see also id. at 822 (recounting the plaintiff's allegations that, beginning on December 22, 1980, the National Park Service "began to allow 'the public to traverse and use the land without [her] permission or acquiescence'").  Notwithstanding her allegation that "'[u]pon the effective date of the Act, the United States utilized the property as its own and for public use as part of the [National Park],'" the plaintiff did not file suit until after the temporary taking ended.  Id. at 823 (alterations in original) (quoting the complaint).

        The Kemp court, relying upon Fallini, reiterated that "[w]hen the taking is effected by legislation, the taking accrues on the enactment of the legislation introducing the physical taking."  Id. at 822.  It explained: "[T]he taking accrued when the government legislation allowed [Rocky Mountain National Park] to start using the land as its own and deprived [plaintiff] of her right to exclude."  Id. at 824.  That right to exclude, the Kemp court reasoned, was extinguished upon the legislative enactment, not on the date that the public began traversing across the property.  See id. at 825.  Thus, Kemp suggests that the NPS's activities or encroachments on the property that occurred subsequent to the legislative enactment were irrelevant for the purpose of determining when the plaintiff's claim accrued because "only the original act permitting the public access is considered a compensable taking."  Id. (emphasis added).  Accordingly, even if no one entered the plaintiff's property within six years after the Act became law, the triggering action nevertheless remained the legislation's enactment: "Ms. Kemp's claim is barred by the statute of limitations because it was not filed within six years of the date the claim first accrued[] (December 22, 1980, the date on which the government expanded the boundaries of the National Park and began to use Ms. Kemp's land) . . . ."  Id. at 824; see also Hair v. United States, 52 Fed. Cl. 279, 283 (2002) (concluding that takings claims associated with the San Francisco Peace Treaty, which was ratified by the United States in April 1951 and waived all reparations claims of the Allied powers arising out of any actions taken by Japan during World War II, were untimely because "a taking claim based on a treaty accrues 'when the taking occurs,'" i.e., when the treaty extinguished the plaintiff's legal rights against the government (quoting Alliance of Descendants of Tex. Land Grants, 37 F.3d at 1482)).

        The same principle is evident in other cases.  For example, in Whitney Benefits, Inc., the Federal Circuit reversed a United States Claims Court determination that "no taking could have occurred up to the date of hearing and it was then uncertain whether a taking ever would occur" as a result of Congress's enactment of the Surface Mining Control and Reclamation Act.  752 F.2d at 1554.  It explained: "The complaint alleges a legislative taking, effective to accrue the claim on the date of enactment of the statute, but if a taking occurred on any later date, the court

_____

        [30]  The NPS is a federal agency within the United States Department of the Interior.  See 16 U.S.C. § 1 (2006) ("There is created in the Department of the Interior a service to be called the National Park Service . . . .").

would allow amendment, and the theory of dismissal was and could only be that it had not occurred at all and could not have." Id. at 1558 (emphasis added).  The Federal Circuit made a similar determination in Maritrans, Inc., reversing a Court of Federal Claims ruling that enactment of the Oil Pollution Act of 1990 ("OPA90") did not ripen a takings claim related to seven vessels. 342 F.3d at 1359, 1361.  The Federal Circuit reasoned: "Upon enactment, OPA90 interfered in a 'clear, concrete fashion' with Maritrans' 'primary use' of its tank barges . . . . Maritrans suffered actual injury upon enactment of OPA90.  At that time, the useful lives of its single hull tank barges were shortened from sixty years to between five and twenty-five years." Id. at 1360-61.  Furthermore, although ripeness was not at issue in Loretto, implicit in the Supreme Court's decision was the recognition that the plaintiff's cause of action accrued when the New York legislature enacted a regulation preventing landowners from "'interfer[ing] with the installation of cable television facilities upon his property or premises . . . .'" 458 U.S. at 423 (quoting N.Y. Exec. Law § 828 (McKinney Supp. 1981-1982)); see also Cienega Gardens v. United States, 265 F.3d 1237, 1244 (Fed. Cir. 2001) (indicating that a taking occurs when government action, "although not encroaching upon or occupying private property, still affects and limits its use").

The government contends that Loretto is distinguishable because "a third party had in fact entered the plaintiff's property and placed cable wires on the structure."  Def.'s Reply 26. Although the telecommunications company "routinely obtained authorization for its installations from property owners" before the New York legislature enacted the regulation at issue in Loretto, 458 U.S. at 423, this fact alone is not dispositive.  Whereas the property owners previously negotiated with the telecommunications company for compensation that equaled five percent of the gross revenues realized from the property, the regulation limited the property owners' ability to "demand payment . . . 'in excess of any amount which the [State Commission on Cable Television] . . . by regulation, determine[d] to be reasonable.'"  Id. (second alteration in original) (quoting N.Y. Exec. Law § 828).  The "'character of government action'" in Loretto, viz., the enactment of a regulation that eviscerated the property owner's right to exclude the telecommunications company from installing its equipment, was what the Supreme Court determined "so frustrate[d] property rights that compensation must be paid." Id. at 426; see also id. (explaining that the character of the government action is "not only . . . an important factor in resolving whether the action works a taking but also is determinative" (emphasis added)).

A claim accrues when the government, "by some specific action, [takes] a private property interest for a public use without just compensation." Alliance of Descendants of Tex. Land Grants, 37 F.3d at 1481.  Here, plaintiffs allege that their leases allow only a single use of Love Field, namely air transportation, and that the WARA precludes their use of the premises for air transportation purposes.  Plaintiffs are correct that they allege in their complaint a legally cognizable legislative taking arising from Congress's prohibition of the sole economic use of their leasehold property and that the WARA deprived them of the ability to exclude persons on the day it was enacted.

33

The court determines that plaintiffs' claim was ripe at the time they filed their complaint. The principles derived from <u>Loretto</u> and discussed in <u>Fallini</u>, <u>Kemp</u>, <u>Maritrans, Inc.</u>, and <u>Whitney Benefits, Inc.</u> indicate that a claim alleging that the WARA effected a taking became ripe on October 13, 2006, the date the legislation became law.[31]  To hold otherwise would subject plaintiffs to a "Catch-22" wherein a cause of action accrues and the statute of limitations begins running, but a claim cannot be filed because it is not ripe.  Were the court to adopt defendant's position, plaintiffs might ultimately find themselves facing a statute of limitations defense that the plaintiffs in <u>Fallini</u> and <u>Kemp</u> could not overcome.

Furthermore, the court rejects the government's argument that the holding in <u>Williamson County Regional Planning Commission</u> warrants a finding in this case that plaintiffs' claim is unripe.  In <u>Williamson County Regional Planning Commission</u>, Tennessee law permitted a property owner to bring an inverse condemnation action to obtain just compensation for an alleged taking.  473 U.S. at 194.  The respondent, however, did not seek compensation through the procedure provided under state law.  <u>Id.</u>  Because the respondent failed to utilize that procedure, the Supreme Court determined that the respondent's claim was not ripe.  <u>Id.</u> at 196-97.  Specifically, it indicated that no constitutional violation could occur "until just compensation has been denied," <u>id.</u> at 194 n.13, explaining that "the Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking," <u>id.</u> at 195.  In other words, the state action was "not 'complete' until the State fail[ed] to provide adequate compensation for the taking."  <u>Id.</u>  Until such time as the respondent showed that the state procedure was either unavailable or inadequate, its taking claim was premature.  <u>Id.</u> at 196-97.

Here, neither Dallas nor any state legislative body created a mechanism through which plaintiffs could seek compensation for the taking of their property interests.  Plaintiffs did not institute suit in state court claiming an inverse condemnation or pursue an alternative remedy under Texas law because they contend that Dallas is acting as an agent of the United States.  Indeed, plaintiffs claim that the WARA, rather than a Texas statute, effected a taking of their property, and the WARA sets forth no special procedure for plaintiffs to invoke in order to obtain compensation.  Accordingly, plaintiffs have availed themselves of the process provided by the Tucker Act.  The Supreme Court has held that "takings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act."  <u>Id.</u> at 195.  To determine whether a remedy exists under the Tucker Act for a claim arising out of a taking pursuant to a federal statute, courts must ascertain whether Congress, in the

---

[31]  Plaintiffs, citing Supreme Court and Federal Circuit precedent, maintain that "the deprivation of the right to exclude, not the actual 'boots on the ground' physical occupancy . . . constitute[s] the taking."  Pls.' Reply Gov't's Opp'n Cross-Mot. ("Pls.' Reply") 22 (discussing <u>Kaiser Aetna</u> and <u>Whitney Benefits, Inc.</u>).  In light of plaintiffs' representation that Dallas completed demolition of the Lemmon Avenue Terminal gates in September 2010, amendment of the complaint to incorporate this allegation, in accordance with RCFC 15(a)(2), remains available to plaintiffs.  <u>See</u> <u>Whitney Benefits, Inc.</u>, 752 F.2d at 1558.

statute in question, withdrew the Tucker Act grant of jurisdiction to entertain a suit founded upon the Constitution. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1017 (1984). Defendant does not claim that the WARA in any way affects the Tucker Act, and nothing in the statute or its legislative history indicates that Congress intended to withdraw Tucker Act jurisdiction. See 120 Stat. at 2011-14; see also Ruckelshaus, 467 U.S. at 1017 (explaining that a repeal of the Tucker Act's jurisdiction by implication is disfavored); Acceptance Ins. Cos., 503 F.3d at 1336 (stating that "withdrawal of Tucker Act jurisdiction by implication is disfavored, which means that a court must find that the statute at issue . . . reflects an unambiguous congressional intent to displace the Tucker Act's waiver of sovereign immunity"). Thus, the Supreme Court's holding in Williamson County Regional Planning Commission that a property owner must first utilize procedures created by the state to seek just compensation as a result of conduct by a state municipality planning commission is inapposite here.

### B. Defendant's Motion

Having determined that plaintiffs' claim is ripe, the court turns to defendant's motion. Defendant argues that no taking in contravention of the Fifth Amendment has occurred because the United States did not acquire any land, airport facilities, or leasehold rights. Defendant also contends that the United States did not order Dallas to acquire plaintiffs' property interests. Furthermore, defendant argues that the WARA does not contain any regulatory limitations on the use of plaintiffs' property. Before it addresses the substance of defendant's argument, the court must determine whether the exhibits appended to the parties' briefs require the court to convert defendant's motion into one for summary judgment under RCFC 56. See RCFC 12(d).

### 1. The Parties' Exhibits Are Not "Matters Outside the Pleadings" That Require Conversion of Defendant's Motion to a Motion for Summary Judgment

As discussed in Part III.C, supra, the court has discretion to consider materials beyond the pleadings and "is not limited to the four corners of the complaint" when ruling upon an RCFC 12(b)(6) motion. 5B Wright & Miller, supra, at § 1357 (discussing Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP")). Courts "have allowed consideration of matters incorporated by reference or integral to the claim . . . ." Id.; see also In re Syntex Corp. Secs. Litig., 95 F.3d 922, 926 (9th Cir. 1996) ("When deciding a motion to dismiss, a court may consider the complaint and 'documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading.'" (quoting Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994))). "Where a complaint refers to a document but does not incorporate it, a party may submit a copy of the document to support or oppose a motion to dismiss as long as the document is 'central' to the complaint." P.D. v. Mt. Vernon Cmty. Sch. Corp., No. 1:07-CV-1048-DFH-JMS, 2008 WL 1701877, at *1 (S.D. Ind. Apr. 10, 2008).

Here, defendant appended to its motion the following documents: the Joint Statement; Senate Report No. 109-317, a Senate Committee on Commerce, Science, and Transportation

report; and the declaration of J. Michael Nicely, the manager of the Texas Airport Development Office in Fort Worth for the Federal Aviation Administration ("FAA"). Additionally, defendant appended to its reply brief copies of plaintiffs' brief filed in the antitrust action before the Northern District of Texas and supplements to the Master Lease. In support of their cross-motion, plaintiffs appended a declaration from Mr. Naul, the Contract, correspondence between plaintiffs and Dallas related to the property encompassed by the Master Lease, a state court final judgment granting Dallas a writ of possession of the premises encompassed by the Master Lease, and the Dallas City Council Resolution.

None of these materials warrants conversion of defendant's motion into one for summary judgment. First, these materials clarify, rather than add anything new to, the allegations in the complaint. See Song v. City of Elyria, Ohio, 985 F.2d 840, 842 (6th Cir. 1993) (rejecting an argument that materials were outside the pleadings on an FRCP 12(b)(6) motion where the documents "did nothing more than verify the complaint" and "added nothing new, but, in effect, reiterated the contents of the complaint itself"). Second, these materials fall within the "narrowly defined category of materials a court can consider without converting a[n FRCP] 12(b)(6) motion to one for summary judgment. This category includes exhibits attached to the complaint, undisputed documents relied upon by the plaintiff, other items appearing in the record of the case, and matters of public record." Stuler v. United States, No. 07-642, 2008 WL 957009, at *2 (W.D. Pa. Apr. 8, 2008) (citation omitted). Senate reports, court filings, and resolutions passed by municipalities are public records. See Biomed. Patent Mgmt. Corp. v. Cal., Dep't of Health Servs., 505 F.3d 1328, 1331 (Fed. Cir. 2007) ("[C]ourt filings . . . are matters of public record . . . ."); Jones v. Butler, No. 09-03128, 2009 WL 2461885, at *5 (E.D. Pa. Aug. 11, 2009) (recognizing that a city council resolution is "unquestionably a matter of public record"); L.H. v. Schwarzenegger, 519 F. Supp. 2d 1072, 1079 (E.D. Cal. 2007) ("[T]he Senate Report is a public record . . . ."). The Joint Statement, which is publicly accessible via Love Field's Internet website, see "Agreement Reached on Love Field," at http://www.dallas-lovefield.com/pdf/ Wright_Amend_Agreement061506.pdf (last visited Feb. 11, 2011), as well as Mr. Nicely's and Mr. Naul's declarations, are no different. See United States ex rel. Dingle v. BioPort Corp., 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) ("Public records and government documents are generally considered 'not to be subject to reasonable dispute.' This includes public records and government documents available from reliable sources on the Internet." (quoting Jackson v. City of Columbus, 194 F.3d 737, 745 (6th Cir. 1999))). Under Texas law, the Joint Statement is a "local government record," a "document . . . created or received by a local government or any of its officers or employees pursuant to law . . . in the transaction of public business." Tex. Loc. Gov't Code Ann. § 201.003 (West 2008). Local government records are subject to public information access laws. See id. § 201.009(a). "Public information" includes, among other things, "information that is collected, assembled, or maintained . . . in connection with the transaction of official business, " id. § 552.002(a)(1), by a "municipal governing body," id. § 552.003(1)(A)(iii). Additionally, defendant utilizes Mr. Nicely's declaration to indicate that, as of November 18, 2008, the Lemmon Avenue Terminal gates had not been demolished. See Def.'s Mot. Ex. C at 1 (Decl. J. Michael Nicely ¶ 5). Such an eyewitness observation, the court finds, "reflect[s] common knowledge," Olson v. Ford Motor Co., 481 F.3d 619, 629 (8th Cir.

2007), and courts may, among other things, "take notice of matters of common observation," N.Y. Indians v. United States, 170 U.S. 1, 32 (1898).  Furthermore, Mr. Naul's declaration merely supplements, rather than adds new material to, the complaint.  Accordingly, the court's consideration of these materials does not require conversion of defendant's motion into one for summary judgment.

### 2.  Plaintiffs Have Identified a Property Interest That Was Allegedly Taken

Under the Federal Circuit's two-step approach to analyzing takings claims, plaintiffs must first identify the property interest allegedly taken.  See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004); Ammon, 209 F.3d at 1374.  Plaintiffs allege that Love Terminal Partners subleased nine acres of the area covered by the Master Lease "for the purpose of providing commercial air passenger service at Love Field," Compl. ¶ 6, and that Virginia Aerospace eventually acquired the Master Lease, "subject to the [Love Terminal Partners] sublease, for the purpose of providing commercial passenger airline service at Love Field, in cooperation with [Love Terminal Partners]," id. ¶ 8; see also Pls.' Cross-Mot. 12-13 (arguing that the complaint alleges that plaintiffs "own property in the form of their Love Field leases (including the [Lemmon Avenue] Terminal, gates, and the right to fly from these gates)").  Thus, plaintiffs assert, they have identified a property interest for purposes of the Fifth Amendment:

> The first step of the inquiry is easily satisfied: the commercial leases, the [Lemmon Avenue] Terminal, gates, and the right to fly are property within the meaning of the Fifth Amendment.  [Virginia Aerospace] is the assignee of the original Braniff Airlines 1955 lease, which now covers 26.8 acres, and [Love Terminal Partners] holds a sublease of nine of those acres, on which it has constructed the [Lemmon Avenue] Terminal.  Both leases allow use of these airport premises for air transportation purposes only.  [Love Terminal Partners] constructed the Terminal with six gates in 1999.

Pls.' Cross-Mot. 13 (footnotes omitted); see also id. at 14 (noting that the complaint alleges that plaintiffs "each held a leasehold interest at Love Field" at the time the WARA was enacted).

> As the Federal Circuit observed, the Constitution

> neither creates nor defines the scope of property interests compensable under the Fifth Amendment.  Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking.  These existing rules often involve and define "the citizen's relation to the physical thing, as the right to possess, use and dispose of it."

Conti, 291 F.3d at 1340 (quoting Lucas, 505 U.S. at 1030; United States v. Gen. Motors Corp.,

323 U.S. 373, 378 (1945)) (citation & footnote omitted); accord Acceptance Ins. Cos., 583 F.3d at 857; see also Hage v. United States, 35 Fed. Cl. 147, 168 (1996) ("Property rights are generally defined by state law . . . ."). Here, plaintiffs maintain that Love Terminal Partners, at the time the WARA was enacted, possessed the exclusive right to use, rent, alter, renovate, and lease space within the Lemmon Avenue Terminal building.  Plaintiffs further argue that Dallas, at no time, had the right to enter onto the property.  Plaintiffs further explain that their business plan included expansion of the terminal and related air passenger services beyond the nine acres subleased by Love Terminal Partners as air traffic at Love Field increased.

It is abundantly clear that plaintiffs possess a valid property interest.  In Travis Central Appraisal District v. Signature Flight Support Corp., the Court of Appeals of Texas recognized that the ownership interest at issue in that case was "an ownership interest in a leasehold. Because the City [of Austin] own[ed] the improvements but lease[d] them to appellees, it is perfectly correct to refer to appellees' ownership interests in the leased facilities and allow them the right to 'sell' that leasehold interest."[32]  140 S.W.3d 833, 841 (Tex. App. 2004); see also Panola County Appraisal Dist. v. Panola County Fresh Water Supply Dist. No. 1, 69 S.W.3d 278, 283 (Tex. App. 2002) ("A leasehold interest is an ownership right in land that belongs to the lessee."), 284 ("An ownership interest in a leasehold is the legal right to possess that property for a set period of time . . . ."); Def.'s Reply Ex. B at 4 (Master Lease art. II ¶ 1 (providing that Dallas "hereby leases and rents to Lessee for Lessee's exclusive use, and Lessee hereby agrees to hire and take, . . . the Premises")).  As the Court of Appeals of Texas further noted, the ownership of a leasehold interest

> has a measurable fair market value because there are people who are willing to purchase and do purchase that right to possess the property under the terms of the lease.  Furthermore, the assignee of the leasehold may in turn convey his or her ownership right to another person and obtain the fair market value existing at that time.

Panola County Appraisal Dist., 69 S.W.3d at 284.  See generally Gen. Motors Corp., 323 U.S. at 373(recognizing that just compensation was required by the Fifth Amendment in a case where the federal government deprived a tenant, which held a long-term lease, of occupancy of portions of a leased building); see also U.S. Trust Co. of N.Y., 431 U.S. at 19 n.16 (recognizing that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid"); Sun Oil Co., 572 F.2d at 818 (stating that "a leasehold interest is

---

[32]  The Master Lease provides that, upon its termination, title to "all permanent improvements, including but not limited to buildings, structures, wings, or annexes to buildings, paved areas, utility lines, roads, fences, walls, or anything affixed to any building in such a way as to become a fixture under Texas law . . . erected on the Premises, whether by Lessor or Lessee or any sub-lessee, shall immediately vest in Lessor," subject to automatic revestment of title in Lessee or any sub-lessee under certain conditions.  Def.'s Reply Ex. B at 27 (Master Lease art. XVII ¶ 1).

property, the taking of which entitles the leaseholder to just compensation for the value thereof").

Plaintiffs assert that the complaint adequately alleges their ownership of the leasehold, noting that it describes the lease and the property interests acquired by both Love Terminal Partners and Virginia Aerospace.  Defendant does not appear to challenge the premise that plaintiffs own a property right in their leases.  Rather, it contends that Dallas, not plaintiffs, owns the Lemmon Avenue Terminal and that the government neither acquired nor assumed any rights or responsibilities under plaintiffs' leases with Dallas.  "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation."  Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003).  Plaintiffs have both identified and alleged possession, through their ownership of their leasehold interests, of "a 'stick in the bundle of property rights,'" Ammon, 209 F.3d at 1374, at the time of the purported taking.

### 3.  Plaintiffs Have Alleged Government Appropriation of Their Ownership in the Leaseholds

"If a property right has been established, the court must then determine whether the Government has taken it in part or in whole."  Griffin Broadband Comm'ncs, Inc. v. United States, 79 Fed. Cl. 320, 323 (2007).  Defendant, as noted above, claims that no taking has occurred.  First, it states that the sine qua non of a physical taking is the requirement that the plaintiff submit to the physical occupation of property and emphasizes that the United States has not entered upon the leasehold property.  Next, defendant asserts that the WARA effected no regulatory taking of plaintiffs' leasehold property because the legislation placed no limit on how plaintiffs could use their property.  Third, defendant emphasizes the significance of the absence of any reference to plaintiffs or their leasehold interests in the WARA.

Defendant's arguments ignore the fact that the Love Terminal Partners and Virginia Aerospace leases permitted use of the premises only for air transportation purposes.  Plaintiffs contend that the WARA's prohibition of such uses and requirement that Dallas acquire the leases and demolish the passenger gates so that the leased premises can never again be used for air transportation purposes clearly establish a legislative taking.  Specifically, plaintiffs allege in their complaint that (1) the Master Lease permits the sole use of the Love Field premises for air transportation, (2) the WARA precludes all uses for that purpose, (3) the WARA requires that Dallas acquire plaintiffs' leases in part or in whole, and (4) Dallas must, pursuant to the WARA, demolish the passenger gates of the Lemmon Avenue Terminal so that those gates can never again be used for air passenger service.  Plaintiffs claim that the WARA's legislative prohibition on the sole economically beneficial use of the premises constitutes a per se taking under Lucas.  Additionally, plaintiffs assert a claim for a physical taking because the WARA requires the physical demolition of the passenger gates at the Lemmon Avenue Terminal.  Thus, the court determines that plaintiffs sufficiently allege that the government appropriated their ownership in their leaseholds.  Next, the court addresses whether plaintiffs have stated a takings claim by addressing their physical and regulatory takings theories.

### 4. Plaintiffs' Complaint States a Takings Claim

As explained in Part III.C, supra, a motion made pursuant to RCFC 12(b)(6) "challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced." Advanced Cardiovascular Sys., Inc., 988 F.2d at 1160.  Plaintiffs argue that their complaint sufficiently alleges a claim for relief, asserting that a physical taking occurred because the WARA required the physical demolition of the passenger gates at the Lemmon Avenue Terminal.  Alternatively, plaintiffs assert that the WARA effected a regulatory taking on grounds that it legislatively prohibited the sole economically beneficial use of the premises.  As the Supreme Court has recognized, "[c]onsideration of whether a regulatory taking occurred would not assist in resolving whether a physical taking occurred as well" because neither inquiry encompasses the other.  Yee, 503 U.S. at 537.  Nevertheless, each inquiry "might be subsidiary to a question embracing both–Was there a taking?"  Id.  Thus, plaintiffs' position that the WARA effected a taking in two different ways reflects their advancement of "separate arguments in support of a single claim," rather than separate claims.  Id. at 535; see also Acceptance Ins. Cos., 583 F.3d at 854 ("A 'taking' may occur either by physical invasion or by regulation." (emphasis added)); cf. Estate of Hage, 82 Fed. Cl. at 211-13 (determining that the government effected both physical and regulatory takings of the plaintiffs' property).

### a. Plaintiffs' Complaint States a Claim for a Physical Taking

Plaintiffs allege that a physical taking of their leasehold interest occurred when their legal right to exclude was extinguished, asserting that Dallas was acting pursuant to a federal mandate set forth in the WARA and, as such, was an agent of the federal government.  See Preseault v. United States, 100 F.3d 1525, 1551 (Fed. Cir. 1996) (en banc) (explaining that "when the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions").  By contrast, defendant maintains that plaintiffs failed to allege that the United States physically invaded or occupied their property.  According to defendant, any limitation established by the WARA were directed at Dallas, not plaintiffs.

In support of its position, defendant relies upon Loretto and that decision's emphasis upon a physical intrusion that, according to defendant, had not occurred in this case at the time plaintiffs filed their complaint.  Defendant suggests that Loretto stands for the proposition that a physical taking is not established until the physical intrusion reaches the level of a permanent physical occupation.  According to defendant,

> [i]n Loretto, unlike the instant case, a third party had in fact entered the plaintiff's property and placed cable wires on the structure.  Plaintiffs must admit that, to the contrary, the City of Dallas ha[d] not demolished the terminal gates on the Lemmon Avenue facility. . . .  [T]he language of Loretto makes clear that a physical taking is not established until 'the physical intrusion reaches the extreme form of a permanent physical occupation.'  Here, there [wa]s no physical

40

intrusion, let alone a physical intrusion that represents a permanent physical occupation.[33]

Def.'s Mot. 26-27 (footnote added) (citation omitted).

Yet, the Loretto Court addressed whether the New York statute authorizing a telecommunications company to install equipment on private property without interference from the landowners effected the physical taking. That a physical intrusion had already occurred was not relevant to the Loretto Court's analysis. In its decision, the Supreme Court held that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." Loretto, 458 U.S. at 426 (emphasis added). In so holding, the Supreme Court implicitly recognized that the statutory enactment granting the telecommunications company entry onto the property to install its equipment–and not the actual, physical entry by the telecommunications company–triggered the extinguishment of what it previously termed the property owner's "'right to exclude,'" which is "universally held to be a fundamental element of the property right," Kaiser Aetna, 444 U.S. at 180. Therefore, Loretto suggests that a court's focus is upon the government's enactment of legislation that deprives a landowner of one of the sticks in his bundle of rights. In this case, plaintiffs allege that the WARA authorized Dallas to demolish the Lemmon Avenue Terminal gates and precluded them from excluding Dallas from entry onto their property. These allegations are sufficient to state a takings claim. Thus, plaintiffs' claim is not predicated upon any future entry by Dallas onto the premises.

The Supreme Court's decision in Nollan does not suggest otherwise. There, the Supreme Court observed that "a 'permanent physical occupation' has occurred . . . where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." 483 U.S. at 832. In that case, the plaintiffs leased, with an option to buy, beachfront property that contained a small bungalow that had fallen into disrepair. Id. at 827. Their option to buy "was conditioned on their promise to demolish and replace" the bungalow, actions that could not be accomplished absent a coastal development permit from the California Coastal Commission ("CCC"). Id. at 828. The plaintiffs applied to the CCC for a permit, and the CCC recommended issuance of the permit subject to a condition that the plaintiffs "allow the public an easement to pass across a portion of their property . . . ." Id. Challenging the CCC's condition, the plaintiffs asserted that it constituted a taking, and they successfully obtained a writ of mandamus from the Ventura County Superior Court directing that

---

[33] As previously noted, Dallas ultimately demolished the Lemmon Avenue Terminal gates. As discussed in Part IV.C.4.c.iv, infra, Dallas acted pursuant to the express language set forth in the WARA.

the permit condition be stricken.[34]  Id. at 829.  While the CCC's appeal to the California Court of Appeal was pending, the plaintiffs tore down the bungalow, built a new house, and purchased the property, actions of which the CCC was not aware.  Id.

The taking in Nollan did not occur when any individual entered upon or traversed across the plaintiffs' property.  Rather, it occurred when the CCC conditioned issuance of the permit upon the plaintiffs' forfeiture of their right to exclude others from passing across their property:

> Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to build their house on their agreeing to do so, we have no doubt there would have been a taking. . . .  We have repeatedly held that, as to property reserved by its owner for private use, "the right to exclude [others is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'"

Id. at 831 (quoting Loretto, 458 U.S. at 433).

Here, the fact that Congress chose Dallas as its agent to demolish the gates, rather than assign that responsibility to the FAA or any other federal entity, does not relieve defendant of its takings liability.  It is well established that the United States may incur takings liability when another entity acts as its agent.  See, e.g., Yearsley v. W.A. Ross Constr. Co., 309 U.S. 18, 22 (1940) ("[A]ction which constitutes the taking of property is within [the government's] constitutional power and there is no ground for holding its agent liable who is simply acting under the authority thus validly conferred.  The action of the agent is 'the act of the government.'" (quoting United States v. Lynah, 188 U.S. 445, 465 (1903)); Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1363 (Fed. Cir. 2005) (stating that "when separate corporate entities act for the United States, the United States is liable for their takings" and that "when state agencies act as agents of the United States, the United States may incur takings liability"); Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196 (Fed. Cir. 2004) (recognizing that state-imposed restrictions upon property may be attributed to the federal government for purposes of a takings analysis where the state officials acted as agents of the federal government or pursuant to federal authority).  As the Federal Circuit stated in Preseault, where "the Federal Government authorized and controlled the behavior of the State[,] . . . the consequences properly fall there." 100 F.3d at 1531.  It added:

> Both the State and the Federal Governments were fully invested in the effort . . . . It would be absurd to deny the Preseaults their Constitutional rights on the grounds that the State has concluded it was the Federal Government who did it, and the Federal Government has concluded it was the State.  In sum, the

_____

[34]  The California Court of Appeal reversed.  See Nollan v. Cal. Coastal Comm'n, 177 Cal. App. 3d 719 (1986), rev'd, 483 U.S. at 825.

Government cannot now point its finger at the State and say 'they did it, not us.'
As in <u>Hendler</u>, when the Federal Government puts into play a series of events
which result in a taking of private property, the fact that the Government acts
through a state agent does not absolve it from the responsibility, and the
consequences, of its actions.

<u>Id.</u> at 1551.

Dallas previously and successfully argued that it was required to demolish the Lemmon
Avenue Terminal gates pursuant to the WARA, <u>see</u> <u>Love Terminal Partners, L.P.</u>, 256 S.W.3d at
897, thereby effectively asserting that it was acting pursuant to a federal mandate. Here,
defendant contends that the WARA imposed no such mandate and that plaintiffs' dispute rests
with Dallas, rather than the federal government. In essence, plaintiffs find themselves in the
midst of the same finger-pointing to which the Federal Circuit referred in <u>Preseault</u>.

The ruling in the Northern District of Texas makes clear that Dallas could not institute
direct condemnation proceedings and demolish plaintiffs' gates without the authority granted to
it under the WARA because such actions would have been anticompetitive in nature and
therefore contrary to the Sherman Antitrust Act of 1890. The Northern District of Texas,
acknowledging Dallas's obligations under the WARA, explained that antitrust liability did not
attach to Dallas, as well as the co-defendants in that case, because their "actions . . . [we]re
compelled by the [WARA], including by the Contract that the [WARA] incorporates. Congress
would not have endorsed the Contract and then have subjected defendants to antitrust liability for
acting under its aegis." <u>Love Terminal Partners, L.P.</u>, 527 F. Supp. 2d at 560. Thus, plaintiffs
have sufficiently alleged that the WARA extinguished their right to exclude Dallas, which was
acting as an agent of the federal government, from demolishing the Lemmon Avenue Terminal
and that, consequently, the federal government effected a taking of their property interests
without just compensation in contravention of the Fifth Amendment. Accordingly, plaintiffs
state a takings claim based upon their theory that the WARA subjected them to a physical taking
of their property.

**b. Plaintiffs Are Entitled to Offer Evidence in Support of Their Regulatory Takings
Theory**

Plaintiffs allege that the WARA, which was "intended to place a limit on commercial
passenger service at Love Field by prohibiting the use of the 26.8 acres leased by [plaintiffs] for
commercial passenger service," requires the demolition of "all of the passenger gates at [Love
Terminal Partners'] existing terminal building to ensure that that facility (as well as the
[Virginia] Aerospace lease) can never again be used for passenger service." Compl. ¶ 9.
Plaintiffs further allege that enactment of the WARA precluded them from utilizing "for air
transportation purposes" the Lemmon Avenue Terminal, Virginia Aerospace's lease, and Love
Terminal Partners' sublease. <u>Id.</u> ¶ 10. In other words, according to plaintiffs, the WARA's
legislative prohibition on the only economically beneficial use of the premises rises to the level

of a per se taking under <u>Lucas</u>.

Both the Joint Statement and the Contract reflect the signatories' intent to reduce "the number of gates available for scheduled passenger air service at [Love Field] . . . from the 32 gates envisioned in 2000 to 20 gates."  Def.'s Mot. Ex. A at 1 (Joint Statement ¶ 3).  According to defendant, one objective of the WARA was limiting the number of gates operating at Love Field, particularly since the results of an environmental study showed that reducing the number of terminal gates from thirty-two to twenty would be equivalent to the then-existing thirty-two gates given the use of larger airplanes for longer-haul flights.[35]  Defendant asserts, however, that the WARA did not prohibit the designation of the Lemmon Avenue Terminal gates as six of the twenty gates that could be used for passenger air service.  In fact, defendant theorizes, Dallas could have contracted with plaintiffs to add additional gates at the Lemmon Avenue Terminal and transfer the entire Love Field airport operations to the Lemmon Avenue Terminal. According to defendant, the only limitation imposed upon Dallas would be that Dallas continue allocating those twenty gates to the airlines operating out of Love Field as of July 11, 2006, in accordance with the Contract.  Thus, defendant argues, plaintiffs have no claim for a per se regulatory taking.

Defendant's theory, however, is unsustainable because it ignores the plain language of the Contract.  The Contract, which required Dallas to acquire all or part of plaintiffs' leases and to demolish the passenger gates at the Lemmon Avenue Terminal, became part of a federal statute, plaintiffs claim, by virtue of its incorporation by reference into the WARA.  Indeed, plaintiffs rely upon a holding of the Northern District of Texas, which determined that the WARA "plainly and unambiguously incorporate[d] all the rights and obligations of the Contract. . . . [Section 5(a)] manifest[ed] Congress' intent to incorporate into the [WARA] the terms of the Contract executed on July 11, 2006 . . . ."  <u>Love Terminal Partners, L.P.</u>, 527 F. Supp. 2d at 558-59.

The <u>Love Terminal Partners, L.P.</u> court determined that the WARA

refers without qualification to Dallas' obligation to act in accordance "with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006."  The "contractual rights and obligations" that existed "as of the effective date of" the Reform Act are those included in the Contract.

. . . .

. . . Considering the statute as a whole, the court concludes that the Reform Act unambiguously incorporates the entire Contract.

---

[35] Plaintiffs assert that the WARA imposed upon Dallas a mandate to eliminate gates because it would have been unlawful for the city to do so for the purpose of limiting air transportation competition.

44

> Accordingly, the court holds that the Reform Act compels [Dallas, Fort Worth, American, Southwest, and the DFW Board] to implement the terms of the Contract.

Id. at 559-60.  This court is not bound by the Northern District of Texas's decision.  See AINS, Inc. v. United States, 365 F.3d 1333, 1336 n.1 (Fed. Cir. 2004) (stating that Court of Federal Claims decisions, "like those of federal district courts, are instructive but not precedential, and do not bind future court rulings"); see also Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims.").  Nevertheless, the reasoning set forth by the Love Terminal Partners, L.P. court is persuasive.

More compelling than the ruling in the Northern District of Texas litigation is the WARA's legislative history, which indicates that the statute "would implement a compromise agreement reached . . . on July 11, 2006, regarding air service at Dallas Love Field."  H.R. Rep. No. 109-600, pt. 2, at 3 (emphasis added).  Indeed, defendant's theory that the WARA does not preclude use of the Lemmon Avenue Terminal runs afoul of the Love Field Master Plan, which formed the basis of the Contract into which the signatories entered.  It is clear that moving the twenty gates to the 26.8 acres encompassed by the Master Lease would be inconsistent with the Love Field Master Plan because neither the Love Field Master Plan nor any of the plans described by the airport authorities to plaintiffs contemplated having passenger gates on those 26.8 acres.  Indeed, that is precisely what is stated in the July 11, 2006 Contract.  Dallas was to (1) redevelop Love Field in accordance with the Love Field Master Plan, which called for a $150-200 million terminal to be placed in the general location where the old terminal is now located; (2) acquire the Lemmon Avenue facility; and (3) demolish the Lemmon Avenue Terminal gates.

The Contract provided, among other things, that (1) the number of gates available for passenger service at Love Field would "be, as soon as practicable, reduced from the 32 gates . . . to 20 gates and that Love Field [would] thereafter be limited permanently to a maximum of 20 gates," Pls.' Ex. 2 at 3 (Contract art. I ¶ 3), a reduction that was "consistent with a revised Love Field Master Plan, based upon the 2006 Love Field Impact Analysis Update," id.; and (2) Dallas would, "consistent with a revised Love Field Master Plan," significantly redevelop portions of Love Field, acquire all or a portion of the lease on the Lemmon Avenue facility, and "demoli[sh] . . . the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that that facility can never again be used for passenger service," id. at 4 (Contract art. I ¶ 5).  It is inconceivable that Dallas could demolish the Lemmon Avenue Terminal gates in compliance with these Contract provisions and simultaneously contract with plaintiffs to transfer all Love Field operations to a facility that was slated for demolition and could never again be utilized for passenger air service.

Plaintiffs have alleged that Congress incorporated the terms of the Contract into the WARA.  As a signatory to the Contract, Dallas committed itself to, among other things, (1) redevelop Love Field in accordance with a master modernization plan,[36] (2) acquire all or part of the Lemmon Avenue Terminal "necessary to fulfill its obligations under this Contract," and (3) "demoli[sh] . . . the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that that facility can never again be used for passenger service."  Id. (Contract art. I ¶ 5).  The Contract's signatories committed themselves to "encourag[ing] and seek[ing] the passage of legislation necessary and appropriate to implement the terms and spirit of th[e] Contract,"[37] id. at 6 (Contract art. I ¶ 14), and, absent congressional action, the Contract was null and void, id. at 7 (Contract art. I ¶ 17).  It is beyond dispute that Congress, by enacting the WARA, approved a plan for the allocation of twenty gates among the airlines that were serving Love Field as of July 11, 2006, the date of the Contract.  Plaintiffs have sufficiently alleged that this plan included the acquisition of their leaseholds and demolition of the Lemmon Avenue Terminal gates.

Plaintiffs also allege that Congress, by enacting the WARA, precluded all economically beneficial use of their leased property, the Lemmon Avenue Terminal, and their right to fly commercial passenger flights from the Lemmon Avenue Terminal.  Plaintiffs claim that the Master Lease restricts their activities to air transportation purposes.  Compl. ¶¶ 5-6, 8.  Once the WARA became law, plaintiffs maintain that "[t]hey could no longer use or market the terminal and the gates or the leased premises, because they were slated for city acquisition."  Pls.' Cross-Mot. 21; see also Compl. ¶ 10 (alleging that "[a]s a result of Congress' passage of the [WARA] in 2006, [Love Terminal Partners'] terminal building and 9-acre sublease, as well as [Virginia] Aerospace's 26.8-acre lease, cannot be used for air transportation purposes" (footnote omitted)).  Indeed, plaintiffs note that their proposed business deal with Pinnacle collapsed after Dallas officials publicly announced that the Lemmon Avenue Terminal would be demolished.  See supra note 10 and accompanying text.

Defendant contends that any impact plaintiffs experienced as a result of the WARA was, at most, a noncompensable derivative economic injury.  It relies, in part, upon the Supreme Court's decision in Omnia Commercial Co. v. United States, 261 U.S. 502 (1923), suggesting that the impact encountered in that case, which did not result in a taking, was far more direct and substantial than the impact plaintiffs experience here.  In Omnia Commercial Co., the plaintiff, by assignment, became the owner of a contract to purchase steel at a price below market.  261 U.S. at 507.  In October 1917, before any deliveries had been made under the contract, the

---

[36]  Plaintiffs emphasize that the Love Field Master Plan compelled the demolition of the Lemmon Avenue Terminal and precluded the future use of the 26.8 acres encompassed under the Master Lease for passenger service.

[37]  The signatories to the Contract also covenanted that they would "oppose any legislative effort that [was] inconsistent with the terms of [the] Contract."  Pls.' Ex. 2 at 6 (Contract art. I ¶ 14).

government "requisitioned the steel company's entire production of steel plate for the year 1918, and directed that company not to comply with the terms of appellant's contract, declaring that if an attempt was made to do so the entire plant of the steel company would be taken over and operated for the public use."[38]  Id.  The plaintiff claimed that the government's action had "the effect . . . [of] tak[ing] for the public use [its] right of priority to the steel plate expected to be produced by the steel company and thereby appropriat[ing] for public use [its] property in the contract."  Id. at 508.

The Supreme Court disagreed.  While the contract "was property within the meaning of the Fifth Amendment," the Supreme Court reasoned that "destruction of, or injury to, property is frequently accomplished without a 'taking' in the constitutional sense" in cases where property was destroyed to prevent the spread of fire.  Id.  It explained that the government, by exercising its requisition power, "dealt only with the steel company, which company thereupon became liable to deliver its product to the government, by virtue of the statute and in response to the order."  Id. at 511.  As a result, "performance of the contract was rendered impossible.  It was not appropriated, but ended."  Id.; see also id. at 513 (stating that "the effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the government").  The Supreme Court elaborated:

> If, under any power, a contract or other property is taken for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable.  What was here requisitioned was the future product of the steel company, and, since this product in the absence of governmental interference would have been delivered in fulfillment of the contract, the contention seems to be that the contract was so far identified with it that the taking of the former, ipso facto, took the latter.  This, however, is to confound the contract with its subject-matter.  The essence of every executory contract is the obligation which the law imposes upon the parties to perform it. . . . Plainly here there was no acquisition of the obligation or the right to enforce it.
>
> . . . .
>
> . . . If one makes a contract for the personal services of another, or for the sale and delivery of property, the government, by drafting one of the parties into the army, or by requisitioning the subject-matter, does not thereby take the contract.

Id. at 510-11.  The Supreme Court found no taking because "there was no acquisition of the

_____

[38]  The Supreme Court assumed, for the purposes of the case, that the officer who made the requisition order and gave the directions respecting noncompliance with the contract possessed the statutory authority to bind the government.  Omnia Commercial Co., 261 U.S. at 508.

47

obligation [to perform pursuant to the contract] or the right to enforce it," id. at 511, and "[f]rustration and appropriation are essentially different things,"[39] id. at 513.  Ultimately, the government's conduct in Omnia Commercial Co. frustrated the plaintiff's business expectations, i.e., a large profit flowing from the purchase of low-priced steel, but did not effect a taking.  NL Indus., Inc. v. United States, 839 F.2d 1578, 1579 (Fed. Cir. 1988).

Whereas the government's requisition of steel targeted the subject matter of–and not the rights provided by–the contract at issue in Omnia Commercial Co., see 261 U.S. at 511 ("If the steel company had failed to comply with the requisition, what would have been the remedy?  Not enforcement of the contract, but enforcement of the statute [under which the requisition was made and directions related to noncompliance with the contract were issued]."), the WARA, plaintiffs argue, directly targets plaintiffs' property rights.  The plaintiff in Omnia Commercial Co. ultimately could have sought the steel that was requisitioned to the government from another source.  In the instant case, however, plaintiffs are directly regulated by the WARA to the extent that Dallas has been required by the government to destroy the Lemmon Avenue Terminal gates and ensure that plaintiffs can never utilize that facility for air transportation services, the sole use authorized under the Master Lease.[40]  In essence, plaintiffs assert that the WARA, by compelling

_____

[39]  In so holding, the Supreme Court recognized that the government "took over during the war railroads, steel mills, shipyards, telephone and telegraph lines, the capacity output of factories and other producing activities."  Omnia Commercial Co., 261 U.S. at 513.  Adopting the plaintiff's position, it reasoned, required a conclusion that "the government thereby took and became liable to pay for an appalling number of existing contracts for future service or delivery, the performance of which its actions made impossible."  Id.  Such a position, the Supreme Court determined, was unsustainable.  Id.

[40]  Defendant emphasizes that no taking occurred in Omnia Commercial Co. despite the Supreme Court's recognition that the plaintiff there was directly targeted by the federal government.  See Def.'s Reply 8 (noting that the Supreme Court in Omnia Commercial Co. indicated that the government "requisitioned the steel company's entire production of steel plate for the year 1918, and directed [the Allegheny Steel Company] not to comply with the terms of [Omnia's] contract" (quoting 261 U.S. at 507)); id. at 8 & n.6 (arguing that the Federal Circuit, in Huntleigh USA Corp., recognized that "'in Omnia [Commercial Co.], the government's actions were directed squarely at the contractual relationship that existed between Allegheny and Omnia'" and stating that the Air Transportation Security Act ("ATSA") "'had the effect of bringing to an end Huntleigh's security screening contracts with airlines'" (quoting 525 F.3d at 1373, 1381)).  Yet, the Omnia Commercial Co. Court expressly distinguished between requisitioning the subject matter and taking the contract: "[T]he effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the government."  261 U.S. at 513.  The WARA, unlike the government's actions in Omnia Commercial Co., did nothing to bring the Master Lease to an end.  Furthermore, although the ATSA may have effectuated the end of the contracts at issue in Huntleigh USA Corp., none of the airlines, save for American, affirmatively terminated those contracts.  525 F.3d at 1375-76.  Instead, the parties themselves "treated their

Dallas to act consistently with the Love Field modernization plan, directly regulated their conduct and extinguished their rights under the Master Lease.  As the United States Court of Claims observed,

> [T]o constitute a taking under the Fifth Amendment it is not necessary that property be absolutely "taken" in the narrow sense of that word to come within the protection of this constitutional provision; <u>it is sufficient if the action by the government involves a direct interference with or disturbance of property rights</u>. Nor need the government directly appropriate the title, possession or use of the properties in question since it is "the deprivation of the former rather than the accretion of a right or interest to the sovereign (which) constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, <u>if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter</u> to amount to a taking."

<u>R. J. Widen Co. v. United States</u>, 357 F.2d 988, 993 (Ct. Cl. 1966) (quoting <u>Gen. Motors Corp.</u>, 323 U.S. at 378) (emphasis added) (citation omitted).

Recent Federal Circuit decisions cited by the parties reflect situations in which the effects of government regulation did not deprive the plaintiff of all or most of its property interests.  For example, in <u>Huntleigh USA Corp.</u>, the Federal Circuit affirmed a Court of Federal Claims decision finding no taking after Congress enacted the ATSA, legislation that transferred the responsibility for airport security screening from airlines to the federal government in the aftermath of the September 11, 2001 terrorist attacks.[41]  <u>See</u> 525 F.3d at 1370.  It acknowledged that Congress, which eliminated the market for airport screening functions by "concentrat[ing] all screening functions in the federal government," did not preclude the plaintiff from continuing to provide those services.[42]  <u>Id.</u> at 1375.  In essence, the government preempted the market but did nothing to affect the plaintiff's contract rights.  As such, the Federal Circuit determined that the ATSA "merely frustrated [the plaintiff's] business interests . . . ."  <u>Id.</u> at 1384.

The situation implicated in <u>Huntleigh USA Corp.</u>, however, is distinguishable from what occurred in this case.  First, unlike the plaintiff in <u>Huntleigh USA Corp.</u>, plaintiffs in this case

---

contracts as terminated upon the government's full assumption of screening functions at airports," <u>id.</u> at 1375, a fact that, as discussed below, is absent in this case.

   [41]  The plaintiff, which was a company that provided passenger and baggage screening services at airports, had contracts with approximately seventy-five airlines for such services when the ATSA became law in November 2001.  <u>Huntleigh USA Corp.</u>, 525 F.3d at 1373-74.

   [42]  The Court of Federal Claims noted that the various airlines with which the plaintiff contracted "allowed the contracts to expire pursuant to their terms" following the enactment of the ATSA.  <u>Huntleigh USA Corp.</u>, 75 Fed. Cl. at 646.

49

allege that their contract rights–specifically, their ability to exclude–were directly affected by passage of the WARA.  Second, the Master Lease, unlike the contracts in <u>Huntleigh USA Corp.</u>, did not expire pursuant to its terms after passage of the WARA.  Third, as plaintiffs note, nothing in the ATSA "required the airport owners to demolish Huntleigh's airport screening equipment to ensure that it could never again be used for airport screening purposes, as the [WARA] requires with respect to [plaintiffs'] six passenger gates . . . ."  Pls.' Reply 7.

Similarly, the Federal Circuit's decision in <u>Air Pegasus of D.C., Inc.</u> does not support defendant's position.  There, the Federal Circuit found that no taking occurred because the plaintiff "failed to assert a cognizable property interest for purposes of the Fifth Amendment." 424 F.3d at 1215.  The plaintiff, which owned and operated a heliport business in Washington, DC, signed a lease in which it was permitted to use property "<u>solely in the conduct of a private use and/or public use heliport/vertiport</u> . . . and for any uses related thereto . . . ."  <u>Id.</u> at 1209. Immediately following the September 11, 2001 terrorist attacks, the FAA "used its emergency powers to shut down virtually all commercial air traffic throughout the United States" and then restricted commercial air travel within twenty-five nautical miles of the nation's capital, thereby preventing the plaintiff from resuming its flight operations.  <u>Id.</u>  The plaintiff ultimately abandoned its lease and ceased operations at its Washington, DC location.  <u>Id.</u>

Although the aforementioned facts appear somewhat similar to those at issue in the case <u>sub judice</u>, the case is wholly distinguishable.  As a preliminary matter, the court notes that the <u>Air Pegasus of D.C., Inc.</u> case arose in the aftermath of the September 11, 2001 terrorist attacks. Conversely, the WARA arose as a congressional solution to a local problem, <u>i.e.</u>, the competition between Dallas and Fort Worth.  Indeed, the legislative history of the WARA acknowledges the unique nature of Congress's involvement, noting that the Wright Amendment and subsequent legislative enactments represent "the only time Congress has intervened . . . to promulgate specific rules relating to the scope of a locally owned airport."  S. Rep. No. 109-317, at 16.  Next, the court finds great significance in the <u>Air Pegasus of D.C., Inc.</u> plaintiff's failure to claim that its property interest was taken by the FAA's regulation.  <u>See</u> 424 F.3d at 1215 ("Air Pegasus does not appear to assert that its property was actually taken . . . .").  Instead, the plaintiff conceded that its "takings claim was really for compensation resulting from a 'derivative injury.'"  <u>Id.</u> Takings jurisprudence is clear that a "derivative injury" is not compensable.  Thus, while the plaintiff owned a property interest in its leasehold, <u>id.</u> at 1216, the Federal Circuit determined that Air Pegasus of D.C., Inc.

> did not itself own or operate any helicopters[ and] does not allege that the FAA's restrictions regulated <u>its</u> operations under the lease.  Instead, Air Pegasus basically alleges that the FAA, by regulating helicopters owned by third parties, frustrated its business expectations at the . . . heliport.  Therefore, like the appellant in <u>Omnia [Commercial Co.]</u>, Air Pegasus, while no doubt injured by reason of the government's actions, has not alleged a taking of private property under the Fifth Amendment.

Id.

In stark contrast, plaintiffs here specifically allege that the WARA regulated their conduct under the Master Lease, precluded them from operating their business, and directed the destruction of the Lemmon Avenue Terminal gates. Thus, plaintiffs lost the "right to exclude" by operation of federal legislation. Moreover, nothing in Air Pegasus of D.C., Inc. suggests that the plaintiff in that case erected any improvements upon the leased premises or that the FAA mandated that the plaintiff's leased premises be demolished to ensure that those premises could never be utilized for air transportation or related services again.

The court also declines to adopt defendant's argument that 767 Third Avenue Associates v. United States, 48 F.3d 1575 (Fed. Cir. 1995), aff'g 30 Fed. Cl. 216 (1993), provides significant guidance. There, the plaintiffs–767 Third Avenue Associates and its agent, Sage Realty Corporation–entered into leases with three organizations from the then-Socialist Federal Republic of Yugoslavia ("SFRY") in 1981. 48 F.3d at 1576. When these organizations extended their leases ten years later, "the SFRY was experiencing significant turmoil" that eventually erupted into a bloody ethnic and civil war. Id. at 1577. In 1992, the United States formally acknowledged that the SFRY ceased to exist, and President George H.W. Bush issued executive orders blocking the SFRY's property and interests, and freezing its assets. Id. As a result, the SFRY tenants sent lease termination notices to plaintiffs, and the United States Department of the Treasury ("Treasury Department") subsequently entered and inspected the premises that the SFRY tenants previously occupied.[43] Id. The plaintiffs sued, alleging that the government's closure of the SFRY's offices in its building "constituted a regulatory taking of its property, consisting of the benefits of its leases . . . ." Id. at 1578. The Court of Federal Claims held that no taking occurred.[44] See 767 Third Ave. Assocs., 30 Fed. Cl. at 221-23.

The Federal Circuit affirmed, recounting numerous instances in which the government exercised its sovereign powers against other countries and reasoning that plaintiffs "could not

---

[43]   Although Treasury Department agents posted a notice on the doors of the former SFRY tenants' offices stating that the premises were closed and that access was restricted, the government granted the plaintiffs access to the premises and later removed all restrictions. 767 Third Ave. Assocs., 48 F.3d at 1578. In fact, at no time were the locks changed or guards placed at the doors to restrict entry. Id. at 1583. Moreover, plaintiffs were granted access to the premises on the one occasion they requested access. Id.

[44]   The Court of Federal Claims determined that none of the plaintiffs had a "compensable investment-backed expectation 'to be free from government interference with [its] contract rights.'" 767 Third Ave. Assocs., 48 F.3d at 1578 (alteration in original) (quoting 30 Fed. Cl. at 222). Furthermore, the court held that the government's actions did not constitute a per se physical taking because "the government 'did not take physical possession of the subject premises and [plaintiffs were] never physically denied access to the property on those occasions when [they] asked for access.'" Id. (quoting 767 Third Ave. Assocs., 30 Fed. Cl. at 222).

have had a reasonable investment-backed expectation . . . that [their] leases to the SFRY organizations would proceed totally without interference by the government." 767 Third Ave. Assocs., 48 F.3d. at 1580. Indeed, the court emphasized that the plaintiffs could not have had a reasonable expectation of noninterference by the government in light of the possibility of changing world circumstances generally and, more specifically, the uncertain future of Yugoslavia and the instability in the Balkans, a region that succumbed to "turmoil for generations." Id. at 1581. Relying upon Omnia Commercial Co., the Federal Circuit explained that the government's actions "did not take any property interest of [the plaintiffs]" because the SFRY tenants "still had a legal obligation to pay rent," id. at 1582, and the government never acquired any obligation to pay rent or prevented plaintiffs from enforcing their agreements with the SFRY, id. at 1583. Accordingly, the Federal Circuit concluded, the "government's actions in this case . . . did not take [the plaintiffs'] interests in the leases."[45] Id.

As the Federal Circuit noted, nothing prevented the 767 Third Avenue Associates plaintiffs from finding new tenants to replace the SFRY tenants. That is hardly the situation in the case now before the court. The demolition of the gates simultaneously destroyed plaintiffs' lease rights and any hope they had of attracting new tenants. See supra note 10. Moreover, the government action at issue in 767 Third Avenue Associates did not affect the physical structure such that it could never again be utilized as rental property. As a result, the 767 Third Avenue Associates plaintiffs were not deprived of all economically beneficial or productive use of their property. See 48 F.3d at 1583-84. Unlike the plaintiffs in 767 Third Avenue Associates, which were dealing with an organization from a then-Soviet bloc country whose interests ran afoul of United States foreign policy, plaintiffs in the case sub judice allege they suffered a taking because Dallas and Fort Worth secured congressional intervention to (1) eliminate their ability to conduct business and (2) direct Dallas to destroy improvements at the Lemmon Avenue Terminal located on their leasehold property. There were no foreign policy concerns at stake in this case. Rather, the sole concern was to resolve air transportation issues related to the operations at Love Field and DFW. In order to modernize and redevelop the airport in accordance with the Love Field Master Plan, Dallas was required to acquire the 26.8 acres leased by plaintiffs and to demolish the Lemmon Avenue Terminal gates, and demolition of the gates ensured that the Lemmon Avenue Terminal could never again be used for passenger service. See Pls.' Ex. 2 at 4 (Contract art. I ¶ 5). Even assuming that Dallas did not demolish the Lemmon Avenue Terminal gates, the Contract nevertheless mandated that the leased premises never again be used for passenger air service. See id.

---

[45] The Federal Circuit also found that no per se taking occurred because the plaintiffs neither submitted to a physical occupation nor were subjected to a regulation that deprived them of all economically beneficial or productive use of their property. 48 F.3d at 1583. With regard to the latter, the Federal Circuit noted that the government's actions "were directed to keeping the SFRY organizations out of the property, not preventing use by [plaintiffs]." Id. at 1584. Indeed, the court noted, plaintiffs "might well have made other uses of the offices. It failed to request any such uses, however[, and plaintiffs'] failure to explore all possibilities serves to bar any regulatory taking claim." Id.

As the Federal Circuit explained in <u>Palmyra Pacific Seafoods, L.L.C. v. United States</u>, "when a party alleges that a contract has been taken, courts should distinguish between the claimed taking of the subject matter of a contract and the taking of the contract itself." 561 F.3d 1361, 1365 (Fed. Cir. 2009). The element absent from <u>Omnia Commercial Co.</u>, <u>Huntleigh USA Corp.</u>, <u>Air Pegasus of D.C., Inc.</u>, and <u>767 Third Avenue Associates</u> is that the plaintiffs never alleged that the government regulations at issue targeted their property rights or took their contracts. Indeed, the Federal Circuit determined that these cases were virtually identical. <u>See Huntleigh USA Corp.</u>, 525 F.3d at 1381 (stating that <u>Air Pegasus of D.C., Inc.</u> "is indistinguishable from this case because in both <u>Air Pegasus [of D.C., Inc.]</u> and this case the party alleging a taking, rather than having its own property taken, saw its business interests frustrated by governmental regulation of third parties"); <u>Air Pegasus of D.C., Inc.</u>, 424 F.3d at 1216 (stating that the plaintiff, "like the appellant in <u>Omnia [Commercial Co.]</u>, . . . while no doubt injured by reason of the government's actions, has not alleged a taking of private property"); <u>767 Third Ave. Assocs.</u>, 48 F.3d at 1581-83 (discussing <u>Omnia Commercial Co.</u>, noting that the circumstances of that case were virtually indistinguishable from the case before the Federal Circuit, and emphasizing that the government did not take any property interest). By contrast, plaintiffs have removed themselves from the circumstances presented in <u>Omnia Commercial Co.</u> and its progeny because they allege that the government specifically targeted and took their contractual rights under the Master Lease. In fact, plaintiffs assert that the WARA deprived them of all economically beneficial and productive use of their property because they could "no longer use or market the terminal and the gates or the leased premises, because they were slated for city acquisition." Pls.' Cross-Mot. 21. By asserting that the WARA extinguished their right to exclude under the Master Lease, <u>see supra</u> Part IV.B.4.a, plaintiffs present a set of facts which suggests that the WARA targeted their specific contractual right to quiet enjoyment under the Master Lease. Because plaintiffs assert that the WARA directly targeted their contract rights under the Master Lease by depriving them of all economically beneficial and productive use of their property through condemnation of their leases and demolition of the Lemmon Avenue Terminal gates, they have sufficiently alleged that this statute effected a taking and may present evidence in support of their theory.

Finally, defendant does not argue that plaintiffs, by constructing and operating the Lemmon Avenue Terminal, used their leaseholds in a manner that was harmful to public health or safety. Defendant also does not assert that any restriction placed upon plaintiffs' use of their leaseholds merely precludes them from engaging in a use prohibited by their leases. Accordingly, no argument has been made that the nuisance exception to a taking applies in this case.

In sum, the court, which assumes that plaintiffs' well-pled factual allegations are true and indulges in all reasonable inferences in favor of the nonmovant plaintiffs, <u>United Pac. Ins. Co.</u>, 464 F.3d at 1328, concludes that plaintiffs have pled "factual content to draw the reasonable inference that the defendant is liable for the misconduct alleged," <u>Iqbal</u>, 129 S. Ct. at 1949. Plaintiffs are entitled to offer evidence in support of their takings claim. <u>See</u> <u>Chapman Law Firm Co.</u>, 490 F.3d at 938. Accordingly, defendant's motion is denied.

**C. Plaintiffs' RCFC 56 Cross-Motion**

As discussed in Part III.D, supra, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. See RCFC 56(c). Plaintiffs argue that because the WARA mandated a legislative, physical taking of the Lemmon Avenue Terminal gates, they are entitled to partial summary judgment: "The [WARA]'s mandate that Dallas demolish the passenger gates deprives [Love Terminal Partners] of its pre-existing property right to exclude others (including Dallas) from invading these gates to destroy them. The legislative deprivation of [plaintiffs'] right to exclude, without more, constitutes a taking." Pls.' Cross-Mot. 30. The physical taking issue turns on the court's interpretation of the requirements arising under the WARA and is an issue of law that can be adjudicated on a motion for summary judgment. See Billings v. United States, 322 F.3d 1328, 1332 (Fed. Cir. 2003) ("The underlying issue, one of statutory . . . construction, is a question of law . . . ."); Santa Fe Pac. R.R. Co., 294 F.3d at 1340 (recognizing, in a takings case, that "[i]ssues of statutory interpretation and other matters of law may be decided on motion for summary judgment"); see also Palmyra Pac. Seafoods, L.L.C., 561 F.3d at 1361 ("[C]ontract rights can be the subject of a takings action." (citing Lynch, 292 U.S. at 579)). Before the court analyzes the WARA, it addresses plaintiffs' proposed findings of uncontroverted fact ("Pls.' PFUF") and defendant's objections thereto ("Def.'s Resp. Pls.' PFUF") in order to determine whether any genuine issue of material fact exists that would preclude summary judgment.

**1. Defendant's Discovery-Related Objections Are Insufficient Under RCFC 56**

In support of their cross-motion, plaintiffs propose six findings of uncontroverted fact. The parties do not dispute that the WARA provided, among other things, that Dallas would "'determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006.'" Pls.' PFUF ¶ 2 (quoting Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012); Def.'s Resp. Pls.' PFUF ¶ 2. Additionally, the parties do not dispute the October 18, 2006 passage of the Dallas City Council Resolution, which provided, in part, that

> "after the administrator of the [FAA] has provided notice to Congress in accordance with Section of Public Law 109-352, the City Manager and the City Attorney are hereby directed to promptly take all necessary steps to ensure that the City of Dallas complies with provisions of Public Law 109-352 and all other applicable laws, including taking all appropriate steps to acquire, including the exercise of the right of eminent domain, if such becomes necessary, all or a portion of the leasehold interests, if any, from Virginia Aerospace, . . . Love Terminal Partners . . . , and all other persons claiming an interest in certain tracts of property at Love Field with addresses of 7701 and 7777 Lemmon Avenue."

Pls.' PFUF ¶ 4 (quoting Pls.' Ex. 6 at 2 (Dallas City Council Resolution § 1)); Def.'s Resp. Pls.'

PFUF ¶ 4.  Defendant, however, disputes that plaintiffs owned the Lemmon Avenue Terminal.
Compare Pls.' PFUF ¶ 1 (stating that Love Terminal Partners owned the Lemmon Avenue
Terminal), with Def.'s Resp. Pls.' PFUF ¶ 1 (asserting that the Lemmon Avenue Terminal "is
and always has been owned by . . . Dallas" (citing Def.'s Reply Ex. B at 27 (Master Lease art.
XVII ¶ 1))).  Defendant also contends that numerous elements of the WARA do not apply to
certificated air carriers.  Compare Pls.' PFUF ¶ 3 (enumerating various "contractual rights and
obligations existing as of the effective date of the [WARA] for certificated air carriers providing
scheduled passenger service at Love Field on July 11, 2006"), with Def.'s Resp. Pls.' PFUF ¶ 3
("[N]umerous elements of the Local Agreement, including provisions related to the disposition
of the leased property at Love Field, do not relate to certificated air carriers . . . ." (emphasis
added)).  Furthermore, defendant raises several discovery-based objections.  See, e.g., Def.'s
Resp. Pls.' PFUF ¶¶ 1, 5, 6 (asserting that defendant cannot provide complete responses to
plaintiffs' proposed finding of uncontroverted fact because it has not been provided with an
opportunity to conduct discovery); see also Def.'s Reply 27 (arguing that plaintiffs' cross-motion
should be denied because "the United States has not had an opportunity to conduct discovery at
this early stage of the litigation regarding threshold issues necessary to make such a
determination, such as the scope of Plaintiffs' property interest").

Defendant's discovery-based objections are insufficient under RCFC 56.  Generally,
courts should not rule upon a motion for summary judgment prior to affording the parties an
opportunity to conduct discovery.  See Celotex Corp., 477 U.S. at 322 (allowing summary
judgment after an "adequate time for discovery").  Nevertheless, RCFC 56(e) provides that a
party opposing summary judgment must "by affidavits or as otherwise provided in this rule–set
out specific facts showing a genuine issue for trial."  Reliance "merely on allegations or denials
in its own pleading" is insufficient, and the court may enter summary judgment against the
opposing party if it fails to respond in the manner prescribed under the rule.  Id.

RCFC 56(f) "enables a court to deny or stay a motion for summary judgment to permit
additional discovery if the non-movant explains by affidavit why it cannot fulfill the
requirements of RCFC 56(e)."  Theisen Vending Co. v. United States, 58 Fed. Cl. 194, 197
(2003).  It provides:

> If a party opposing the motion shows by affidavit that, for specified reasons, it
> cannot present facts essential to justify its opposition, the court may:
>
> (1) deny the motion;
>
> (2) order a continuance to enable affidavits to be obtained, depositions to
> be taken, or other discovery to be undertaken; or
>
> (3) issue any other just order.

RCFC 56(f).  The party "must set forth 'with some precision,' the evidence it hopes to obtain,

how this evidence would likely disclose issues of material fact, and why it is unable to access such evidence without further discovery." Padilla v. United States, 58 Fed. Cl. 585, 593 (2003). Thus, the opposing party "cannot evade summary judgment simply by arguing that additional discovery is needed; rather, [it] must meet the requirements of Rule 56(f)." Brown v. Miss. Valley State Univ., 311 F.3d 328, 333 n.5 (5th Cir. 2002); see also Keebler Co. v. Murray Bakery Prods., 866 F.2d 1386, 1389 (Fed. Cir. 1989) ("A party may not simply assert that discovery is necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit.").

The Theisen Vending Co. court, following an examination of the standards set forth by several circuit courts of appeals, articulated a five-part set of prerequisites for relief under RCFC 56(f):

> [T]he non-movant must by affidavit and supporting papers: (1) specify the particular factual discovery being sought, (2) explain how the results of the discovery are reasonably expected to engender a genuine issue of material fact, (3) provide an adequate factual predicate for the belief that there are discoverable facts sufficient to raise a genuine and material issue, (4) recite the efforts previously made to obtain those facts, and (5) show good grounds for the failure to have discovered the essential facts sooner.

58 Fed. Cl. at 198. The court emphasized that "[t]hese prerequisites should not impair the salutary, generous purposes of the Rule." Id.

Here, defendant neither moved for discovery nor submitted any affidavit in support of a discovery request. In Padilla, the plaintiff filed a motion for discovery, though the court noted that the plaintiff's failure to file an affidavit with its motion constituted "procedural error." 58 Fed. Cl. at 593. Notwithstanding the plaintiff's error, the court determined that the plaintiff merely asserted that discovery was necessary without complying with the substantive requirements of RCFC 56(f) and, on that basis, denied the motion. Id. Even if the court here liberally construes defendant's statements in its reply and responses to plaintiffs' proposed findings of uncontroverted fact as requests for discovery in this case, defendant has still failed to (1) specify what discovery is needed, (2) indicate how that discovery might raise a genuine issue of material fact, (3) explain whether it previously endeavored to obtain those facts, and (4) state grounds for its failure to have discovered those facts at an earlier time. See Theisen Vending Co., 58 Fed. Cl. at 198.

Defendant had, but did not pursue, an opportunity to contest the information contained in Mr. Naul's declaration that accompanied plaintiffs' cross-motion. Defendant, as the nonmoving party, did not produce any evidence that raises a genuine issue of fact material to the outcome of the case. See Eli Lilly & Co., 251 F.3d at 971. As such, defendant does not sufficiently contradict Mr. Naul's testimony concerning the following facts:

1.      Love Terminal Partners "owned a luxury airline terminal building, containing six passenger gates, at Love Field . . . ."  Pls.' PFUF ¶ 1 (citing Pls.' Ex. 1 at 1-2 (Naul Decl. ¶¶ 1, 3-4)).[46]

2.      The Justice Court for Dallas County, on December 9, 2008, issued an order granting Dallas possession of the leased premises, and plaintiffs surrendered possession of the leased premises to Dallas.  Pls.' PFUF ¶ 5 (citing Pls.' Ex. 1 (Naul Decl. ¶ 13); Pls.' Ex. 4).

3.      Love Terminal Partners has not been paid any compensation for the alleged taking of its leased premises or the Lemmon Avenue Terminal and its six gates.  Pls.' PFUF ¶ 6 (citing Pls.' Ex. 1 (Naul Decl. ¶ 15)).

Furthermore, defendant's objection to plaintiffs' third proposed finding of uncontroverted fact states that plaintiffs "are seeking a legal interpretation of the [WARA]" and indicates that "numerous elements" of the Contract do not pertain to certificated air carriers.  Def.'s Resp. Pls.' PFUF ¶ 3.  This objection does not defeat an award of summary judgment because statutory construction and contract interpretation are both matters of law.  See Hawkins v. United States, 469 F.3d 993, 1000 (Fed. Cir. 2006) ("Statutory construction is a matter of law . . . ."); Billings, 322 F.3d at 1332.  Accordingly, absent a genuine issue of material fact, the court directs its attention to the pertinent question of law.

### 2. Principles of Statutory Construction

Plaintiffs argue that the WARA incorporates the entirety of the Contract and mandates that Dallas comply with the Love Field Master Plan, thereby obligating Dallas (1) to acquire plaintiffs' leasehold interests and (2) to demolish the Lemmon Avenue Terminal.  Defendant asserts that plaintiffs' interpretation is incorrect, emphasizing that the United States has not restricted plaintiffs' use of its property.  Furthermore, defendant argues that the WARA only

----

[46] Although defendant cites the Master Lease in support of its contention that Dallas owned the Lemmon Avenue Terminal, see Def.'s Resp. Pls.' PFUF ¶ 1 (citing Def.'s Reply Ex. B at 27 (Master Lease art. XXVII ¶ 1)), plaintiffs note that "the facts are undisputed that [Love Terminal Partners] constructed its terminal on land leased from [Virginia Aerospace], and the underlying fee estate is owned by the city of Dallas," Pls.' Reply 27 (emphasis added). Furthermore, plaintiffs' leasehold constitutes an interest in real property under Texas law.  See Travis Cent. Appraisal Dist., 140 S.W.3d at 841; Panola County Appraisal Dist., 69 S.W.3d at 284.  As the Court of Appeals of Texas explained, "[b]ecause the City owns the improvements but leases them to appellees, it is perfectly correct to refer to appellees' ownership interests in the leased facilities and allow them the right to 'sell' that leasehold interest."  Travis Central Appraisal Dist., 140 S.W.3d at 841.  Thus, plaintiffs "possess[] a 'stick in the bundle of property rights,'" Adams, 391 F.3d at 1218 (quoting Ammon, 209 F.3d at 1374), though ascertaining the precise scope of those rights may require discovery.

incorporates limited contractual rights and obligations.

When construing a statute, courts begin with the "literal text, giving it its plain meaning," Hawkins, 469 F.3d at 1000; see also Williams v. Taylor, 529 U.S. 420, 431 (2000) ("We start, as always, with the language of the statute."), and "must presume that a legislature says in a statute what it means and means in a statute what it says there,"[47] Germain, 503 U.S. at 253-54. Words in a statute "are assumed to bear their 'ordinary, contemporary, common meaning.'" Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 207 (1997). "Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." Timex V.I., Inc., 157 F.3d at 882. In cases where the statute's text does not explicitly address the precise question, then courts rely upon other tools of statutory construction, including the statute's structure and legislative history. Id. Additionally, "[i]n expounding a statute, [courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." United States v. Boisdore's Heirs, 49 U.S. (8 How.) 113, 122 (1850). As the Federal Circuit has instructed, "[c]orrect statutory interpretation is that which is 'most harmonious with [the statutory] scheme and with the general purposes that Congress manifested." BlackLight Power, Inc. v. Rogan, 295 F.3d 1269, 1273 (Fed. Cir. 2002) (quoting Comm'r v. Engle, 464 U.S. 206, 217 (1984)) (second alteration in original); see also Delverde SrL v. United States, 202 F.3d 1360, 1364-65 (Fed. Cir. 2000) (stating that a court "must try to read the statute as a whole, to give effect to all of its parts, and to avoid, if possible, rendering language superfluous").

### 3. The Doctrine of Judicial Estoppel Does Not Apply to Plaintiffs' Contrary Positions Advanced Before the Northern District of Texas and the Court of Federal Claims

Defendant places some importance upon the fact that plaintiffs advance an argument in this case that is opposite to one they advanced in their antitrust litigation before the Northern District of Texas. In the Texas litigation, plaintiffs argued that the WARA addressed, among other things, the reduction of gates at Love Field, but did not compel Dallas to demolish the Lemmon Avenue Terminal gates. In this case, defendant asserts that plaintiffs' argument before the district court was correct, but that the North District of Texas erred in its interpretation of the WARA.

That plaintiffs asserted an argument in their antitrust litigation before the Northern District of Texas that is contrary to the position they now advance in the Court of Federal Claims warrants a brief discussion of the equitable doctrine of judicial estoppel, which is "designed to 'protect the integrity of the judicial process . . . .'" CRV Enters., Inc. v. United States, 626 F.3d

---

[47] Although "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation," the Supreme Court described this principle as the one cardinal canon that precedes all others. Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992); see also Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) ("The first and foremost 'tool' to be used is the statute's text, giving it its plain meaning.").

1241, 1248 (Fed. Cir. 2010).  The doctrine of judicial estoppel "posits that 'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." HighQBPO, LLC v. United States, 84 Fed. Cl. 360, 364 (2008) (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)); see also Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000) (stating that judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase"); cf. James Wm. Moore et al., Moore's Federal Practice § 134.30 (3d ed. 2009) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.").  Judicial estoppel "is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996).  Because it "serves a different function from other forms of estoppel, such as equitable estoppel or collateral estoppel[,] . . . judicial estoppel may apply in contexts when other forms of estoppel do not."[48] United States v. Owens, 54 F.3d 271, 275 (6th Cir. 1995).  A decision whether to invoke judicial estoppel lies within the court's discretion.  Id.; see also New Hampshire v. Maine, 532 U.S. 742, 750 (2001) ("Because the rule is intended to prevent 'improper use of judicial machinery,' estoppel 'is an equitable doctrine invoked by a court at its discretion[.]'" (citation omitted)).

As the Court of Federal Claims explained, "there is no precise formula regarding when the doctrine of judicial estoppel should be applied . . . ."  Alpha I, L.P. ex rel. Sands v. United States, 89 Fed. Cl. 347, 360 (2009); accord New Hampshire, 532 U.S. at 750.  Nevertheless, the Supreme Court articulated several factors that inform a court's determination:

> First, a party's later position must be "clearly inconsistent" with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled[.]"  Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations and thus poses little threat to judicial integrity.

---

[48]  Defendant notes:

> [B]ecause the United States was not a party to the district court litigation, the decision in that case has no preclusive effect in the instant case, and neither issue preclusion nor claim preclusion appl[ies] to the findings in that case.  Collateral estoppel or issue preclusion may only be applied to a "party to the prior litigation."

Def.'s Reply 12 n.7 (quoting Montana v. United States, 440 U.S. 147, 153 (1979)).  As discussed below, Federal Circuit precedent sets forth that privity is also a necessary element for application of judicial estoppel.

A third consideration is whether the party seeking to assert an inconsistent
position would derive an unfair advantage or impose an unfair detriment on the
opposing party if not estopped.

    In enumerating these factors, we do not establish inflexible prerequisites
or an exhaustive formula for determining the applicability of judicial estoppel.
Additional considerations may inform the doctrine's application in specific factual
contexts.

New Hampshire, 532 U.S. at 750-51 (citations omitted).  Additionally, while a "majority of
courts do not require mutuality of judicial estoppel," viz., that "a party is not required to have
been a party to the prior proceeding to be able to invoke judicial estoppel,"[49] 18 Moore et al.,
supra, at § 134.33, the Federal Circuit has retained the privity requirement, see Jackson Jordan,
Inc. v. Plasser Am. Corp., 747 F.2d 1567, 1579 (Fed. Cir. 1984) (stating that "[n]o case is cited
where the doctrine [of preclusion of inconsistent positions (i.e., judicial estoppel)] was applied in
favor of a total stranger to the first phase of the dispute . . . or . . . outside the context of a
particular set of related transactional facts").

    Since the United States was not a party in the Northern District of Texas antitrust
litigation, the privity requirement is not satisfied.  See id.  Notwithstanding the absence of
privity, the doctrine of judicial estoppel would not apply for another important reason: plaintiffs
failed to persuade the Northern District of Texas to accept their interpretation of the WARA, an
interpretation that is contrary to the one they advance here.  It is immaterial, for the purpose of
analyzing any potential judicial estoppel issue, that plaintiffs did not ultimately prevail on the
merits before the Northern District of Texas.  See Reynolds v. Comm'r, 861 F.2d 469, 473 (6th
Cir. 1988) ("The 'prior success' requirement does not mean that the party against whom the
judicial estoppel doctrine is to be invoked must have prevailed on the merits.  'Rather, judicial
acceptance means only that the first court has adopted the position urged by the party, either as a
preliminary matter or as a part of a final disposition.'" (quoting Edwards v. Aetna Life Ins. Co.,
690 F.2d 595, 599 n.5 (6th Cir. 1982))).  Therefore, the doctrine of judicial estoppel has no
application in this case.

---

    [49] See, e.g., Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1286 (11th Cir. 2002)
(stating that doctrine of judicial estoppel "protects the integrity of the judicial system, not the
litigants; therefore, . . . '[w]hile privity and/or detrimental reliance are often present in judicial
estoppel cases, they are not required'" (quoting Ryan Operations G.P. v. Santiam-Midwest
Lumber Co., 81 F.3d 355, 360 (3d Cir. 1996))); Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214,
1220 (6th Cir. 1990) ("Judicial estoppel is not bounded by the limits of mutuality and finality that
protect the parties in collateral estoppel.").

### 4.  Numerous Provisions of the WARA Contain Language Utilized in the Contract

The purpose of the WARA was to "implement a compromise agreement reached by the City of Dallas; the City of Fort Worth, Texas; American Airlines; Southwest Airlines; and Dallas-Fort Worth International Airport . . . on July 11, 2006, regarding air service at Dallas Love Field."[50]  H.R. Rep. No. 109-600, pt. 1, at 1; see also Pls.' Ex. 2 at 2 (Contract art. I ¶ 1 (providing that the signatories "agree[d] to seek the enactment of legislation to allow for the full implementation of [the] Contract" (emphasis added))); H.R. Rep. No. 109-600, pt. 2, at 31 (expressing support from Congressman John Conyers, Jr. for an amendment to draft legislation that would "preserve[] the agreement made by the parties").  Although the Contract is not explicitly referenced in the statute until section 5, it is clear that Congress intended to incorporate the Contract into the statute.[51]

### a.  The WARA Contains Identical Provisions to Those Set Forth in the Contract

Congress utilized language throughout the WARA that borrows from or is virtually identical to language in the Contract.  Such similarities are apparent in at least five statutory provisions.  First, Congress modified section 29(c) of the International Air Transportation Competition Act of 1979 to provide that

> [a]ir carriers and, with regard to foreign air transportation, foreign air carriers, may offer for sale and provide through service and ticketing to or from Love Field, Texas, and any United States or foreign destination through any point within Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri, or Alabama.

Pub. L. No. 109-352, § 2(a), 120 Stat. at 2011.  Section 2(a) of the WARA is consistent with the Contract, wherein the signatories sought "[t]o immediately allow airlines serving Love Field to offer through ticketing between Love Field and any destinations (including international destinations) through any point in Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana,

---

[50]  In fact, the Contract signatories covenanted that they would "support, encourage and seek the passage of legislation necessary and appropriate to implement the terms and spirit of [the] Contract.  The Parties each separately covenant[ed] that they [would] oppose any legislative effort that [was] inconsistent with the terms of [the] Contract."  Pls.' Ex. 2 at 6 (Contract art. I ¶ 14).  The signatories' support for the WARA evidences their belief that the legislation would fully implement the Contract.

[51]  The Court of Appeals of Texas noted that the WARA "explicitly incorporate[d] many of the Love Field Agreement's provisions."  Love Terminal Partners, L.P., 256 S.W.3d at 896.  A similar determination was made by the Northern District of Texas.  See Love Terminal Partners, L.P., 527 F. Supp. 2d at 547 ("The [WARA] explicitly incorporate[d] many of the Contract's provisions.").

Mississippi, Missouri, and Alabama, and to market such services[.]"  Pls.' Ex. 2 at 2 (Contract art. I ¶ 1(a)).  Second, the WARA repealed the Wright Amendment after a period of eight years, Pub. L. No. 109-352, § 2(b), 120 Stat. at 2011, which gave effect to the signatories' explicit intent, see Pls.' Ex. 2 at 2-3 (Contract art. I ¶¶ 1, 1(b) (stating that the signatories sought to effect the repeal of the Wright Amendment and "eliminate all the remaining restrictions on air service from Love Field after eight years from the enactment of legislation")).  Third, Congress restricted charter flights at Love Field to destinations within the fifty states and the District of Columbia, and limited charter flights to "no more than 10 per month per air carrier for charter flights" beyond Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri, and Alabama, Pub. L. No. 109-352, § 4(a)(1)-(2), 120 Stat. at 2011, restrictions expressly enumerated in the Contract, see Pls.' Ex. 2 at 10 (Contract art. II § 16 (providing that "[c]harter flights at Love Field shall be limited to destinations within the 50 United States and the District of Columbia and shall be limited to no more than ten per month per air carrier except as otherwise permitted by Section 29(c) of the Wright Amendment")).  Fourth, Congress mandated that "[a]ll flights operated to or from Love Field by air carriers that lease terminal gate space at Love Field shall depart from and arrive at one of those leased gates."  Pub. L. No. 109-352, § 4(b), 120 Stat. at 2012.  Although this provision contains two exceptions that were not incorporated in the Contract,[52] see id. § 4(b)(1)-(2), it is virtually identical in form and substance to the relevant Contract provision, see Pls.' Ex. 2 at 10 (Contract art. II § 16 ("All flights operated by air carriers that lease terminal gate space shall depart from and arrive at one of those leased gates.")).  Fifth, Congress provided that "[c]harter flights from Love Field . . . operated by air carriers that do not lease terminal space at Love Field may operate from nonterminal facilities or one of the terminal gates at Love Field," Pub. L. No. 109-352, § 4(c), 120 Stat. at 2012, language that mirrors the Contract, see Pls.' Ex. 2 at 10 (Contract art. II § 16 ("Charter flights operated by air carriers that do not lease terminal space may operate from non-terminal facilities or one of the 20 terminal gates.").

These examples, standing alone, constitute strong evidence that Congress intended to incorporate the Contract into the WARA.  Additionally, numerous provisions within section 5 of the WARA support this conclusion:

1.    Dallas "shall reduce as soon as practicable, the number of gates available for passenger air service at Love Field to no more than 20 gates."  Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012; cf. Pls.' Ex. 2 at 3 (Contract art. I § 3 ("[C]onsistent with a revised Love Field Master Plan . . . , the number of gates available for passenger air service at Love Field will be, as soon as practicable, reduced from the 32 gates envisioned in the 2001 Love Field Master Plan to 20 gates . . . .")).

---

[52]  The two exceptions concern "flights operated by an agency of the Federal Government or by an air carrier under contract with an agency of the federal government" and "irregular operations."  Pub. L. No. 109-352, § 4(b)(1)-(2), 120 Stat. at 2012.

2.     "[T]he number of gates available for such service shall not exceed a maximum of 20 gates."  Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012; <u>cf.</u> Pls.' Ex. 2 at 3 (Contract art. I § 3 ("Love Field will thereafter be limited permanently to a maximum of 20 gates.")).

3.     Nothing in the WARA

> shall affect general aviation service at Love Field, including flights to or from Love Field by general aviation aircraft for air taxi service, private or sport flying, aerial photography, crop dusting, corporate aviation, medical evacuation, flight training, police or fire fighting, and similar general aviation purposes, or by aircraft operated by any agency of the Federal Government or by any air carrier under contract to any agency of the Federal Government.

Pub. L. No. 109-352, § 5(c), 120 Stat. at 2012; <u>cf.</u> Pls.' Ex. 2 at 10 (Contract art. II ¶ 16 (providing that "[n]othing in this Contract is intended to affect general aviation service at Love Field, including, but not limited to, flights to or from Love Field by general aviation aircraft for air taxi service, private or sport flying, aerial photography, crop dusting, business flying, medical evacuation, flight training, police or fire fighting, and similar general aviation purposes, or by aircraft operated by any agency of the U.S. Government or by any airline under contract to any agency of the U.S. Government")).

4.     "No Federal funds or passenger facility charges may be used to remove gates at the Lemmon Avenue facility, Love Field, in reducing the number of gates as required under this Act . . . ."  Pub. L. No. 109-352, § 5(b), 120 Stat. at 2012; <u>cf.</u> Pls.' Ex. 2 at 4 (Contract art. I ¶ 5 ("The City of Dallas . . . agrees that it will acquire all or a portion of the lease on the Lemmon Avenue facility . . . necessary to fulfill its obligations under this Contract. The City of Dallas further agrees to the demolition of the gates at the Lemmon Avenue facility . . . .")).

In short, the WARA either replicates or gives effect to parallel Contract provisions, thereby indicating that the Contract formed the basis upon which the WARA was drafted.  Indeed, Senator Hutchison, within two days after the Contract was executed, introduced a bill in the United States Senate that mirrored the Contract's provisions.  The court's conclusion is also supported by the Northern District of Texas's ruling in <u>Love Terminal Partners, L.P.</u>, which determined that the Contract contained many terms that the WARA later explicitly adopted.

**b.  The WARA Explicitly References the Contract**

In addition to incorporating Contract language into the WARA, the statute also explicitly references the Contract.  As explained fully in Part IV.C.4.c.ii, <u>infra</u>, the clause "in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006" refers directly to the Contract.  Moreover, specific references to the Contract, the date on which it was executed, and its signatories are contained in section 5(d) of the WARA, which provides:

(d) ENFORCEMENT. –

(1) IN GENERAL. – Notwithstanding any other provision of law, the Secretary of Transportation and the Administrator of the [FAA] may not make findings or determinations, issue orders or rules, withhold airport improvement grants or approvals thereof, deny passenger facility charge applications, or take any other actions, either self-initiated or on behalf of third parties–

(A) that are inconsistent with the <u>contract dated July 11, 2006, entered into by the city of Dallas, the city of Fort Worth, the DFW International Airport Board, and others regarding the resolution of the Wright Amendment issues</u>, unless actions by the <u>parties to the contract</u> are not reasonably necessary to implement <u>such contract</u>; or

(B) that challenge the legality of any provision of <u>such contract</u>.

Pub. L. No. 109-352, § 5(d)(1)(A)-(B), 120 Stat. at 2012 (emphasis added).  Furthermore, Congress stipulated that the "contract described in paragraph (1)(A) of this subsection, and any actions taken by the parties to such contract that are reasonably necessary to implement its provisions, shall be deemed to comply in all respects with the parties' obligations under title 49, United States Code." <u>Id.</u> § 5(d)(2), 120 Stat. at 2013.  The only contract described in section 5(d)(1)(A) is, as noted above, the Contract executed by Dallas, Fort Worth, the DFW Board, American, and Southwest on July 11, 2006.  Accordingly, the court determines that the explicit references to the Contract in the language of the statute demonstrate Congress's intent to incorporate the Contract into the WARA.

### c.  Section 5 of the WARA Codifies Under Federal Law Specific Obligations Set Forth in the Contract

Congress, by incorporating the Contract into the WARA, rendered the obligations set forth in the Contract matters of federal law.  See Love Terminal Partners, L.P., 256 S.W.3d at 897 (referencing section 5 of the statute); see also Love Terminal Partners, L.P., 527 F. Supp. 2d at 558 (holding that the statute incorporated "all the rights and obligations of the Contract" (emphasis added)).  Indeed, during the state court litigation, Dallas, along with other named defendants employed by the city, advanced this precise argument, claiming that "since Dallas' performance is now compelled by federal law, any challenge to the Love Field [Local] Agreement is moot."  Love Terminal Partners, L.P., 256 S.W.3d at 897 (emphasis added).  The Court of Appeals of Texas ultimately agreed.  Id.

Section 5(a) of the WARA enumerates the specific obligations imposed upon Dallas under federal law.[53]  The court addresses each below.

### i.  The WARA Requires That Dallas Reduce the Number of Gates at Love Field

The WARA provides that Dallas "shall reduce as soon as practicable, the number of gates available for passenger air service at Love Field to no more than 20 gates."  Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012.  Use of the term "shall" denotes the imperative and connotes a mandatory obligation.  See Merck & Co. v. Hi-Tech Pharmacal Co., 482 F.3d 1317, 1322 (Fed. Cir. 2007); Sys. Fuels, Inc. v. United States, 65 Fed. Cl. 163, 173 (2005).  Nothing in the WARA's language explicitly states or suggests that the term "shall" does not mean exactly what it says.  Whereas the Contract indicates that all of the signatories collectively agreed to reduce the number of gates at Love Field, see Pls.' Ex. 2 at 3 (Contract art. I ¶ 3 ("The Parties agree [to] . . . reduce[] . . . the 32 gates . . . to 20 gates and that Love Field will thereafter be limited permanently to a maximum of 20 gates")), the WARA imposes that obligation solely upon Dallas.[54]  The requirement that Dallas reduce the number of gates is again referenced in section 5(d)(2), which provides that certain provisions of the WARA "shall only apply with respect to

---

[53]  As discussed in Part IV.C.4.a, supra, these obligations were derived from the Contract executed by five signatories: Dallas; Fort Worth; the DFW Board; and American and Southwest, two certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006.

[54]  Defendant argues that the WARA "incorporates certain rights and obligations only 'for certificated air carriers.'"  Def.'s Reply 13-14.  Yet, it is clear that under the Contract, no specific signatory was obligated to reduce the number of gates at Love Field.  Three of those parties–Dallas, Fort Worth, and the DFW Board–are not certificated air carriers.  Congress, by mandating that Dallas reduce the gates, clarified that this obligation rested with one signatory, which is not a certificated air carrier.  Accordingly, defendant's position that the WARA only applies to certificated air carriers is unsustainable based upon a plain reading of the statute.

facilities that remain at Love Field <u>after the city of Dallas has reduced the number of gates at Love Field as required by subsection (a)</u> . . . ."  Pub. L. No. 109-352, § 5(d)(2)(A), 120 Stat. at 2013 (emphasis added).  Therefore, failure on the part of Dallas to reduce the number of gates to no more than twenty constitutes a violation of the WARA and, in turn, a violation of federal law.

The WARA also mandates that "the number of gates available for such service shall not exceed a maximum of 20 gates."  <u>Id.</u> § 5(a), 120 Stat. at 2012.  Once again, this requirement is mandatory and is derived from the Contract, <u>see</u> Pls.' Ex. 2 at 3 (Contract art. I ¶ 3), and there is no indication that the term "shall," as used here, does not mean exactly what it says.  Furthermore, the WARA imposes upon Dallas the additional obligation of ensuring that no more than twenty gates at Love Field are utilized for passenger air service now or in the future.  § 5(d)(2)(B)(i), 120 Stat. at 2013 (providing that certain provisions of the WARA shall not be construed to require the city of Dallas "<u>to construct additional gates beyond the 20 gates referred to in subsection (a)</u>" (emphasis added)).

Because the Love Field Master Plan, as indicated by the Contract signatories, originally envisioned thirty-two gates at the airport, <u>see</u> Pls.' Ex. 2 at 3 (Contract art. I ¶ 3 ("[T]he number of gates available for passenger air service at Love Field will be, as soon as practicable, reduced from the 32 gates envisioned in the 2001 Love Field Master Plan to 20 gates . . . .")), the next inquiry focuses upon how Dallas must determine which gates are eliminated in order to comply with the WARA's mandate that no more than twenty gates can be made available for passenger service.

## ii.  The WARA Requires That Dallas Allocate the Number of Gates in Accordance With the Contract

The WARA provides that

<u>[t]he city of Dallas</u>, pursuant to its authority to operate and regulate the airport as granted under chapter 22 of the Texas Transportation Code and this Act, <u>shall determine the allocation of leased gates</u> and manage Love Field <u>in accordance with contractual rights and obligations existing</u> as of the effective date of this Act <u>for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006</u>.[55]

---

[55]  Defendant argues that plaintiffs' interpretation of the WARA is incorrect because it believes plaintiffs omit or ignore the phrase "effective date of this Act."  In construing the WARA, the court must give effect to the language Congress employed, including the phrase "effective date of this Act."  It is apparent that Congress, by utilizing this phrase, recognized that only certain provisions of the Contract became effective on July 11, 2006.  The Contract provides:

6.  <u>EFFECTIVE DATE</u>.  Notwithstanding anything to the contrary herein, the

Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012 (emphasis & footnote added).  Once again, use of the term "shall" denotes the imperative and connotes a mandatory obligation, and nothing in this language explicitly states or suggests that the term "shall" does not mean exactly what it says. The WARA does not provide Dallas with any discretion to determine which gates it must remove.[56]  Instead, Dallas must allocate leased gates "in accordance with those rights and obligations existing . . . for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006."[57]  Id.  This language specifically references the Contract.  The July 11,

---

Parties agree that (i) Sections 1, 7, 8, 9, 14, 15, and 16 of Article I and all Sections of Article II shall take effect as of the last date of execution of this Contract by any of the Parties and (ii) the remaining Sections of Article I shall take effect on the date that legislation that would allow the Parties to implement the terms and spirit of this Contract is signed into law.

Pls.' Ex. 2 at 8 (Contract art. II ¶ 6) (emphasis added).  The Contract provisions that expressly addressed gate allocation are contained in paragraph 3 of article I.  See id. at 3 (Contract art. I ¶ 3).  Although the signatories bound themselves to these provisions on July 11, 2006, these provisions did not take effect until the WARA was signed into law.  Therefore, Congress, by utilizing the phrase "effective date of this Act" within the clause "contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006," Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012, recognized that paragraph 3 of article I addressed contractual rights and obligations that existed, but had yet to take effect, as of the effective date of the WARA.  Indeed, these provisions could not take legal effect unless and until congressional action permitted implementation thereof.  Thus, the WARA enabled these contractual rights and obligations to become mandatory under federal law as of the effective date of the WARA.

[56] Plaintiffs advanced an argument in their antitrust litigation that section 5(a) did not require Dallas to determine the allocation of leased gates at Love Field in accordance with rights and obligations specified in the Contract.  See Love Terminal Partners, L.P., 527 F. Supp. 2d at 558; supra Part IV.C.3.  The Northern District of Texas rejected this argument.  See Love Terminal Partners, L.P., 527 F. Supp. 2d at 558-60.

[57] In their antitrust litigation, plaintiffs argued that, under the doctrine of last antecedent, the phrase "in accordance with contractual rights and obligations" modified the obligation imposed upon Dallas to manage Love Field, not the obligation to determine the allocation of leased gates.  527 F. Supp. 2d at 558.  The doctrine of last antecedent "is a canon of statutory construction, which states that 'qualifying words, phrases and clauses must be applied to the words or phrases immediately preceding them and are not to be construed as extending to and including others more remote.'"  Demko v. United States, 216 F.3d 1049, 1053 (Fed. Cir. 2000) (quoting Wilshire Westwood Assocs. v. Atl. Richfield Corp., 881 F.2d 801, 804 (9th Cir. 1989)). Like its corollary, the rule of punctuation, the doctrine of last antecedent is a guideline and not an absolute rule.  Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1336 (Fed. Cir. 2008)

2006 date is not coincidental.  See, e.g., H.R. Rep. No. 109-600, pt. 2, at 11 (explaining that section 5 "provides that any action taken by the parties that is reasonably necessary to implement the provisions of the July 11, 2006 agreement, and the agreement itself, is deemed to comply in all respects with the parties['] obligations under title 49, United States Code"); see also Pub. L. No. 109-352, § 5(d)(2), 120 Stat. at 2013 (providing that the Contract "shall be deemed to comply in all respects with the parties' obligations under title 49).  Indeed, it represents the date on which the signatories executed the Contract.  See Pls.' Ex. 2 at 10-11.

     Additionally, the certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006, were either signatories to the Contract–American and Southwest–or mentioned therein–ExpressJet Airlines, Inc. ("ExpressJet").  As the Senate Committee on Commerce, Science, and Transportation specifically recognized, American and Southwest engaged in extensive negotiations concerning their rights at Love Field:

> [L]ocal community leaders have reached a consensus[, which is] . . . reflected in an agreement dated July 11, 2006.

> (5) The agreement dated July 11, 2006, does not limit an air carrier's access to the Dallas Fort Worth metropolitan area, and in fact may increase access opportunities to other carriers and communities.  It is not Congressional intent to limit any air carrier's access to either airport. . . .

> . . . .

> (7) Congress also recognizes that the agreement, dated July 11, 2006, does not harm any city that is currently being served by these airports, and thus the

---

(citing Bingham, Ltd. v. United States, 724 F.2d 921, 926 n.3 (11th Cir. 1984)).  The Northern District of Texas rejected plaintiffs' argument, holding that the WARA "plainly and unambiguously incorporate[d] all of the rights and obligations of the Contract," and explain[ed]:

> [P]laintiffs' attempt to avoid the Act's clear statutory intent by relying on the doctrine of last antecedent, which "is hardly a mandatory rule of statutory construction," "can assuredly be overcome by other indicia of meaning," and "is not applied where the context indicates otherwise[.]"

>      In relevant part, § 5(a) of the Act directs Dallas to "determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006."

527 F. Supp. 2d at 558-59 (emphasis added) (citations omitted).

agreement does not adversely affect the airline industry or other communities that
are currently receiving service, or hope to receive service in the future.

(8) Congress finds that the <u>agreement, dated July 11, 2006,</u> furthers the public
interest as consumers in, and accessing, the Dallas and Forth Worth areas should
benefit from increased competition.

(9) Congress also recognizes that each of the parties was forced to make
concessions to reach an agreement. . . .   The negotiations between the two
communities forced [Southwest and American] to respond . . . to a host of
options, which ultimately were included, as part of the <u>agreement dated July 11,
2006</u>.

S. Rep. No. 109-317, at 17 (emphasis added).  The rights and obligations existing for American,
Southwest, and ExpressJet were specifically defined in several paragraphs of the Contract.  In
paragraph 3(b) of article I, American and Southwest agreed that they could "not subdivide a
'gate.'"  Pls.' Ex. 2 at 3 (Contract art. I ¶ 3(a)).  American and Southwest also "agree[d] to
voluntarily surrender gate rights under existing leases in order to reduce the number of gates as
necessary to implement this agreement."  <u>Id.</u> (Contract art. I ¶ 3(b)).  Paragraph 3(b) of article I
further provided:

> During the four year period from the date the legislation . . . is signed into law:
> Southwest . . . shall have the preferential use of 15 gates under its existing lease to
> be used for passenger operations; American . . . shall have the preferential use of 3
> gates under its existing lease to be used for passenger operations; and
> ExpressJet . . . shall have the preferential use of 2 gates under its existing lease to
> be used for passenger operations.  Thereafter, Southwest . . . shall have the
> preferential use of 16 gates under its existing lease to be used for passenger
> operations; American . . . shall have the preferential use of 2 gates under its
> existing lease to be used for passenger operations; and ExpressJet . . . shall have
> the preferential use of 2 gates under its existing lease to be used for passenger
> operations.  In consideration of Southwest['s] . . . substantial divestment of gates
> at Love Field and the need to renovate or reconstruct significant portions of the
> concourse, Southwest . . . shall have the sole discretion (after consultation with
> the City) to determine which of its gates it uses within its existing leasehold at
> Love Field during all phases of reconstruction.  Upon the earlier of (i) the
> completion of the concourse renovation, or (ii) 4 years from the date the
> legislation as provided herein is signed into law, all Parties agree that facilities
> will be modified as necessary, up to and including demolition, to ensure that Love
> Field can accommodate only 20 gates for passenger service.

<u>Id.</u>  Additionally, paragraphs 10 and 11 of article I addressed gate allocations if either airline
"[chose] to operate passenger service from another airport within an 80-mile radius of Love Field

69

in addition to its operations at Love Field" and required each airline to voluntarily relinquish a fixed number of gates until the year 2025.  See id. at 5-6 (Contract art. I ¶¶ 10-11 (requiring that Southwest and American voluntarily relinquish "up to 8 gates" and "up to one and one-half gates," respectively, after which those gates would become available to other carriers)).  By mandating that Dallas determine the allocation of leased gates in accordance with the Contract, the WARA incorporated these Contract provisions into federal law and compelled compliance therewith.

The WARA also provides that, "[t]o accommodate new entrant air carriers, the city of Dallas shall honor the scarce resource provision of the existing Love Field leases."[58]  Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012.  This provision mandates that Dallas abide by terms in its leases with American and Southwest that pertain to the sharing of preferential lease gates.  The "scarce resource provision" of these leases is referenced in two paragraphs of the Contract.  First, paragraph 3(b) of article I provided:

> To the extent a new entrant carrier seeks to enter Love Field, the City of Dallas will seek voluntary accommodation from its existing carriers to accommodate the new entrant service.  If the existing carriers are not able or are not willing to accommodate the new entrant service, then the City of Dallas agrees to require the sharing of preferential lease gates, pursuant to Dallas' existing lease agreements.  To the extent that any existing airline gates leased at Love Field revert to the City of Dallas, these gates shall be converted to common use during the existing term of the lease.[59]

Pls.' Cross-Mot. 3 (Contract art. I ¶ 3(b)) (emphasis & footnote added).  The WARA binds Dallas to this commitment as a matter of federal law.  Second, paragraph 12 of article I provided:

> Each carrier shall enter into separate agreements and take such actions, as necessary or appropriate, to implement its obligations under this Contract.  Similarly, the Cities shall enter into such agreements and take such actions, as necessary or appropriate, to implement the Contract.  All such agreements and actions are subject to the requirements of law.  Such agreements shall include amendments to: (i) American Airlines' Love Field terminal lease; and (ii) Southwest Airlines' Love Field terminal lease.  The City of Dallas shall develop a revised Love Field Master Plan consistent with this Contract.

---

[58]  The term "new entrant air carriers," of course, does not refer to American, Southwest, or ExpressJet because these three certificated air carriers were providing scheduled passenger service at Love Field on July 11, 2006.

[59]  Although Dallas "agree[d]" to require the sharing of preferential lease gates when it executed the Contract on July 11, 2006, this provision did not take effect until enactment of the WARA.  See Pls.' Ex. 2 at 8 (Contract art. II ¶ 6); supra note 55.

Id. at 6 (Contract art. I ¶ 12) (emphasis added).  The WARA makes this obligation binding upon Dallas, requiring it to amend its leases, as necessary, to comply with the terms of the Contract.

Furthermore, the WARA explicitly authorizes Dallas to implement those portions of the Contract that relate to preferential gate leases with American, Southwest, and ExpressJet by ensuring that neither the FAA nor any other federal agency can interfere with those contractual agreements.  Although the WARA provides that nothing in the statute shall be construed

> to limit the authority of the [FAA] or any other Federal agency to enforce requirements of law and grant assurances . . . that impose obligations on Love Field to make its facilities available on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities, or to withhold grants or deny applications to applicants violating such obligations with respect to Love Field[,]

§ 5(e)(1)(E), 120 Stat. at 2013, this provision pertains only to facilities remaining at Love Field after Dallas reduces the number of gates, and it "shall not be construed to require the city of Dallas, Texas . . . to modify or eliminate preferential gate leases with air carriers in order to allocate gate capacity," id. §§ 5(e)(2)(A), (B)(ii), 120 Stat. at 2013.  Therefore, the WARA ensures that, while those portions of the Contract that pertain to gate allocation at Love Field are matters of federal law, the federal government may not interfere with the rights and obligations set forth in paragraph 3 of article I of the Contract.

The WARA requires that Dallas allocate gates in accordance with the terms of the Contract, which defined the rights and obligations existing for American, Southwest, and ExpressJet, the three certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006.[60]  It also limits the federal government's authority to withhold grants or deny applications based upon preferential gate leases entered into by Dallas with American, Southwest, and ExpressJet.  Any interpretation of the WARA that does not take into account the Contract's leased gate allocation provisions would effectively render the language "in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006," irrelevant and mere surplusage.  Accordingly, Congress incorporated the Contract's leased gate allocation provisions into federal law, thereby requiring Dallas's compliance with–and ensuring that the federal government could not alter–those provisions.

---

[60] There is no dispute between the parties that the WARA reduces the number of gates at Love Field to twenty, allocates those gates among the certificated air carriers in accordance with the Contract, and, within eight years, repeals any limitations contained in the Wright Amendment.

### iii.  The WARA Requires That Dallas Manage Love Field in Accordance With the Contract

In addition to requiring that Dallas allocate leased gates in accordance with the Contract, the WARA imposes upon Dallas the following requirement:

> The city of Dallas, pursuant to its authority to operate and regulate the airport as granted under chapter 22 of the Texas Transportation Code and this Act, shall determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006.

Id. § 5(a), 120 Stat. at 2012 (emphasis added).  This requirement is separate and distinct from the obligation imposed upon Dallas to determine the allocation of leased gates.  If the allocation of leased gates was, in fact, part of the management of Love Field, then Congress would have no need to include the term "manage," which would have been subsumed by the phrase "determine the allocation of leased gates," in the WARA.  See United States v. Menasche, 348 U.S. 528, 538-39 (1955) ("'The cardinal principle of statutory construction is to save and not to destroy.'  It is our duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section . . . ." (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937); Inhabitants of Montclair Twp. v. Ransdell, 107 U.S. 147, 152 (1883)) (citations omitted)).  Therefore, Congress imposed upon Dallas two separate and distinct requirements: (1) determine the allocation of leased gates in accordance with the Contract; and (2) manage Love Field in accordance with "contractual rights and obligations existing . . . for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006."  As stated previously, use of the term "shall" denotes the imperative and connotes a mandatory obligation, and nothing in this language explicitly states or suggests that the term "shall" does not mean exactly what it says.

The WARA precludes Dallas from exercising discretion in determining how to manage Love Field.  Instead, the WARA requires that Dallas manage Love Field in accordance with the contractual rights and obligations existing for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006, a direct reference to the date upon which the signatories executed the Contract.  See supra Part IV.C.iv.c.ii.  Therefore, the next inquiry turns to how Dallas must manage Love Field under the Contract in order to comply with section 5(a) of the WARA.

Numerous Contract provisions indicate how Dallas was required to manage Love Field.  Paragraph 5 of article I imposed upon Dallas at least twelve separate requirements related to airport management.  Dallas was required to: (1) "significantly redevelop portions of Love Field, including the modernization of the main terminal, consistent with a revised Love Field Master Plan"; (2) "acquire all or a portion of the lease on the Lemmon Avenue facility, up to and including condemnation, necessary to fulfill its obligations under this Contract"; (3)

"demoli[sh] . . . the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that that facility [could] never again be used for passenger service"; (4) finance a modernization program by investing no less than $150 million and no greater than $200 million in 2006 dollars ("Spending Cap"); (5) develop and construct a "'people mover' connector" ("Connector") to the Dallas Area Rapid Transit ("DART") mass transit system; (6) ensure that the Spending Cap would be "exclusive of the costs connected with the acquisition and demolition of the Lemmon Avenue Terminal gates and of the capital costs associated with" the Connector; (7) recover costs for the demolition of the Lemmon Avenue Terminal gates from airport users; (8) "seek state, federal, DART, and any other available public funds to supplement . . . [passenger facility charges] funds"; (9) utilize its best efforts, if passenger facility charges were not approved for the modernization plan, "to seek and use [passenger facility charges], state, federal, DART, and any other available public funds (other than City of Dallas general funds) as the only sources of funding for the Connector and to avoid impacting terminal rents and landing fees"; (10) recover costs for the modernization plan by negotiating amendments to the leases executed by Southwest, American, and ExpressJet; (11) adopt city ordinances modifying terminal rents and landing fees to be paid by airline users at Love Field; and (12) determine, together with Southwest, "a phase-in of the [modernization plan]" and "decide which party will fund and manage the construction."  Pls.' Ex. 2 at 4-5 (Contract art. I ¶ 5).

In addition to the provisions set forth in paragraph 5 of article I, Dallas was required to "develop a revised Love Field Master Plan consistent with [the] Contract."  Id. at 6 (Contract art. I ¶ 12).  Dallas also "agree[d] to grant American . . . and Southwest . . . options to extend their existing terminal leases until 2028."  Id. at 7 (Contract art. I ¶ 17).  Furthermore, the Contract clarified the funding limitations paragraph 5 of article I imposed upon Dallas:

> Any capital spending obligations of the City of Dallas under this Contract for airport projects that require the expenditure of public funds or the creation of any monetary obligation shall be limited obligations, payable solely from airport revenues or the proceeds of airport revenue bonds issued by or on behalf of the City of Dallas, such revenue bonds being payable and secured by the revenues derived from the ownership and operation of Love Field.

Id. (Contract art. II ¶ 2).

These Contract provisions defined how Dallas was required to manage Love Field.  All of the obligations set forth in paragraph 5 of article I took effect on the date that the WARA was signed into law, see id. (Contract art. II ¶ 6); supra note 55, and could not have been effectuated absent congressional approval.  Absent incorporation of these provisions into the WARA, the phrase "in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006," would be irrelevant and mere surplusage.  Accordingly, Congress, by mandating that Dallas manage Love Field in accordance with the contractual rights and obligations contained in the Contract, incorporated those rights and obligations, as discussed above, into federal law.

73

### iv.  The WARA Requires That Dallas Demolish the Lemmon Avenue Terminal

In addition to mandating that Dallas reduce the number of gates at Love Field, the WARA requires that Dallas, as part of this reduction, remove the Lemmon Avenue Terminal gates. Defendant, however, contends otherwise, arguing that the WARA does not regulate where the twenty Love Field gates must be located or who must own those gates.  According to defendant, the WARA permits Dallas, if it so chooses, to contract with plaintiffs to add additional gates at the Lemmon Avenue Terminal and relocate the entire Love Field airport operations to that facility.  The only limitations upon Dallas, defendant argues, are its continued allocation of those twenty gates among the airlines that were operating on July 11, 2006, as required by the Contract. Defendant's argument finds no support in the plain language of the WARA.

As discussed in Part IV.C.4.c.ii, supra, section 5(a) of the WARA requires that Dallas allocate leased gates in accordance with the Contract.  Pursuant to paragraph 5 of article I of the Contract, Dallas "agree[d] to the demolition of the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that that facility [could] never again be used for passenger service."  Pls.' Ex. 2 at 4 (Contract art. I ¶ 5) (emphasis added).  The Contract did not specify demolition of "some" gates.  Rather, it stated "the gates," indicating the signatories' intent that Dallas demolish all of the gates.  This conclusion is further supported by the fact that Dallas was required to ensure that the "facility" could never again be used for passenger service.  The term "facility" appears in both the Contract and the WARA, and retention of any passenger gate at the Lemmon Avenue Terminal would run afoul of the requirement that the "facility" never again be used for such a purpose.  Dallas, therefore, could not retain any of the Lemmon Avenue Terminal gates as part of the twenty that will operate at Love Field.

It is not possible for Dallas to fulfill the requirements of the WARA–viz., remove the gates at the Lemmon Avenue Terminal as part of its reduction of gates at Love Field, Pub. L. No. 109-352, § 5(a)-(b), 120 Stat. at 2012, and ensure that the "Lemmon Avenue facility" can never again be used for passenger service under the Contract, Pls.' Ex. 2 at 4 (Contract art. I ¶ 5), a requirement that Congress incorporated into the WARA–while preserving the option to add additional gates to the Lemmon Avenue Terminal.  If, as defendant suggests, the signatories intended for the Lemmon Avenue Terminal to serve as the center for air passenger services, then they would not have agreed to the demolition of preexisting gates.  Moreover, they would not have agreed to transfer air passenger services to a facility targeted for destruction because the WARA's unambiguous statutory language states that the Lemmon Avenue Terminal gates shall never again be used for air passenger services.  Furthermore, Congress would not have mandated that Dallas remove the Lemmon Avenue Terminal gates or, for that matter, restricted the type of funding Dallas could use for that demolition if transfer of airport operations to the very facility designated for demolition had been contemplated.  Clearly, once the gates are demolished, little use remains.  Because the WARA mandates that Dallas demolish the Lemmon Avenue Terminal gates and ensure that it could never again be utilized for passenger service, Dallas would violate federal law if it moved its Love Field operations to the Lemmon Avenue Terminal.

74

**v.  The WARA Specifies how Dallas May Fund the Reduction of Gates at Love Field**

The WARA stipulates what funds Dallas may and may not use to demolish the Lemmon Avenue Terminal facility.  Section 5 provides:

> (b) REMOVAL OF GATES AT LOVE FIELD.–  No Federal funds or passenger facility charges may be used to remove gates at the Lemmon Avenue facility, Love Field, in reducing the number of gates as required under this Act, but Federal funds or passenger facility charges may be used for other airport facilities under chapter 471 of title 49, United States Code.

Pub. L. No. 109-352, § 5(b), 120 Stat. at 2012 (emphasis added).  Accordingly, Congress, in section 5(b) of the WARA, mandated that Dallas (1) demolish the Lemmon Avenue Terminal and (2) not utilize federal funds or passenger facility charges in order to do so.[61]  Furthermore, Congress expressly permitted Dallas to use federal funds or passenger facility charges to remove any other gates at Love Field.  If Congress did not intend to require the demolition of the Lemmon Avenue Terminal, then it would not have incorporated section 5(b) in the WARA.

**vi.  The WARA's Limitations Upon the DOT and the FAA Do Not Affect the Determination That the WARA Incorporates the Contract Into Federal Law**

Section (d)(1), quoted in Part IV.C.4.b, supra, precludes the DOT and the FAA from making findings or determinations, issuing orders or rules, withholding airport improvement grants or approvals thereof, denying passenger facility charge applications, or taking any other actions, either self-initiated or on behalf of a third party, that (1) are inconsistent with the Contract or (2) challenge the legality of any Contract provision.  Id. § 5(d)(1)(A)-(B), 120 Stat. at 2012.  The Contract did not mention either the DOT or the FAA.  Instead, the signatories indicated that the Contract was "made subject to the provisions of the Charter and ordinances of the cities of Dallas and Fort Worth, in existence as of the date hereof, and all applicable State and federal laws."  Pls.' Ex. 2 at 7 (Contract art. II ¶ 5).

Defendant maintains that any determination that the WARA incorporates the entire Contract would render section 5(d)(1) of the WARA entirely superfluous.  Conversely, plaintiffs argue that, absent section 5(d)(1), federal agencies could issue orders that call for actions at Love

---

[61]  Although the statute provides that Dallas may not use federal funds or passenger facility charges to demolish the Lemmon Avenue Terminal gates, the term "may" does not suggest that Dallas's obligation to remove the gates is discretionary.  Cf. Contreras v. United States, 64 Fed. Cl. 583, 593 (2005) ("The proper inference drawn from the distinction between 'may' and 'shall' in the same statute further strengthens the presumption that 'may' is discretionary.").  Rather, as discussed above, this section of the WARA reflects congressional intent to require that Dallas demolish the Lemmon Avenue facility in accordance with the Contract and to disallow Dallas from utilizing certain funds to effectuate that result.

Field that would be inconsistent with the codified Contract.  According to plaintiffs, the Contract makes no mention of either the FAA or the DOT, and the WARA, they contend, "neither expressly imposes obligations on them nor affords them rights."  Pls.' Reply 14.  Plaintiffs further assert that "[i]nsuring that FAA actions are consistent with the agreement struck among all of the local parties is sound legislative draftsmanship and not, as the Government would have it, an indication that Congress did not intend to mandate that the parties comply with the terms of the agreed-upon Wright Amendment compromise."  Id. at 14-15.

Draft legislation of the WARA, as reported in the Senate, initially conferred upon the DOT "exclusive jurisdiction with respect to the agreement described in section 5(a) of this Act." S. 3661, 109th Cong. § 6 (2006).  This language was ultimately removed.  By incorporating section 5(d)(1) into the WARA, Congress ensured that any subsequent actions by the DOT and the FAA could neither frustrate nor challenge as unlawful the signatories' rights and obligations under the Contract.  Plaintiffs explain that, in section 5(d)(1), Congress prohibited the Secretary of the DOT and the Administrator of the FAA from taking any action inconsistent with the Contract.  Thus, plaintiffs conclude that the FAA and the DOT are prohibited from taking any action whatsoever.

The parties' respective arguments notwithstanding, neither plaintiffs nor defendant discusses the impact of section (e) of the WARA, which qualifies the general exclusions placed upon the DOT and the FAA set forth in section (d)(1).  Although neither the DOT nor the FAA may take actions that are inconsistent with or challenge the Contract, the WARA does not preclude either entity from enforcing its programs related to aviation safety, labor, the environment, national historic preservation, civil rights, small business concerns, veterans preferences, disability access, and revenue diversion.  Pub. L. No. 109-352, § 5(e)(1)(A)-(B), 120 Stat. at 2013.  Moreover, the WARA does not limit the FAA's authority–or the authority of another federal agency–to enforce requirements of law and grant assurances that impose obligations on Love Field to make its facilities, viz., those that exist after Dallas reduces the number of gates, available "on a reasonable and nondiscriminatory basis to air carriers seeking to use such facilities, or to withhold grants or deny applications to applicants violating such obligations with respect to Love Field."  Id. §§ 5(e)(1)(E), (2)(A), 120 Stat. at 2013.  Thus, by enacting section 5(d), Congress reinforced its intention to incorporate the Contract into federal law by ensuring that DOT and FAA policymaking does not affect any of the provisions contained therein.  Congress may delegate to an agency policymaking responsibilities or it may withhold doing so.  As the United States Court of Appeals for the Ninth Circuit observed,

> [t]oday's administrative law jurisprudence is . . . driven by a pragmatic view of the roles of Congress and the administrative agencies.  That jurisprudence does not inquire whether Congress has delegated legislative power at all, but only whether Congress has placed appropriate limits on the agency's exercise of legislative authority. . . .

> Nor must Congress intend–in whatever sense a collective body intends anything–each and every regulation an agency promulgates to implement a statute. To the contrary, Congress may choose not to legislate specifically in a particular area but instead leave it to the agency to fill out the area with regulations.  In such instances, the agency performs much like a legislature, albeit only as to matters pre-designated by Congress.

Save Our Valley v. Sound Transit, 335 F.3d 932, 957 (9th Cir. 2003) (citations omitted).

Here, Congress chose to explicitly legislate with respect to Love Field.  When it incorporated the Contract into federal law, Congress simultaneously defined and limited the ability of the DOT and the FAA to regulate those matters encompassed by the Contract.  That the DOT and the FAA are statutorily obligated to neither act in a manner that is inconsistent with the Contract nor challenge the legality of the Contract does not render section 5(d) meaningless or surplusage.  See Heckler v. Chaney, 470 U.S. 821, 832-33 (1985) ("Congress may limit an agency's exercise of enforcement power if it wishes . . . .").  Section 5(d) merely defines the rights and obligations of the DOT and the FAA with respect to Contract provisions that are now part of a federal mandate.[62]  Indeed, the Northern District of Texas determined that the WARA's directive to the FAA provided further evidence of congressional intent to incorporate the Contract as a whole in the statute.  Love Terminal Partners, L.P., 527 F. Supp. 2d at 559.  Accordingly, a determination that the WARA incorporates the Contract into federal law does not render section 5(d) superfluous or surplusage.[63]

### 5.  Incorporation of the Contract Into the WARA Does Not Create Constitutional, Contractual, or Statutory Conflicts

Defendant advances the position that incorporation of the Contract into the WARA creates numerous conflicts.  First, it asserts that plaintiffs' interpretation of the WARA, viz., that Congress, by enacting the WARA, has violated the Fifth Amendment by taking property without just compensation, "violates the [canon] of constitutional avoidance . . . ."  Def.'s Reply 15.  Second, it argues that incorporation of the Contract into the WARA would "create a conflict for the City of Dallas," id. at 17, adding that plaintiffs' interpretation of the WARA creates a "'catch

---

[62]  The court finds no support in the WARA for defendant's contention that "inclusion of all of the terms of the Local Agreement into the [WARA] would automatically preclude anyone, including the FAA and the DOT, from taking any actions inconsistent with the Local Agreement."  Def.'s Reply 16-17.  Section 5(d) only precludes the FAA and the DOT from taking actions that are inconsistent with the Contract.  See Pub. L. No. 109-352, § 5(d)(1)(A)-(B), 120 Stat. at 2012.  No other agency is referenced in this provision, and section 5(e) preserves DOT and FAA authority.  Id. § 5(e)(1)(B), (E), 120 Stat. at 2013.

[63]  The court, therefore, rejects defendant's assertion that incorporation of the Contract into the WARA creates statutory conflicts.  See infra Part IV.C.5.b.

22' for the City of Dallas," id. at 18.  The court addresses each argument in turn.

### a. The Canon of Constitutional Avoidance Is Not Implicated in This Case

The canon of constitutional avoidance "is a doctrine of statutory interpretation–that is, it is relevant when the court is construing disputed statutory language."  SKF USA, Inc. v. U.S. Customs & Border Prot., 556 F.3d 1337, 1368 (Fed. Cir. 2009).  "Where a possible construction of a statute would render the statute unconstitutional, courts must construe the statute 'to avoid such problems unless such construction is plainly contrary to the intent of Congress.'"  Consol. Coal Co. v. United States, 528 F.3d 1344, 1347 (Fed. Cir. 2008) (quoting Edward J. DeBartolo Corp. v. Fla. Gulf Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988)).  In other words, the "elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  Hooper v. California, 155 U.S. 648, 657 (1895).  The canon of constitutional avoidance "is subject only to the qualification that the interpretation that 'save[s] a statute from unconstitutionality' must be reasonable . . . ."  Consol. Coal Co., 528 F.3d at 1347 (alteration in original).  As the Supreme Court explained, the canon of constitutional avoidance "not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution."  Edward J. DeBartolo Corp., 485 U.S. at 575.

Plaintiffs have not challenged the constitutionality of the WARA.[64]  Moreover, Congress's failure to address in the WARA the government's liability to pay just compensation in the event that a taking occurred does not require invocation of the canon of constitutional avoidance.  In Ruckelshaus, the Supreme Court observed:

> Congress' failure specifically to mention or provide for recourse against the Government may reflect a congressional belief that use of data by EPA in ways authorized by FIFRA effects no Fifth Amendment taking or it may reflect Congress' assumption that the general grant of jurisdiction under the Tucker Act would provide the necessary remedy for any taking that may occur.

467 U.S. at 1018-19.  The same principles apply here.  In Preseault v. Interstate Commerce Comm'n, the Supreme Court distinguished between inquiring into whether a statute effected a taking and whether Tucker Act remedies were available for claims arising out of a taking.  494 U.S. 1, 12 (1990).  It explained that the "proper inquiry is not whether the statute 'expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy,' but rather 'whether Congress has in the [statute] withdrawn the Tucker Act grant of jurisdiction to the [Claims Court] to hear a suit involving the [statute] "founded . . . upon the Constitution."'"

---

[64]  Congress enacted the WARA pursuant to the powers granted under the Commerce Clause.  See H.R. Rep. No. 109-660, pt. 1, at 8-9; see also U.S. Const. art. I, § 8, cl. 3 (granting Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes").

Id. (alterations in original).  In other words, the court must assess whether Congress precluded an aggrieved party from seeking redress via the Tucker Act, not whether a statute can be reasonably construed to avoid a determination that it effects a taking.

Here, the fact that Congress did not address the liability of the government to pay just compensation in the event a taking occurred neither renders the WARA unconstitutional nor requires the court to invoke the canon of constitutional avoidance.  The Preseault Court indicated that it had "always assumed that the Tucker Act is an 'implie[d] promis[e]' to pay just compensation which individual laws need not reiterate."  Id. at 13 (alterations in original) (quoting Yearsley, 309 U.S. at 21).  Because a Tucker Act remedy "exists unless there are unambiguous indications to the contrary," id., congressional silence with respect to providing recourse against the government may reflect Congress's belief that the WARA either effected no taking or that the Tucker Act provided an adequate remedy in the event such a taking occurred.  There is no indication that Congress, by enacting the WARA, intended to preclude recourse to the Tucker Act in the event that a taking did occur.  Indeed, this dispute is properly before the court, and neither party contests that the court possesses jurisdiction under the Tucker Act to entertain a Fifth Amendment takings claim.  As the Ruckelshaus Court explained, Congress's failure to address in a statute the government's liability to pay just compensation in the event of a taking "cannot be construed to reflect an unambiguous intention to withdraw the Tucker Act remedy."  467 U.S. at 1019.  Congress did not express any intention in the WARA to withdraw a remedy under the Tucker Act in order to preclude plaintiffs' claim.  See Preseault, 494 U.S. at 12.  Because there is no legitimate dispute that the WARA permits a Tucker Act remedy if it causes a Fifth Amendment taking, the doctrine of constitutional avoidance, which would require the court to seek an alternative interpretation of the WARA in the event of a "constitutional problem," has no application here.

**b.  Incorporation of the Contract Into the WARA Creates No Conflict for Dallas**

Defendant, as noted previously, next contends that the WARA only pertains to certificated air carriers, arguing that incorporation of the Contract into the WARA would also require incorporation of "all contracts relating to management of Love Field that existed as of the effective date of the Act . . . ."  Def.'s Reply 17.  According to the defendant, plaintiffs' interpretation of the WARA would require incorporation of the Master Lease, which authorizes plaintiffs to use the leased premises for air transportation uses.

Defendant's interpretation of section 5(a) of the WARA is overly broad.  The WARA does not compel Dallas to comply with each contract pertaining to all facets of operations at Love Field that were in effect on the date of the statute's enactment.  In fact, defendant concedes that Congress did not intend to regulate all aspects of Love Field.  For example, defendant acknowledges that the WARA does not address any agreements between Dallas and restaurants located at the Love Field terminal.  As explained in Parts IV.C.4.c.ii-iii, supra, the WARA requires that Dallas allocate leased gates and manage Love Field in accordance with the contractual rights and obligations "existing as of the effective date of this Act for certificated air

carriers providing scheduled passenger service at Love Field on July 11, 2006," Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012, language that refers specifically and directly to the Contract. Nowhere in the WARA does Congress, either explicitly or implicitly, incorporate any other agreement or contract to which Dallas is a party.  Therefore, incorporation of the Contract into the WARA does not impose upon Dallas conflicting legislative mandates.

### c.  Incorporation of the Contract Does Not Result in an "Unfunded Mandate"

Defendant also asserts that plaintiffs' interpretation that the WARA incorporates the Contract is unreasonable because it would create an unfunded mandate by requiring Dallas to acquire plaintiffs' leasehold interests without providing the federal funds necessary to carry out that directive.  According to defendant, Congress intended that Dallas would collect funds from airport users and then utilize those monies to compensate plaintiffs.  Specifically, defendant argues:

> While Plaintiffs argue for the incorporation of Dallas's solely contractual obligation to acquire and destroy the six passenger gates at the Lemmon Avenue facility into the [WARA], they conveniently ignore Dallas's concomitant obligation to acquire the leasehold interests through the exercise of its power of eminent domain.  Moreover, they ignore that the Local Agreement specifically provides a funding source for the acquisition of the passenger gates: "airport users."  If Plaintiffs' reading of the [WARA] is correct, Dallas's contractual obligation to acquire the gates through the use of its power of eminent domain has also been incorporated in the [WARA].  That obligation extends not only to Dallas's exercise of its power of eminent domain, but also to the source of funds to pay for that exercise–and it is not the United States.

Def.'s Reply 18 (citation omitted).  It further notes that the Congressional Budget Office ("CBO") determined that the WARA "'contain[ed] no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act,'"[65] id. at 17 n.10 (quoting S. Rep. No. 109-317, at 15), and, as a result, require[d] Dallas to demolish the Lemmon Avenue Terminal without receiving a federal reimbursement for the costs associated with acquiring and demolishing the gates, see id.  Thus, defendant argues, "[p]laintiffs need only seek the

---

[65]  The Unfunded Mandates Reform Act of 1995 ("UMRA"), Pub. L. No. 104-4, 109 Stat. 48 (codified in scattered sections of 2 U.S.C. (2006)), addresses situations wherein federal law imposes duties upon state and local governments without providing federal grants to pay for them.  Recent Legislation, 109 Harv. L. Rev. 1469, 1469 (1996); see also 2 U.S.C. §§ 1501(2) (providing that one of the purposes of the UMRA was "to end the imposition, in the absence of full consideration by Congress, of Federal mandates on State, local, and tribal governments without adequate Federal funding"), 1501(5) (providing that an additional purpose of the UMRA was "to require that Congress consider whether to provide funding to assist State, local, and tribal governments in complying with Federal mandates").

appropriate enforcement of the [WARA] against the City of Dallas to recoup what they believe they are owed." Id. at 19.

Plaintiffs dismiss the government's argument, asserting that congressional intent with respect to the source of compensation for the demolition of their gates is irrelevant. Instead, they argue that Congress may not legislate away a right to just compensation. Pls.' Reply 16 (citing Jacobs v. United States, 290 U.S. 13 (1933)). In Jacobs, the Supreme Court reversed a determination that the petitioner was not entitled to interest as part of the just compensation awarded for a taking of property. See 290 U.S. at 15-16. Explaining that the "concept of just compensation is comprehensive, and includes all elements, 'and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation,'" id. at 17-18 (quoting Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 306 (1923)), the Jacobs Court emphasized that the right to recover just compensation for property taken by the United States for public use was guaranteed by the Fifth Amendment, not by any statute: "Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the amendment . . . ." Id. at 16. Thus, plaintiffs contend, whether Congress intended that airport user fees, as opposed to federal funds, be utilized to provide compensation to plaintiffs for acquisition of the Lemmon Avenue Terminal gates is beside the point.

Congress, when it enacted the UMRA, expressed "concern[] about shifting costs from Federal to State and local authorities . . . ." 2 U.S.C. § 1513(a)(1). Under the UMRA, a federal intergovernmental mandate means

> (A) any provision in legislation, statute, or regulation that–
>
>> (i) would impose an enforceable duty upon State, local, or tribal governments, except–
>>
>>> (I) a condition of federal assistance; or
>>>
>>> (II) a duty arising from participation in a voluntary Federal program, except as provided in subparagraph (B)[]; or
>>
>> (ii) would reduce or eliminate the amount of authorization of appropriations for–
>>
>>> (I) Federal financial assistance that would be provided to State, local, or tribal governments for the purpose of complying with any such previously imposed duty unless such duty is reduced or eliminated by a corresponding amount; or
>>>
>>> (II) the control of borders by the Federal Government . . . ;

(B) any provision in legislation, statute, or regulation that relates to a then-existing Federal program under which $500,000,000 or more is provided annually to State, local, and tribal governments under entitlement authority, if the provision–

(i)(I) would increase the stringency of conditions of assistance to State, local, or tribal governments under the program; or

(II) would place caps upon, or otherwise decrease, the Federal Government's responsibility to provide funding to State, local, or tribal governments under the program; and

(ii) the State, local, or tribal governments that participate in the Federal program lack authority under the program to amend their financial or programmatic responsibilities to continue providing required services that are affected by the legislation, statute, or regulation.

2 U.S.C. § 658(5).  The CBO recognized that the WARA "[made] the necessary changes in federal law to implement an agreement among the cities of Dallas and Fort[] Worth and American and Southwest Airlines," adding that "[a]ny costs to those cities or the state of Texas would be incurred voluntarily."  S. Rep. No. 109-317, at 15 (emphasis added).

The UMRA addresses situations in which the federal government imposes mandates upon local governments but does not provide adequate funding.  Congress cautioned that "the Federal Government should not shift certain costs to the State, and States should end the practice of shifting costs to local governments, which forces many local governments to increase property taxes[.]"  2 U.S.C. § 1513(b)(1).  Such is not the case here.  As the CBO recognized, any cost to Dallas as a result of enactment of the WARA would be voluntarily incurred by the city.  Indeed, when Dallas executed the Contract, it voluntarily agreed to demolish the Lemmon Avenue Terminal gates and to finance the Love Field modernization plan.  The Contract provided that Dallas must make no greater than a $200 million investment–i.e., the Spending Cap–and that capital and operating costs for the modernization plan could be recovered through passenger facility charges.  Pls.' Ex. 2 at 4 (Contract art. I ¶ 6).  Spending Cap costs, however, were exclusive of any other costs associated with the acquisition and demolition of the Lemmon Avenue Terminal gates, all of which were to be recovered from "airport users."  Id.  Section 5(b) of the WARA authorizes these commitments by Dallas, none of which would have legal effect absent congressional action, see supra note 55, and clarifies the limits of "airport users" by mandating that Dallas utilize neither federal funds nor passenger facility charges to fund the removal of these gates.  Pub. L. No. 109-352, § 5(b), 120 Stat. at 2012.  Nothing in the WARA itself directs Dallas to utilize specific funds to compensate plaintiffs.  Instead, the WARA only addresses which funds may not be utilized to remove the gates at the Lemmon Avenue Terminal.

Furthermore, although the Contract provided that the "costs for the acquisition and demolition" of the Lemmon Avenue Terminal gates must be "recovered from airport users," Pls.' Ex. 2 at 4 (Contract art. I ¶ 5), this provision only addressed compensation to Dallas for any costs it ultimately incurs.  It did not set aside funds to compensate any third party.  Indeed, the Contract created no third party beneficiary rights: "The provisions of this Contract are solely for the benefit of the Parties hereto; and nothing in this Contract, express or implied, shall create or grant any benefit, or any legal or equitable right, remedy, or claim hereunder, contractual or otherwise, to any other person or entity."  Id. at 8 (Contract art. II ¶ 11).  Moreover, the Dallas City Council Resolution did not address compensation to a third party or the source of such funds.  Instead, it authorized Dallas to "tak[e] all appropriate steps to acquire" the Master Lease, which included exercise of eminent domain "if such becomes necessary . . . ."  Pls.' Ex. 6 at 2 (Dallas City Council Resolution § 1); see also id. (Dallas City Council Resolution § 2 (providing that the acquisition "is for municipal and public purposes and a public use and that public necessity requires the acquisition")).  It did not mandate that Dallas utilize its eminent domain powers.

Of course, Dallas always maintained its right to exercise eminent domain powers.  The Contract provided that Dallas "agree[d]" to acquire "all or a portion of the lease on the Lemmon Avenue facility, up to and including condemnation, necessary to fulfill its obligations under the Contract."  Pls.' Ex. 2 at 4 (Contract art. I ¶ 5).  In fact, each provision contained in the first part of paragraph 5 of article I of the Contract indicated that Dallas "agree[d]" to engage in certain conduct: it "agrees that it will significantly redevelop portions of Love Field"; "agrees that it will acquire all or a portion" of the Master Lease; and "agrees to the demolition of the gates at the Lemmon Avenue facility."  Id.  According to defendant, the WARA simply permitted Dallas to take certain actions and provided no mandate.  Cf. id. at 7 (Contract art. I ¶ 16 ("If the U.S. Congress does not enact legislation by December 31, 2006, that would allow the Parties to implement the terms and spirit of this Contract, . . . then this Contract is null and void unless all parties agree to extend this Contract." (emphasis added))).

As explained in Parts IV.C.4.c.i-iv, supra, whereas Dallas committed itself to these actions under the Contract, the WARA obligates Dallas to perform.  The fact remains that Dallas never did exercise its eminent domain powers to acquire the Lemmon Avenue Terminal, see Pls.' Ex. 6 at 2 (Dallas City Council Resolution § 1 (requiring Dallas to "compl[y] with the provisions of . . . [the WARA] and all other applicable laws, including taking all appropriate steps to acquire, including the exercise of the right of eminent domain, if such becomes necessary, all or a portion of the leasehold interests, if any, from . . . property at Love Field with addresses of 7701 and 7777 Lemmon Avenue" (emphasis added))), and nothing in the WARA requires that Dallas resort to eminent domain.  The WARA mandates that Dallas act in accordance with the Contract, which contains Dallas's voluntary commitment to acquire the Lemmon Avenue Terminal and demolish the Lemmon Avenue Terminal gates as part of the broader requirement that Dallas reduce the number of gates at Love Field to effectuate the repeal of the Wright Amendment.  See Pub. L. No. 109-352, § 5(a), 120 Stat. at 2012 (requiring that Dallas manage Love Field in accordance with the contractual rights and obligations set forth in the Contract).  Stated simply, the WARA does not impose upon Dallas an unfunded mandate because Dallas voluntarily

assumed the costs, contingent upon congressional approval, of those actions. The WARA merely reflects Congress's assent to the commitments set forth in the Contract.

The fact that Dallas must, under federal law, comply with the terms of the Contract and, in turn, recover any costs it incurs for the acquisition and demolition of the Lemmon Avenue Terminal gates from airport users without reliance upon federal funds or passenger facility charges does not insulate the government from compensating for any consequential taking. Even if the Contract, as incorporated under the WARA, requires that airport user funds be utilized to compensate plaintiffs, an "owner's right to just compensation cannot be made to depend upon . . . statutory provisions." Seaboard Air Line Ry. Co., 261 U.S. at 306. In Monongahela Navigation Co. v. United States, the Supreme Court rejected the notion that Congress could determine an appropriate measure of compensation, stating:

> By this legislation[,] [C]ongress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question. The legislature may determine what private property is needed for public purposes; that is a question of a political and legislative character. But when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through [C]ongress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The [C]onstitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry.

148 U.S. 312, 327 (1893). Accordingly, whether Congress intended to provide a mechanism through which compensation should be paid for the demolition of the Lemmon Avenue Terminal gates is immaterial. As previously noted, a Tucker Act remedy exists, and Congress did not withdraw Tucker Act jurisdiction when it enacted the WARA. See supra Parts IV.A, IV.C.5.a. Furthermore, section 5(b) of the WARA, by authorizing Dallas to utilize federal funds or passenger facility charges to reduce the number of gates other than those at the Lemmon Avenue Terminal, merely provides that the costs associated with this reduction were permissible airport costs and not revenue diversion. See H.R. Rep. No. 109-600, pt. 1 at 6; H.R. Rep. No. 109-600, pt. 2 at 11.

In short, defendant's argument that the WARA cannot simultaneously mandate that Dallas demolish the Lemmon Avenue Terminal gates without providing a funding mechanism ignores a key element: Dallas previously committed itself to acquire and to demolish the Lemmon Avenue Terminal when it executed the Contract. Absent congressional approval of the Contract, the agreements made therein were null and void. Therefore, by recognizing that the WARA contained no intergovernmental mandate as defined in the UMRA, the CBO explicitly acknowledged that any costs associated with the WARA were being borne by the signatories voluntarily and were not imposed upon them by the federal government as additional obligations that expanded the scope of the Contract.

**6.  The WARA's Legislative History Confirms That Congress Intended to Incorporate the Contract Into Federal Law**

In Parts IV.C.4.a-c, <u>supra</u>, the court analyzed the plain language of the WARA and determined that Congress unambiguously intended to incorporate the Contract into the statute.  In light of this conclusion, the court need not consider the WARA's legislative history.  <u>See Timex V.I., Inc.</u>, 157 F.3d at 882.  Nevertheless, because the legislative history further supports this determination, the court determines that a brief discussion is warranted.

When the WARA was first introduced in the Senate, the draft legislation provided, in part:

> (a) In General.–  Except as provided in subsection (b), <u>any actions</u> taken by the City of Dallas, the City of Fort Worth, Southwest Airlines, American Airlines, and/or the Dallas-Fort Worth International Airport Board (referred to in this section as the 'parties') <u>that are reasonably necessary to implement the provisions of the agreement dated July 11, 2006</u>, and titled CONTRACT AMONG THE CITY OF DALLAS, THE CITY OF FORT WORTH, SOUTHWEST AIRLINES CO., AMERICAN AIRLINES, INC., AND DFW INTERNATIONAL AIRPORT BOARD INCORPORATING THE SUBSTANCE OF THE TERMS OF THE JUNE 15, 2006 JOINT STATEMENT BETWEEN THE PARTIES TO RESOLVE THE 'WRIGHT AMENDMENT' ISSUES, <u>shall be deemed to comply in all respects with the parties' obligations under all Federal laws, rules, orders, agreements, and other requirements</u>.

S. 3661, 109th Cong. § 4(a) (as introduced in Senate, July 13, 2006) (emphasis added).  A subsequent version of the Senate bill contained a modified provision indicating that the Contract "shall be deemed to comply in all respects with the parties' obligations under title 49, United States Code, and any other competition laws . . . ."  <u>See</u> S. 3661, 109th Cong. § 5(a) (as reported in Senate, Aug. 1, 2006).  The bills introduced and reported in the House of Representatives contained similar language.  <u>See</u> H.R. 5830, 109th Cong. § 5(a) (as reported in House, Sept. 15, 2006); H.R. 5830, 109th Cong. § 5(a) (as introduced in House, July 18, 2006).

According to the House Transportation and Infrastructure Committee, H.R. 5830 was designed to "<u>implement a compromise agreement reached</u> by the City of Dallas, Texas; the City of Fort Worth, Texas; American Airlines; Southwest Airlines; and Dallas-Fort Worth International Airport (DFW) <u>on July 11, 2006</u>, regarding air service at Dallas Love Field."  H.R. Rep. No. 109-600, pt. 1, at 1 (emphasis added).  "Given the unique history of the development of DFW," the Committee indicated its belief that H.R. 5830 was "<u>necessary and appropriate to implement the July 11 agreement</u>."  <u>Id.</u> at 4 (emphasis added).  Indeed, the Committee recognized that "the legislation provide[d] <u>congressional approval to an agreement</u> that pertains to a 'local issue' . . . ."  H.R. Rep. No. 109-600, pt. 2, at 8 (emphasis added); <u>see also</u> 152 Cong. Rec. H8003 (daily ed. Sept. 29, 2006) (statement of Rep. Mica) ("This legislation . . . would implement a

locally initiated and locally approved agreement that seeks to change and eventually eliminate what has been commonly known as the Wright amendment . . . ."), H8008 (daily ed. Sept. 29, 2006) (statement of Rep. Oberstar) (stating that the WARA "would implement an agreement reached by the Cities of Dallas and Fort Worth, the Dallas/Fort Worth International Airport Board, American Airlines and Southwest Airlines").  The Contract, the Committee acknowledged, "provide[d] that the number of gates at Love Field would be immediately and permanently reduced from 32 to 20" and that "existing gate facilities would be physically demolished" in order to effect that result.[66]  H.R. Rep. No. 109-600, pt. 2, at 8.  Thus, Congress, the Committee recognized, intended to codify key provisions of the Contract under federal law.  See H.R. Rep. No. 109-600, pt. 1, at 5 (noting that the Committee "decided to codify the key components of the locally-initiated and locally-approved July 11 agreement in H.R. 5830" (emphasis added)), 8 (stating that H.R. 5830 was "crafted narrowly to codify only those aspects of the July 11 agreement that require changes to federal law" (emphasis added)); see also 152 Cong. Rec. H8003 (daily ed. Sept. 29, 2006) (statement of Rep. Sensenbrenner) (expressing concern that the bill "codifie[d] an agreement among private and local government parties").

The WARA "recognize[d] that the city of Dallas [was] the entity responsible for operating Love Field, and [would] reduce the gates there to 20 and will allocate those gates with existing commitments and obligations, including commitments to accommodate potential new entrants."  152 Cong. Rec. S10560 (daily ed. Sept. 29, 2006) (statement of Sen. Cornyn).  In order for Dallas to fulfill its responsibility to operate Love Field, the WARA "provide[d] a congressional approval, requiring the demolition of existing gates at Love Field, some of which [were] privately owned and utilized by airlines to offer additional air passenger service to points across the United States."  Id. at H8003 (daily ed. Sept. 29, 2006) (statement of Rep. Sensenbrenner).  Notwithstanding this mandate, Texas Senator John Cornyn expressed his belief that

> the proposed legislation reflects a Congressional sanction for the city of Dallas to manage Love Field in a manner that it deems in the best interests of its citizens, and in accordance with a hard fought local compromise, a sanction made necessary only by the existence of the Wright amendment itself.

Id. at S10560 (daily ed. Sept. 29, 2006) (statement of Sen. Cornyn) (emphasis added).  Thus, Congress sought to give full effect to the Contract, which was the product of significant and substantial work by the signatories, see id. at H8004 (daily ed. Sept. 29, 2006) (statement of Rep. Johnson) (noting that the WARA outlined a "compromise" that "require[d] give and take of all vested stakeholders"), H8006 (daily ed. Sept. 29, 2006) (statement of Rep. Barton) (stating that the "compromise was hammered out in a deliberative fashion" and that the legislation was "a balanced compromise that has the support of Dallas and Fort Worth"); see also id. at H8010 (daily ed. Sept. 29, 2006) (statement of Rep. Burgess) (characterizing the Contract as an "historic

---

[66]  Congress was also cognizant of plaintiffs' antitrust litigation pending before the Northern District of Texas.  See H.R. Rep. No. 109-600, pt. 2, at 8.

compromise"); S. Rep. No. 109-317, at 17 (recognizing the "concessions" made by the signatories to reach an agreement), and legislators, see 152 Cong. Rec. H8010 (daily ed. Sept. 29, 2006) (statement of Rep. Costello) ("I know there was a lot of 'give and take' on both sides to reach this legislative agreement.")  Senator Hutchison further explained:

> The cities did a great job.  They made an agreement and they brought it to Congress.  I have felt since the beginning, it was Congress's responsibility to take that agreement, ratify it and mandate that the agreement be kept in its entirety because it is so balanced.  And if you did away with the Wright amendment, but you did not have the 20 gate limit and the implementation of the 20 gates, it could have gone out of balance.

> So this act, regardless of anything else that has been said, authorizes, mandates, and protects all aspects of performance of the legislation's terms, including that the city of Dallas reduce and allocate gates according to this act, its contractual obligations as contemplated by the act, and the local compromise and the balance it has achieved.

Id. at S10561 (daily ed. Sept. 29, 2006) (statement of Sen. Hutchison) (emphasis added); cf. id. at H8008 (daily ed. Sept. 29, 2006) (statement of Rep. Oberstar) (indicating that the House bill "would implement three core provisions of the parties' contract: to repeal the Wright Amendment 8 years after enactment of this Act; eliminate the restrictions on through-ticketing from Love Field; and to cap the Love Field gates at 20 in perpetuity").

By giving full effect to the Contract, Congress recognized that the WARA "direct[ed] the City of Dallas to reduce the number of operational gates to no more than 20, which include[d] the removal of the 6 so-called Lemmon Avenue gates, and allow[ed] the City to allocate the use of the remaining gates based on existing leases and obligations."  Id. at H8008 (daily ed. Sept. 29, 2006) (Statement of Rep. Oberstar); see also id. at S10562 (daily ed. Sept. 29, 2006) (statement of Sen. Hutchison) ("[T]he law we are passing speaks for itself.  The law is very clear in what it instructs the city of Dallas to do, as well as the FAA and the [DOT] in implementing this agreement.  I think it is a major piece of legislation that is absolutely right.").  Indeed, Minnesota Congressman James L. Oberstar emphasized that Congress possessed the authority "to direct the closing of gates for safety, environmental or economic reasons . . . ."  Id. at H8008 (daily ed. Sept. 29, 2006) (statement of Rep. Oberstar).  Thus, a majority of legislators did not hesitate to incorporate into federal law the Contract, which represented "the desire of the community to make sure that the more urban of its two airports does not become overbearing."  Id. at H8008 (daily ed. Sept. 29, 2006) (statement of Rep. Meeks).

Nevertheless, other members of Congress expressed concern about codifying the Contract into federal law.  Texas Congressman Jeb Hensarling objected:

[The Contract] does not get Congress out of the business of interfering with airport competition.  That is the essence of the Wright Amendment, not the specific interference of perimeter restrictions.  For example, in the local agreement, the City of Dallas agrees to reduce the number of gates at Love Field from 32 to 20.  Though I might not like it, I respect their right to contractually bind themselves and decide whether Love Field is limited to 20 gates, 10 gates or even shut down.  It is their airport.

But I believe it is wrong for the parties to ask Congress to establish into Federal law their private contractual obligations.  Those are enforceable in court.  By including these privately made agreements in a new federal law, Congress would be replacing one complex set of anti-competitive rules with another.  Terminating today's version of the Wright Amendment, whereby Congress imposes distance limitations on an airport, only to replace it with a new version of the Wright Amendment whereby Congress imposes gate limitations on an airport, does not constitute repeal–today, in 8 years or ever.  Additionally, the unusual anti-trust exemption language is troubling.

For far too long the Wright Amendment has been a burden on both consumers and the national economy.  In the spirit of compromise, I again would support a simple federal law that would enact immediate through-ticketing, full[] repeal of Wright in 8 years while respecting the rights of American Airlines, Southwest Airlines, D/FW and the cities of Fort Worth and Dallas to otherwise enter into lawful contracts to mutually bind themselves as they choose.

Id. at H8011 (daily ed. Sept. 29, 2006) (statement of Rep. Hensarling) (emphasis added).  Wisconsin Congressman Jim Sensenbrenner, Jr. objected that the WARA provided congressional approval of a contract that required the demolition of the Lemmon Avenue Terminal and fostered anti-competitive objectives, id. at H8003-04 (daily ed. Sept. 29, 2006) (statement of Rep. Sensenbrenner), stating that the legislation "effectively delegate[d] . . . power on this issue [of an antitrust exemption] to the people who came to Congress, and they asked us to ratify this agreement.  We shouldn't be delegating antitrust immunity to anybody," id. at H8009 (daily ed. Sept. 29, 2006) (statement of Rep. Sensenbrenner).  Despite such opposition, Alaska Congressman Don Young set forth his position that "[a] lot of times we lose sight of solving problems in this body by hanging up on jurisdiction or hanging up on some small clause.  But we are the people that write the laws, we create the laws, and we try to make them work."  Id. at H8010 (daily ed. Sept. 29, 2006) (statement of Rep. Young).

Congress, by enacting the WARA, gave full effect to the Contract, an instrument that legislators themselves encouraged Dallas and Fort Worth to negotiate on their own in an effort to resolve disputes arising from the Wright Amendment.  See S. Rep. No. 109-317, at 3 ("In March 2006, at the urging of some members of Congress, the Cities of Dallas and Fort Worth passed resolutions requesting Congress provide them time to develop a local solution." (emphasis

added)).  In so doing, Congress intended to–and did–give effect to the Contract, into which the signatories entered pursuant to Texas law, under federal law.  Such an intent is clearly expressed in the statute's legislative history and, as discussed in Parts IV.C.4.a-c, in the plain language of its provisions.

### 7.  Plaintiffs Are Entitled to Partial Summary Judgment

Defendant characterizes plaintiffs' taking claim as a dispute between a lessor, Dallas, and lessees, plaintiffs.  According to defendant, if the lessor expresses the intention to demolish a building on the leasehold and then terminates the lease, the lessees must look to the lessor, and not a third party, for compensation.  Defendant's lessor-lessee characterization, however, fails to account for the unique circumstances involved in this case, viz., congressional intervention in a local dispute that has, over the years, required legislative action to ensure that locally crafted agreements were binding upon the parties.  See H.R. Rep. No. 109-600, pt. 1, at 2.  Here, Dallas, the lessor in defendant's analogy, presented to Congress an agreement in which Dallas committed, among other things, to demolish a building that was part of plaintiffs' leasehold interests.  Such a commitment was, absent congressional approval, null and void.  By enacting legislation that approved the agreement, Congress mandated that the lessor fulfill this commitment under federal law.  The lessor, now obligated to act in accordance with its commitment under a federal statutory mandate, acts under the aegis of the United States such that its actions are imputed to the federal government for the purpose of a takings analysis.  See Preseault, 100 F.3d at 1551.  The fact that the lessor could have, absent the government's involvement, acted on its own, the Federal Circuit instructs, is "immaterial."  Id.

Based upon its analysis of the WARA, the court holds that the statute incorporated the Contract into federal law, thereby mandating that Dallas fulfill the obligations to which it agreed on July 11, 2006, including acquisition and demolition of the Lemmon Avenue Terminal.  This federal mandate imposed upon Dallas enabled it to satisfy, in part, its obligation to reduce the number of gates at Love Field for passenger air service and to manage the airport in accordance with the rights and obligations set forth in the Contract.  Although Dallas was required to act by the authority of the federal government, it is the latter party that is responsible for any taking that stems from Dallas's conduct.

The court further holds that the WARA did not withdraw a Tucker Act remedy for any taking that resulted from Dallas acting in a manner that was consistent with the Contract and was based upon a federal statutory mandate.  Although the WARA designated Dallas as the party responsible for acquiring and demolishing the Lemmon Avenue Terminal gates as part of a broader commitment to modernize Love Field and to facilitate the end of the Wright Amendment, the federal government sanctioned such actions.  Accordingly, the court concludes that the WARA effected a per se, physical taking of plaintiffs' property for which the government is liable to pay just compensation, and plaintiffs are entitled to partial summary judgment based upon their physical taking theory.

## V.  CONCLUSION

For the reasons discussed above, the government's motion is **DENIED**, and plaintiffs' cross-motion is **GRANTED**.  The parties shall, **by no later than Friday, March 25, 2011**, file a joint status report proposing further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

90