## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| LOVE TERMINAL PARTNERS L.P., et al., ) | |
| ) | Case No. 08-536 L |
| Plaintiffs, ) | Judge Margaret M. Sweeney |
| ) | (E-Filed May 13, 2011) |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |

## JOINT PRELIMINARY STATUS REPORT

In accordance with the Court's order of March 29, 2011 and RCFC Appendix A Section III, Plaintiffs, Love Terminal Partners L.P. and Virginia Aerospace LLC (collectively "LTP"), and Defendant, the United States of America, submit this Joint Preliminary Status Report. The parties have consulted with each other and state the following:

**A.    Jurisdiction**

The parties agree that the Tucker Act, 28 U.S.C. § 1491, confers jurisdiction on this Court to adjudicate Fifth Amendment taking claims, as "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department or upon any express or implied contract with the United States . . . ."

**B.    Consolidation**

The parties agree that this case should not be consolidated with any other case.

**C.    Bifurcation**

The parties agree that there is no need to bifurcate this case.

**D.    Deferral of proceedings**

The parties agree that there is no need to defer these proceedings.

**E.    Remand or suspension**

The parties do not intend to seek a remand or suspension in this case.

**F.    Additional parties**

LTP opposes the joining of the city of Dallas or any other parties, as explained in their opposition brief also filed today, May 13, 2011. LTP does not believe that the city has an interest in this litigation and further believes that the city does not support the Government's plan to join it as a party.

The United States filed a Motion to Issue Notice to Third Party Pursuant to Rule 14(b)(1) (Dkt. No. 45) with its Answer on April 29, 2011. The Court has not ruled on the motion for notice. If the Court issues notice to the City of Dallas, the City may file a motion to intervene in this action. The United States believes that the City of Dallas has an interest in this litigation.

**G.    Motions**

LTP believes that the filing of additional dispositive motions is unwarranted and will therefore oppose the filing of any additional, unnecessary motions. LTP further

notes that this lawsuit was filed on July 23, 2008, almost three years ago and therefore, LTP supports any efforts to resolve the remaining issues expeditiously.

Having completed no discovery in this case, the United States believes it is too early to state whether additional dispositive motions will be appropriate for the timely and expeditious resolution of this litigation.  The United States proposes filing another status report with the court after the close of all discovery to apprise the Court of its intentions with respect to the filing of additional dispositive motions.

**H.**     **Relevant factual and legal issues**

    **1.**     **Plaintiffs' statement**

This is a legislative takings case arising out of Congress' enactment of the Wright Amendment Reform Act of 2006.[1]  The Plaintiffs in this case, Love Terminal Partners L.P. and Virginia Aerospace LLC (collectively "LTP"), acquired lease rights to fly commercial jets from Love Field, and to locate a terminal—which they then built—on Love Field, a public airport owned by the city of Dallas.  LTP's business plan for the property was based on the convenient location of Love Field, about six miles from the Dallas downtown business district and immediately adjacent to a neighborhood where many professionals live.  Passage of the Wright Amendment Reform Act, however, required that all of the gates at LTP's terminal be demolished, resulted in LTP losing its

---

[1] Wright Amendment Reform Act, Pub. L. No. 109-352, 120 Stat. 2011 (2006).

entire $20 million investment in constructing the terminal, and rendered other investments in acquiring the lease rights worthless. Therefore, on July 23, 2008, LTP filed this lawsuit seeking just compensation for the federal government's taking of their property rights.

**Background**

On June 10, 1955, Dallas entered into a lease with Braniff Airways, Inc., covering approximately 36 acres (subsequently reduced to approximately 26.8 acres) of Love Field ("the master lease"), which has since been assigned and subleased to Virginia Aerospace and Love Terminal Partners, respectively. The master lease limits use of the premises to air transportation purposes. Virginia Aerospace is the owner of the master lease. Love Terminal Partners subleases from Virginia Aerospace approximately nine acres of the area covered by the master lease. Love Terminal Partners held the master lease to nine acres of property at Dallas's Love Field Airport. LTP's business plan was to provide luxury commercial air passenger service from Love Field (conveniently located in downtown Dallas) to the rest of the United States. The lease limits use of the premises to air transportation purposes.

After obtaining the rights to the master lease, LTP constructed a luxury airline passenger terminal, including parking and six passenger gates, at a cost of approximately $20 million. Since the construction of Dallas-Fort Worth International Airport (DFW) in the mid-1960s, flights from Love Field were limited to intrastate flights within Texas.

Following airline deregulation in the 1970s, Congress, concerned about interstate flight competition between Love Field and DFW, passed the Wright Amendment, which banned interstate travel from Love Field, excepting airplanes with fewer than 56 passenger seats and flights to the four states contiguous with Texas, namely, Louisiana, Arkansas, Oklahoma, and New Mexico, so long as there was no through service to another state.  Over time, Congress repeatedly loosened the Wright Amendment restrictions so that by 2005, permissible interstate flights from Love Field also included flights to Kansas, Alabama, Mississippi, and Missouri.

Because LTP's proposed luxury flights would have involved airplanes containing fewer than 56 passenger seats, it was exempt from the restrictions of the Wright Amendment.  But by 2005, Congress recognized that the Wright Amendment restrictions were no longer necessary.  Noting that Love Field is a unique instance of extensive federal involvement in a locally owned airport, Congress sought input (a "local solution") from the cities of Dallas and Fort Worth before enacting any reform of the Wright Amendment.

On July 11, 2006, Dallas, Fort Worth, Southwest Airlines, American Airlines, and the Dallas-Fort Worth International Airport Board proposed their "local solution" in a published agreement, which Congress codified as part of the Wright Amendment Reform

Act of 2006.[2]  As passed, the Reform Act contains a federal statutory mandate that Dallas manage Love Field in conformity with the updated 2006 Love Field Master Plan developed by Dallas, acquire the LTP leased premises, and demolish the passenger gates at the LTP terminal (referred to in the Act as "the Lemmon Avenue facility") so they can never again be used for air passenger service:

> (a) IN GENERAL.—The city of Dallas, Texas, shall reduce as soon as practicable, the number of gates available for passenger air service at Love Field to no more than 20 gates.  Thereafter, the number of gates available for such service shall not exceed a maximum of 20 gates.  The city of Dallas, pursuant to its authority to operate and regulate the airport as granted under chapter 22 of the Texas Transportation Code and this Act, shall determine the allocation of leased gates and manage Love Field in accordance with contractual rights and obligations existing as of the effective date of this Act for certificated air carriers providing scheduled passenger service at Love Field on July 11, 2006.[3]

Or as explained in the Senate report accompanying the Reform Act:

> The City of Dallas agrees that it will significantly redevelop portions of Love Field, including the modernization of the main terminal, consistent with a revised Love Field Master Plan based upon the Love Field Impact Analysis Update prepared by DMJM Aviation, Inc. (the "Love Field Modernization Program" or "LFMP").  In addition, the City agrees that it will acquire all or a portion of the lease on the Lemmon Avenue facility, up to and including condemnation, necessary to fulfill its obligations under this Contract.  The City of Dallas further agrees to the demolition of the gates at the Lemmon Avenue facility immediately upon acquisition of the current lease to ensure that that facility can never again be used for passenger service.[4]

---

[2] Wright Amendment Reform Act, Pub. L. No. 109-352, 120 Stat. 2011 (2006) ("Reform Act"); *see also Love Terminal Partners*, 527 F. Supp. 2d at 559 ("[T]he Reform Act unambiguously incorporates the entire Contract.").
[3] Reform Act § 5(a)–(b).
[4] S. Rep. No. 109-317 at 7 (2006).

**Takings Litigation**

LTP responded to the Reform Act by filing an antitrust lawsuit in the U.S. District Court for the Northern District of Texas, but that court dismissed the suit, holding

> that the parties' conduct in connection with the adoption of both the Joint Statement and the Contract "represent[ed] the culmination of [their] efforts to petition Congress," holding that the WARA "compel[led the signatories to the Contract] to implement the terms of the Contract," and that the Joint Statement and Contract—as well as the signatories' activities leading up to execution of the Joint Statement and Contract that it determined were directed toward lobbying the government for legislative action—were immune from antitrust liability under the *Noerr-Pennington* doctrine . . . .[5]

Accordingly, LTP filed this suit on July 23, 2008. In lieu of an Answer, the Government moved to dismiss and LTP cross-moved for partial summary judgment on the issue of whether the Reform Act constituted a per se, physical taking of six air passenger gates that Love Terminal Partners constructed on the leased property. In July 2009, Dallas commenced demolition of the LTP terminal and had completed it by the end of September 2009.

And on February 11, 2011, this Court denied the Government's motion to dismiss and granted LTP's motion for partial summary judgment, holding that

> the statute incorporated the Contract into federal law, thereby mandating that Dallas fulfill the obligations to which it agreed on July 11, 2006, including acquisition and demolition of the Lemmon Avenue Terminal. This federal mandate imposed upon Dallas enabled it to satisfy, in part, its obligation to reduce the number of gates at Love Field for passenger air

---

[5] *Love Terminal Partners v. United States*, 2011 U.S. Claims LEXIS 125, *27–28 (Fed. Cl. Feb. 11, 2011) (footnote and citations omitted).

>   service and to manage the airport in accordance with the rights and obligations set forth in the Contract.  Although Dallas was required to act by the authority of the federal government, it is the latter party that is responsible for any taking that stems from Dallas's conduct.[6]

The Court further found that, through the Reform Act, the federal government had sanctioned the demolition of the LTP terminal which resulted in a per se, physical taking of LTP's property:

>   The court further holds that the WARA did not withdraw a Tucker Act remedy for any taking that resulted from Dallas acting in a manner that was consistent with the Contract and was based upon a federal statutory mandate.  Although the WARA designated Dallas as the party responsible for acquiring and demolishing the Lemmon Avenue Terminal gates as part of a broader commitment to modernize Love Field and to facilitate the end of the Wright Amendment, the federal government sanctioned such actions. Accordingly, the court concludes that the WARA effected a per se, physical taking of plaintiffs' property for which the government is liable to pay just compensation, and plaintiffs are entitled to partial summary judgment based upon their physical taking theory.[7]

   LTP has thus identified the following legal issues remaining for resolution by the Court:

   1. Because LTP's lease restricted the use of the property to airline purposes only, is the Government liable for the legislative taking of LTP's leasehold interest in the subject property (including the right to fly)?

   2. What is the appropriate amount of just compensation, including interest, to be paid to LTP for the Government's taking of their property in violation of the Constitution?

   3. What is the appropriate amount of attorneys' fees and costs to be paid to LTP?

---

[6] *Id.* at *131–32.
[7] *Id.*

### 2. The United States' Statement

Given the extensive briefing and argument that has already been presented by both parties to the Court, as well as the thorough opinion previously issued, the United States will not present the Court with an exhaustive recitation of facts and issues, except to identify the issues remaining for resolution by the Court:

1. Whether the United States is liable for taking Plaintiffs' respective leasehold interests at Love Field?

2. If the United States is liable for taking Plaintiffs' respective leasehold interests at Love Field, what is the appropriate amount of just compensation, if any, to be paid therefor?

3. What amount of just compensation, if any, are Plaintiffs entitled to for the taking of the Lemmon Avenue passenger terminal?

4. What is the appropriate amount of attorneys' fees and costs to be paid to Plaintiffs?

## I. Settlement

Having unsuccessfully attempted to resolve this dispute before and after filing the Complaint, LTP is not optimistic that this case can be settled.

The United States notes that the parties have had a very preliminary conversation regarding the option of settlement in this case. At this time, however, the United States

submits that the litigation should proceed according to the terms and its proposed schedule set forth in this Joint Preliminary Status Report. If the parties are successful in pursuing settlement beyond a fledgling stage, they will report back to the Court and request an appropriate adjustment to the schedule set to be established by the Court.

**J.      Trial**

LTP sees no legitimate reason why this case should not proceed expeditiously to trial on the remaining issues.

The United States believes that that if further dispositive motions do not resolve the liability issues in this case, the case should proceed expeditiously to trial on all remaining legal and factual issues.

The parties do not request expedited trial scheduling.

**K.      Electronic case management needs**

The parties are not aware of any special electronic case management issues.

**L.      Other information**

The parties are not aware of any other information of which the Court should be made aware.

**M.      Proposed schedule**

LTP proposes the following schedule to resolve this case:

- Rule 26 initial disclosures                            June 15, 2011

- Expert disclosures and exchange of       October 15, 2011
  expert reports

- Close of all fact and expert discovery    December 31, 2011

- Trial                                     As soon thereafter as the Court's
                                            schedule permits

LTP believes this is a generous and reasonable discovery schedule for the issues remaining in this case. LTP also opposes the inclusion of expert rebuttal reports in discovery because they are unnecessary, an additional expense for the parties, and not required by the rules. However, LTP does not oppose the Government's filing of expert rebuttal reports, if it so chooses. The exchange of expert reports should be simultaneous. The Government is flatly incorrect in stating that the burden of proof (which is an evidentiary rule that applies at trial) has any applicability to discovery. A staggered exchange of expert reports only further delays the case for no good reason.

The United States proposes the following schedule to resolve this case:

- Rule 26 initial disclosures              June 15, 2011

- Close of Fact Discovery                  November 4, 2011

- Plaintiffs' Expert Reports               December 16, 2011

- United States' Expert Reports            February 10, 2012

- Plaintiffs' Rebuttal Reports, if any     March 9, 2012 Four Weeks After United
  States' Reports

   Close of Expert Discovery               April 20, 2012

11

- Trial                                                   As soon thereafter as the Court's schedule permits

The United States submits that its proposed schedule is reasonable for fact and expert discovery on the remaining issues in this case.  Plaintiffs allege that they are entitled to $120 million and meaningful investigation of Plaintiffs' claims will require significant fact and expert discovery.  Further, the United States proposes that Plaintiffs, as the parties with the burden of proof, submit their expert disclosures and reports before the United States submits its own expert disclosures and reports.  Proceeding in this manner accounts for the parties' evidentiary burden and will promote judicial efficiency.  The discovery plan the United States proposes will ensure that the parties' experts address the same topics, so as to make the reports most useful to the Court and mitigating the time and expense associated with successive rebuttal and supplemental reports.  Respectfully submitted,

  s/ Roger J. Marzulla  
Roger J. Marzulla  
MARZULLA LAW, LLC  
1150 Connecticut Avenue  
Suite 1050  
Washington, DC 20036  
(202) 822-6760 (telephone)  
(202) 822-6774 (facsimile)  

Counsel for Plaintiffs  

Dated:   May 13, 2011

  s/ Joshua A. Doan  
Joshua A. Doan  
Emily M. Meeker  
Environment & Natural Resources Div.  
U.S. Department of Justice  
P.O. Box 663  
Washington, DC 20044-0663  
(202) 305-0874 (telephone)  
(202) 305-0506 (facsimile)  

Counsel for the United States