# In the United States Court of Federal Claims

No. 08-536L

(Filed: April 19, 2016)

```
*****************************************
LOVE TERMINAL PARTNERS et al.,          *
                                        *
                 Plaintiffs,            *
                                        *
v.                                      *
                                        *
THE UNITED STATES,                      *
                                        *
                 Defendant.             *
*****************************************
```

Fifth Amendment Taking; <u>Lucas</u>
Categorical Taking; Regulatory
Taking; <u>Penn Central</u> Factors; Just
Compensation; Highest and Best
Use of Property; Posttrial Award

<u>Roger J. Marzulla</u>, Washington, DC, for plaintiffs.

<u>Joshua P. Wilson</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiffs Love Terminal Partners, L.P. ("Love Terminal Partners") and Virginia Aerospace, LLC ("Virginia Aerospace") are leaseholders of property at Dallas Love Field Airport ("Love Field"), located in Dallas, Texas. In their complaint, filed in the United States Court of Federal Claims ("Court of Federal Claims") on July 23, 2008, plaintiffs allege that the federal government, through the enactment of the Wright Amendment Reform Act of 2006 ("WARA"), prohibited the use of their property, thereby destroying all economic value or benefit of their leasehold and effecting a taking without just compensation, in contravention of the Fifth Amendment to the United States Constitution. Plaintiffs seek compensation for the taking as well as interest from the date of the taking, attorneys' fees, appraiser and expert witness fees, and the costs and expenses of litigation.

In a prior decision issued on February 11, 2011, the court denied defendant's motion to dismiss and granted plaintiffs' motion for partial summary judgment. In its opinion, the court held the following:

> Based upon its analysis of the WARA, the court holds that the
> statute incorporated the Contract [among local government entities
> and two air carriers] into federal law, thereby mandating that
> Dallas fulfill the obligations to which it agreed on July 11, 2006,
> including acquisition and demolition of the Lemmon Avenue
> Terminal. This federal mandate imposed upon Dallas enabled it to
> satisfy, in part, its obligation to reduce the number of gates at Love

> Field for passenger air service and to manage the airport in
> accordance with the rights and obligations set forth in the Contract.
> Although Dallas was required to act by the authority of the federal
> government, it is the latter party that is responsible for any taking
> that stems from Dallas's conduct.

Love Terminal Partners, L.P. v. United States, 97 Fed. Cl. 355, 424 (2011).  The court further
concluded that through the enactment of the WARA, defendant was responsible for the
demolition of the six-gate Lemmon Avenue terminal, resulting in a physical taking of Love
Terminal Partners' property:

> Although the WARA designated Dallas as the party responsible for
> acquiring and demolishing the Lemmon Avenue Terminal gates as
> part of a broader commitment to modernize Love Field and to
> facilitate the end of the Wright Amendment, the federal
> government sanctioned such actions.  Accordingly, the court
> concludes that the WARA effected a per se, physical taking of
> plaintiffs' property for which the government is liable to pay just
> compensation, and plaintiffs are entitled to partial summary
> judgment based upon their physical taking theory.

Id. at 424-25.  The court left for trial the following two issues:  (1) whether the federal government
took the remainder of the leasehold without paying just compensation, and if so, what amount was
due; and (2) the amount of just compensation plaintiffs were due for the per se physical taking of
the six-gate Lemmon Avenue terminal.

In October 2012, the court conducted a seven-day trial.  Plaintiffs offered the following
six fact witnesses:  (1) Trusten A. McArtor; (2) Donald J. McNamara; (3) Alan R. Naul;
(4) Thomas G. Plaskett; (5) Kurt C. Read; and (6) William T. Cavanaugh, as well as the
following five expert witnesses:  (1) David E. Anderson; (2) Allen E. Cullum;[1] (3) Robert A.
Hazel; (4) Michael W. Massey; and (5) Deborah Meehan.  Defendant offered the following
seven fact witnesses:  (1) Grant S. Grayson; (2) Neal Sleeper; (3) Diana Moog; (4) Thomas P.
Poole; (5) Kenneth Gwyn; (6) Robert W. Montgomery; and (7) Michael Anastas, as well as the
following four expert witnesses:  (1) Daniel Wetzel; (2) Rodney Clark; (3) William T. Reed; and
(4) Winthrop Perkins.

After the conclusion of trial, and due to highly unusual and unforeseen circumstances
involving Mr. Anderson, the court reopened the record to allow plaintiffs to submit the
supplemental expert testimony of James F. Miller.  Since Mr. Miller was brought in to review
Mr. Anderson's report, neither Mr. Anderson's report nor his trial testimony was stricken from
the record.  After receiving Mr. Miller's testimony, the court again closed the record, directed the
parties to submit posttrial briefs, and heard closing arguments.

---

[1]  Mr. Cullum also testified as a fact witness.

Upon consideration of the testimony and evidence adduced at trial and the parties' posttrial memoranda, the court concludes that there was a categorical taking of the entire leasehold, and that plaintiffs are entitled to just compensation in the amount of $133,500,000. With respect to the separate value of the six-gate Lemmon Avenue terminal physically taken by the government, the court renders no opinion.  Rather, because plaintiffs' expert testified as to the value of the terminal as well as the adjacent parking garage, the court concludes that the separate value of the 9.3-acre property amounts to $21,165,000.

Due to the length of this opinion, the court provides the following table of contents:

BACKGROUND ...................................................................................................................4
I.     Plaintiffs:  Corporate Structure .................................................................................4
II.    Love Field:  An Overview .........................................................................................5
       A.   Pre-1979...........................................................................................................5
       B.   1979:  The Wright Amendment.........................................................................6
       C.   1997:  The Shelby Amendment ........................................................................6
       D.   2006:  The WARA.............................................................................................6
III.   The Leasehold:  An Overview of the Master Lease and Sublease .....................................9
       A.   The Master Lease .............................................................................................9
       B.   The Sublease ...................................................................................................11
IV.    Hampstead.................................................................................................................12
       A.   Hampstead's Business Activities Generally ...................................................12
       B.   Hampstead's Investment in Legend.................................................................12
       C.   Hampstead's Construction of the Lemmon Avenue Terminal and the Master
            Plan .................................................................................................................16
       D.   Legend's Bankruptcy and Hampstead's Subsequent Management of Operations at
            Love Field ......................................................................................................16
       E.   Hampstead's Acquisition of the Master Lease ...............................................17
       F.   Hampstead's Attempts to Amend the Leases and Disagreements With Dallas Over
            the Terms of the Leases ..................................................................................18
       G.   Hampstead's Income From Subtenants, Valuation of the Leases, and Attempts to
            Sell the Leases.................................................................................................20
       H.   Hampstead's Cessation of Operations at Love Field..........................................21
       I.   Hampstead's Plans for a Sixteen-Gate Terminal ................................................22
THE GOVERNMENT'S LIABILITY FOR FIFTH AMENDMENT TAKINGS ......................22
I.     Legal Standards.........................................................................................................22
       A.   Fifth Amendment Takings Generally ..............................................................22
       B.   Two Types of Takings .....................................................................................23
            1.   Physical Takings .....................................................................................24
            2.   Regulatory Takings.................................................................................24
                 a.   Categorical Takings:  The Lucas Analysis ...................................25
                 b.   NonCategorical Takings:  The Penn Central Factors ...................26
II.    Analysis.....................................................................................................................27
       A.   Plaintiffs Have Established a Lucas Categorical Taking of Their Leasehold .......27
            1.   Plaintiffs Possessed Valid Property Interests at the Time of the Taking...27

2.    The WARA Destroyed All Economically Beneficial and Productive Use of the Subject Property.............................................................28

B.    In the Alternative, Plaintiffs Have Established a Taking of Their Property Under the NonCategorical <u>Penn Central</u> Factors ...............................................47

1.    The Economic Impact of the WARA Was Absolute; No Economic Value Remained After Its Passage .....................................................47

2.    The WARA Destroyed Plaintiffs' Distinct Investment-Backed Expectations.............................................................................49

3.    The WARA Destroyed Plaintiffs' Property Rights for the Sole Benefit of the Signatories to the Five-Party Agreement ...............................55

RELIEF TO BE AWARDED TO PLAINTIFFS ........................................................57

I.    Just Compensation ...........................................................................................57

A.    Fair Market Value ........................................................................................58

1.    Legal Standard ................................................................................58

2.    Analysis..........................................................................................59

a.    The Entire Leasehold ............................................................60

b.    The 9.3-Acre Property ...........................................................66

B.    Interest.........................................................................................................67

II.    Attorneys' Fees and Costs ................................................................................70

CONCLUSION.........................................................................................................70

The following section contains the court's findings of fact as required by Rule 52 of the Rules of this court.[2]  Other findings of fact required by the rule are found in the section containing the court's analysis of the government's takings liability.

## BACKGROUND

### I.    Plaintiffs:  Corporate Structure

Love Terminal Partners "is a limited partnership organized under the laws of the state of Delaware with its principal place of business in Dallas, Texas." Jt. Stip. ¶ 1.  Virginia Aerospace "is a limited liability corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Dallas, Texas."  <u>Id.</u> ¶ 2.  Both plaintiffs are controlled by entities wholly owned by the Hampstead Group ("Hampstead").  <u>Id.</u> ¶ 3.  Specifically, both plaintiffs are wholly owned by Love Equity Group, which, in turn, is owned by Love Equity Partners II and Love Equity Partners III.  <u>Id.</u>  Love Equity Partners II is owned by a group of institutional investors through Hampstead Investment Partners II Funding Corporation.  <u>Id.</u>  Love Equity Partners III is owned by Hampstead Investment Partners III, L.P.  <u>Id.</u>

---

[2]  Citations in the "BACKGROUND" section are to information in the parties' September 25, 2012 Joint Stipulation of Facts ("Jt. Stip.") and evidence from the trial, to include both exhibits and testimony.  Sources of information previously cited to in the court's February 11, 2011 opinion have not been identified herein unless to denote the source of a direct quote.

## II.     Love Field:  An Overview

### A.     Pre-1979

In 1917, the City of Dallas ("Dallas") Chamber of Commerce purchased the land that now constitutes Love Field and developed it to support the aviation industry.  Following World War I, the Dallas Chamber of Commerce developed Love Field into an aviation-oriented industrial park and, in 1927, sold Love Field to Dallas.  Love Field then began servicing Dallas as its municipal airport.

During the 1950s and early 1960s, the cities of Dallas and Fort Worth, which are separated by approximately thirty miles, operated competing airports.  In 1964, the Civil Aeronautics Board ("CAB"), the predecessor to the United States Department of Transportation ("DOT"), determined that the competition between the two cities' airports was harmful and ordered Dallas and Fort Worth to reach an agreement designating one airport through which CAB-regulated carriers would serve both communities.  The cities were unable to designate one of the existing airports to serve the region.  Instead, they agreed to construct a new airport, Dallas/Fort Worth International Airport ("DFW"), which would be located halfway between Dallas and Fort Worth.  In 1968, the cities adopted a Regional Airport Concurrent Bond Ordinance ("1968 Bond Ordinance"), which provided that both cities would take all necessary steps to provide for the orderly and efficient phase-out of operations at Love Field and the transfer of services to DFW.

At the time, eight air carriers that serviced the Dallas and Fort Worth communities agreed to transfer their operations to DFW.[3]  Southwest Airlines Company ("Southwest"), however, chose to remain at Love Field.  Southwest's refusal to transfer its operations to DFW spawned litigation between Southwest and the cities; the cities argued that permitting Southwest to operate at Love Field would financially threaten DFW.  In 1973, the United States District Court for the Northern District of Texas ruled that Dallas and Fort Worth could not lawfully exclude Southwest from Love Field.  As a result, Dallas, Fort Worth, and the DFW Board could not consolidate passenger service at DFW as envisioned by the 1968 Bond Ordinance.  Nevertheless, in 1974, DFW opened for commercial air service.

In the meantime, Love Field continued to be fully operational.  Commercial airlines operated out of a main terminal owned by Dallas.  Adjacent to the main terminal was automobile parking.  In addition, the airport also allowed general aviation flights for private pilots, charter flights, and helicopters.

---

[3]  The eight air carriers were:  (1) American Airlines, Inc. ("American"); (2) Braniff Airways, Inc. ("Braniff"); (3) Continental Airlines, Inc.; (4) Delta Air Lines, Inc. ("Delta"); (5) Eastern Air Lines, Inc.; (6) Frontier Airlines, Inc.; (7) Ozark Air Lines, Inc.; and (8) Texas International Airlines, Inc.  Each air carrier signed a letter agreement and then executed a use agreement with the DFW Airport Board ("DFW Board") in which it agreed to relocate its services to DFW in conformity with the 1968 Bond Ordinance.

### B.    1979:  The Wright Amendment

In 1978, in an attempt to foster competition, Congress enacted the Airline Deregulation Act of 1978.  However, the controversy over Love Field remained.  Therefore, to end the "continuous disagreement, frequent litigation, and constant uncertainty" associated with Love Field, Congress proposed an amendment to the International Air Transportation Competition Act of 1979.  The legislation, which had the backing of Dallas and Fort Worth, was intended to protect the economic vitality of DFW by prohibiting interstate commercial air service from Love Field.  Ultimately, a compromise agreement was reached; the Wright Amendment, enacted as section 29 of the International Air Transportation Competition Act of 1979, authorized flights from Love Field to locations within Texas and the four contiguous states (Arkansas, Louisiana, New Mexico, and Oklahoma); and limited interstate air transportation provided by commuter airlines to aircraft with a capacity of fifty-six or fewer passengers.

### C.    1997:  The Shelby Amendment

In 1996, Legend Airlines, Inc. ("Legend") sought to provide long-haul air service to and from Love Field using airplanes configured to comply with the Wright Amendment's fifty-six-seat limitation.  The DOT's Office of General Counsel, however, determined that the Wright Amendment's fifty-six-seat exception applied only to airplanes that could hold no more than fifty-six passengers, and not to larger airplanes, which in their normal configuration might seat more than fifty-six passengers.  In 1997, Congress responded to this determination by enacting the Shelby Amendment as part of the Department of Transportation and Related Agencies Appropriations Act of 1998, which clarified that the phrase "passenger capacity of 56 passengers or less" included any aircraft of any size, except aircraft exceeding gross aircraft weight of 300,000 pounds, reconfigured to accommodate fifty-six or fewer passengers.  In other words, the Shelby Amendment permitted longer-haul flights on larger airplanes so long as the airplanes were configured to accommodate fifty-six or fewer passengers.  The Shelby Amendment also added Alabama, Kansas, and Mississippi to the list of states that airlines could serve directly from Love Field.

After the enactment of the Shelby Amendment, Southwest began offering flights from Love Field to Mississippi and Alabama, and Legend announced plans to offer long-haul service to states outside of the Love Field service area using reconfigured aircraft.  Shortly thereafter, however, Fort Worth and American sought to enjoin air service pursuant to the provisions of the Shelby Amendment.  As a result of ensuing litigation, Legend was precluded from offering service from Love Field until 1999.

### D.    2006:  The WARA

In late 2004, Southwest initiated a campaign to repeal the Wright Amendment:  the "Wright is Wrong" campaign.  In response, the Senate Committee on Commerce, Science, and Transportation conducted a hearing, after which Missouri Senator Kit Bond lobbied for through-ticketing to states outside of the Love Field service area.  Ultimately, Congress added only

Missouri to the list of Wright Amendment-exempted states.  Shortly thereafter, American opened additional ticket counters and gates at Love Field.

Two years later, several bills were introduced in Congress to repeal or modify the Wright Amendment.  While Southwest advocated for a complete repeal of the Wright Amendment, American lobbied for a continuation of the Wright Amendment restrictions.  Resolution of the issue was reached in 2006 with the enactment of the WARA, which codified the so-called "Five-Party Agreement," an agreement among Dallas, Fort Worth, the DFW Airport Authority, American, and Southwest to restrict flight operations at Love Field.  The signatories to the agreement described its terms in a joint statement issued on June 16, 2006, which this court summarized in its previous opinion:

> Among other provisions, the Joint Statement indicated that the signatories agreed that international commercial passenger service would be limited exclusively to DFW, and "[t]hrough ticketing to or from a destination beyond the 50 United States and the District of Columbia [would] be prohibited from Dallas Love Field."  The Joint Statement signatories sought "to eliminate all the remaining restrictions on service from [Love Field] after eight years from the enactment of legislation," and to reduce "as soon as practicable" the number of gates available for passenger air service at Love Field from thirty-two to twenty.  Dallas agreed to acquire "the portions of the lease on the Lemmon Avenue facility[,] up to and including condemnation, necessary to fulfill the obligations under this agreement" and to "demoli[sh] . . . the Legend gates immediately upon acquisition of the lease to ensure the facility can never again be used for passenger service."  The signatories also agreed that the Joint Statement was predicated on Congress enacting legislation to implement the terms of the agreement.

Love Terminal Partners, L.P., 97 Fed. Cl. at 366-67 (citations omitted); see also Tr. 2044-45 (Montgomery).

Enacted on October 13, 2006, the WARA expanded service at Love Field by permitting domestic and foreign air carriers to "offer for sale and provide through service and ticketing to or from Love Field, Texas, and any United States or foreign destination through any point within Texas, New Mexico, Oklahoma, Kansas, Arkansas, Louisiana, Mississippi, Missouri, or Alabama."  Pub. L. No. 109-352, § 2(a), 120 Stat. 2011, 2011 (2006).  The WARA also provided for the complete repeal of the Wright Amendment after a period of eight years.

In addition, the WARA specifically addressed the future of the gates at Love Field:

> (a)  IN GENERAL. – The city of Dallas, Texas, shall reduce as soon as practicable, the number of gates available for passenger air service at Love Field to no more than 20 gates.  Thereafter, the

number of gates available for such service shall not exceed a
maximum of 20 gates.  The city of Dallas, pursuant to its authority
to operate and regulate the airport as granted under chapter 22 of
the Texas Transportation Code and this Act, shall determine the
allocation of leased gates and manage Love Field in accordance
with contractual rights and obligations existing as of the effective
date of this Act for certificated air carriers providing scheduled
passenger service at Love Field on July 11, 2006.  To
accommodate new entrant air carriers, the city of Dallas shall
honor the scarce resource provision of the existing Love Field
leases.

(b)  REMOVAL OF GATES AT LOVE FIELD. – No Federal
funds or passenger facility charges may be used to remove gates at
the Lemmon Avenue facility, Love Field, in reducing the number
of gates as required under this Act, but Federal funds or passenger
facility charges may be used for other airport facilities under
chapter 471 of title 49, United States Code.[4]

Id. § 5, 120 Stat. at 2012 (footnote added).

Finally, the WARA addressed general aviation flights from Love Field:

Nothing in this Act shall affect . . . flights to or from Love Field by
general aviation aircraft for air taxi service, private or sport flying,
aerial photography, crop dusting, corporate aviation, medical
evacuation, flight training, police or fire fighting, and similar
general aviation purposes, or by aircraft operated by any agency of
the Federal Government or by any air carrier under contract to any
agency of the Federal Government.

Id., § 5(c), 120 Stat. at 2012.

Following the enactment of the WARA, Dallas began a major renovation of the main
midfield terminal at Love Field, to include the addition of four new gates.  Tr. 2040
(Montgomery).  The budget for this renovation project, which was ongoing at the time of trial,
was $519 million.  Id. at 2044.  Southwest, which was headquartered at Love Field, id. at 2008,
oversaw the project, id. at 2040-41.  To support the cost of expanding the terminal, Southwest
issued $350 million in revenue bonds.  Id.  By 2007, passenger demand at Love Field had risen
by twenty percent.  Id. at 2191 (Reed).

---

[4]  Chapter 471 of title 49 of the United States Code governs airport development.  See 49
U.S.C. §§ 47101-47175 (2006).

**III.     The Leasehold:  An Overview of the Master Lease and Sublease**

**A.     The Master Lease**

On June 10, 1955, Dallas executed a long-term Master Lease with Braniff, granting Braniff the exclusive use of approximately thirty-six acres at Love Field, together with the nonexclusive right to use runways, taxiways, and other airport facilities.  Jt. Stip. ¶ 4.  The Master Lease was amended and supplemented five times:  (1) August 1956, (2) July 1996, (3) November 1983, (4) March 1992, and (5) September 1993.  Id. ¶ 5.  The area covered by the Master Lease was eventually reduced to 26.8 acres.  Id. ¶ 6.

Article VIII of the Master Lease, as amended in November 1983, governs the lessee's permissive uses of the property:

ARTICLE VIII

LESSEE'S USE OF PREMISES AND AIRPORT

Lessor hereby grants Lessee the exclusive use of the Premises and the non-exclusive use of the Airport for any lawful purpose, subject to the following:

* * *

(2)  The rights hereinafter granted Lessee for the installation of facilities for fuel and communications on any location other than the Premises shall be subject to the prior approval of Lessor's City Manager of the plans and specifications therefor, and shall be at a reasonable rate of ground rental for any tract or tracts of ground in addition to the Premises on which such equipment or facilities may be installed.  Lessee's rights shall not include the right to any exclusive space within any terminal or passenger station building which Lessor may in the future construct to serve the Airport unless Lessee by supplemental agreement with Lessor agrees to become a tenant and to pay such reasonable rental rates for such building tenancy as maybe established by mutual agreement. Lessee shall in its use of the Airport observe any reasonable safety regulations promulgated by Lessor.

* * *

(3)  Lessee's primary business will be aviation-related and include broad relationships and contracts with the Government, other airlines and the general public, such as the lease, interchange, storage, sale and joint use of equipment, parts, facilities and

9

functions, the consolidation of activities, and the like.  Permitted activities shall include, without limitation, the following:

(a)  On the Premises, the overhaul, repair, modification, manufacture, assembly, testing, fueling, use, and transit and permanent storage of engines, parts, accessories, electronic and other equipment and aircraft and such similar or related activities for which Lessee's equipment or facilities might otherwise be suitable or appropriate:  operation of corporate headquarters and of hangar, reservation center, office, shop and employee facilities for the Lessee and its affiliates, including the parking of automobiles and equipment; the operation of restaurant, cafeteria, club and general recreational facilities for Lessee's employees and guests; and the operation of inflight food preparation facilities.  However, Lessee shall not use the Premises as a passenger terminal area for regularly scheduled air carriers employing aircraft with capacity in excess of fifty passengers per aircraft.

(b)  On the Airport, the operation of a transportation system by aircraft for the carriage of persons, property, cargo and mail, including the landing, taking-off, parking, loading and unloading of aircraft and other equipment and the routine repairing, conditions, servicing, parking and storing thereof.

(c)  On both the Airport and the Premises, training and education in all phases of aeronautics; full right to install adequate storage facilities for gasoline, fuel, lubricating oil, greases, food and other materials and supplies, together with necessary pipes, pumps, motors, filters and other appurtenances incidental to the use thereof; the installation, maintenance, and operation of radio, communications, meteorological and aerial navigation equipment and facilities; the sale, disposal or exchange of Lessee's aircraft, engines, accessories, gasoline, oil, greases, lubricants and other fuel, materials, supplies and equipment (limited to articles and goods used by or bought for use by Lessee); the purchase at the Airport or elsewhere, from any person or company of Lessee's choice, of requirements of gasoline, fuel, lubricating oil, greases, food, and all other materials and supplies, together with the related services by lessee and its suppliers of aircraft and other equipment by truck or otherwise.

JX 1 (LTP-000828-29).

After Braniff went bankrupt, Dalfort Corporation ("Dalfort") acquired the Master Lease. Jt. Stip. ¶ 7.  On March 30, 1992, Dallas and Dalfort executed the "Fourth Supplement to Lease and Agreement" ("Fourth Supplement"), amending the terms of the Master Lease:

> Lessor leases the Premises, including the Base Facilities, to Lessee for a primary term of twenty five years beginning on October 1, 1998 and ending on September 30, 2023, expressly conditioned upon the performance by Lessee of the conditions, terms and provisions in the Lease.  Lessee has no options to extend the Primary Term of the Lease; the Lease and leasehold estate shall expire on September 30, 2023 unless sooner terminated in accordance with the terms of the Lease.  Nothing in this Paragraph shall preclude Lessee and Lessor from entering into a new lease covering the Premises and Base Facilities at Love Field, following expiration of the Lease.

JX 1 (LTP-000785).  The Fourth Supplement also included a provision that governed the sharing of revenue from subleases:

> If at any time following execution of the Fourth Supplement, Lessee subleases in whole or in part, the Premises or Base Facilities, Lessee shall pay to Lessor a sum equal to fifty percent (50%) of the rental collection by Lessee from Sublessee in excess of the rental paid by Lessee to Lessor for said subleased Premises or Base Facilities, in addition to the monthly rental owed Lessor by lessee for the Premises or Base Facilities subleased.  Should Lessee sublease the Premises or Base Facilities for less than it pays in monthly rental to Lessor, Lessee's rental shall not be reduced or abated and lessee shall continue to pay Lessor the full rental set forth in the Lease.

Id. (LTP-000793).

On December 31, 1993, Dalfort assigned the Master Lease to Astrea Aviation Services, Inc. ("Astrea").  Jt. Stip. ¶ 7.  On December 30, 1997, Astrea assigned the Master Lease to Dalfort Aerospace, L.P. ("Dalfort Aerospace").  Id.  On December 12, 2003, Dalfort Aerospace assigned the Master Lease to Virginia Aerospace.  Id. ¶ 9.

## B.    The Sublease

On December 30, 1997, while Dalfort Aerospace was still a signatory to the Master Lease, it subleased 9.3 acres to the Asworth Corporation ("Asworth").  Id. ¶ 8.  In March 1998, Asworth subleased the same 9.3 acres to Legend.  Id.  On August 11, 1999, Legend, in turn, assigned the Sublease to Love Terminal Partners.  Id.  In March 2000, Asworth assigned its interest in the Sublease to Love Terminal Partners.  Id.

11

IV.     **Hampstead**

As noted above, both plaintiffs are controlled by entities wholly owned by Hampstead. Thus, this court's review of plaintiffs' acquisition of the leases necessarily involves a discussion of Hampstead's involvement in the development and management of Love Field, prefaced by a description of Hampstead's business activities.

A.      **Hampstead's Business Activities Generally**

In August 1988, Mr. McNamara founded Hampstead.  Tr. 50 (McNamara).  As a private equity firm, Hampstead made investments in real estate with funds raised from different sources, including the endowments of Yale, Princeton, and Stanford Universities.  Id. at 51-54.  Notably, these investments had a business or operating component to them.  Id. at 57.  In other words, Hampstead's investments often included the option of owning part of the operating company.  Id. at 57-58.

The majority of Hampstead's investments were in lodging and senior housing.  Id. at 184 (Read).  Hampstead also invested in real estate financing and commercial office space.  Id. at 185.  Before making any such investments, Hampstead undertook substantial due diligence efforts, which could take weeks or months.  Id. at 60-61 (McNamara).  Mr. Read, a Hampstead partner, was responsible for leading the teams that performed the due diligence.  Id. at 142 (Read).  That due diligence included, for example, determining the location of the property and determining whether the property was zoned for the intended use.  Id. at 143.

By in large, Hampstead's investments were successful.  Id. at 63-64 (McNamara) (noting that one investment from 1990 took ten years to become profitable and is likely the company's most profitable investment).  However, Hampstead also made some unsuccessful investments.  Id. at 185-87 (Read) (noting Hampstead's failed investments in Malibu Entertainment and Houlihan Restaurants).

B.      **Hampstead's Investment in Legend**

In 1999, Hampstead became interested in Love Field.  Tr. 65 (McNamara).  To gain entry to Love Field, Hampstead developed a plan to fund the construction of a terminal for Legend.  Id.  Hampstead anticipated that it would be a leasehold investment as to the land and real estate.  Id. at 65-66.  Hampstead's investment plan for Love Field also called for a direct investment in Legend.  Id. at 72.

Much of Hampstead's initial due diligence efforts with regard to Love Field and Legend were led by Mr. Read.  Id. at 148 (Read).  First, he and his team examined real estate issues.  Id. Second, he and his team examined legal issues surrounding Love Field, focusing on the Wright Amendment, the Shelby Amendment, and the DOT's rulings.  Id.  Third, Mr. Read analyzed whether flights could profitably be operated from Love Field.  Id. at 149.  According to Mr. Read, the team found a 1992 DOT study, captioned "Analysis of the Impact of Changes to the Wright Amendment," ("DOT study") to be particularly helpful:

> Q    And did you rely on [the DOT study], among all of the other documents that you came across in your due diligence?
>
> A    I did.  You know, one of the things that we needed to be brought up to speed on when we first looked at and understood what the premise of the investment was was what where the demand characteristics at Love Field, and this was a particularly helpful document that talked about the potential for a significant increase of demand at Love Field.
>
> Q    Yes.  Could you expand just a little bit on in what way you found this document helpful?
>
> A    Well, the Wright Amendment basically restricted airline traffic out of Love Field to Southwest and a couple of very – you know, two small, residual gates, and this report sort of reiterated to us and particularly found it interesting from the government's perspective that Love Field had a number of unique characteristics that they thought would cause demand should the Wright amendment ever be modified or lifted, would cause demand to jump dramatically because of the location of Love Field in Dallas and also because of the location of Dallas-Fort Worth as a highly desirable, central location for airlines to fly to attractive destinations.  And so I found this document to be very interesting and helpful.

Id. at 159-60; see also PX 9.

Mr. Read and his team also relied upon assessments performed by various external parties.  For example, Hampstead hired the Seabury Group, an outside aviation consulting firm, to evaluate Legend's proposed terminal gate rental rates.  Tr. 150 (Read).  In addition, Hampstead hired an outside aviation industry analyst, to evaluate the demand for 56-seat aircraft and to inform Mr. Read's team about airline business models generally and regional jet models specifically.  Id. at 151.

Finally, Hampstead reviewed Legend's due diligence efforts.  This included reviewing documents Legend had prepared, to include a study prepared for Legend by the Campbell-Hill Aviation Group regarding the fair value of the annual rentals for Legend gates, as well as an August 1998 investment summary prepared for Legend by Jones Lang Wootton, a real estate service company, wherein the Legend terminal was valued at $23 million.  Id. at 154-55 (Read);

see also JX 7.  This also included speaking with experts Legend had previously consulted.  Tr. 152-53 (Read).

Internal due diligence was also performed by Mr. McNamara; he spoke with several individuals within the commercial airline world, as well as with Legend's management team.  Id. at 66-74 (McNamara).  Furthermore, he reviewed real estate issues, regulatory issues, and airline operations.  Id. at 74.

In addition to the due diligence performed by Messrs. Read and McNamara, Mr. Cavanaugh, Hampstead's outside counsel, reviewed the terms of the Master Lease.  Id. at 842-43 (Cavanaugh).  Upon concluding his review, Mr. Cavanaugh advised Hampstead that it was not bound by the rent-sharing provision of the Master Lease because it never planned to sublease the property and because it never intended to surrender control over any aspect of the property.  Id. at 843-44.  In other words, Mr. Cavanaugh believed that Hampstead could enter into licensing agreements for use of the premises without invoking the Master Lease's rent-sharing provision:

> Q       Okay.  Did you have occasion to review that rent sharing
>         provision either as outside counsel or as general counsel for
>         Hampstead?
>
> A       Yes.
>
> Q       Now, to your knowledge, did either Love Terminal Partners
>         or Virginia Aerospace ever pay any sum to the City of
>         Dallas under that rent sharing provision?
>
> A       No.
>
> Q       And why not?
>
> A       When we originally looked at this - - and as you can
>         imagine, this was a provision we focused on - - we thought
>         several things, at least three.  One was a fairly common
>         provision in a real estate lease where a landlord will
>         provide - - they don't want the tenant to make money off of
>         the premises from subleasing the premises to another tenant
>         without sharing in the rental in some way, so this provision
>         had been inserted.
>
>         It only applied to a sublease that Dalfort as lessee would
>         have subleased to another party, so in this case, Love
>         Terminal Partners was not required to pay Dalfort any more
>         in rent than a proportionate share of what Dalfort owed to
>         the city under the primary lease.  This provision did not

> purport to reach down any farther into rentals or
> compensation that a subtenant would have received from - -

Q     Okay.

A     So that was point 1.

Q     Okay.  In addition to Point 1, was there another rationale?

A     Yes.  Point 2 was we felt like at Love Terminal Partners
from our business plan we weren't going to sublease the
premises to anybody.  We were going to run an operating
business.  And so, in thinking about what an airline
terminal was, we're not signing leases with airlines that
give or anybody else frankly that would give them the
exclusive right to operate and control and use a space in the
way that a real estate tenant would.  We had gate license
agreements that provided as I recall nonexclusive rights to
use gates to Delta and Legend.  We had management
agreements and parking agreements and other things, but
effectively we felt like we were running an operating
business, not subleasing the premises to anybody, so the
provision wouldn't require a sharing of the rent.

Id. at 842-44.  Ultimately, no such payments were ever made.  Id.; see also id. at 560 (Naul).

Following the completion of its due diligence efforts, Hampstead presented its findings to its investors at a one-day meeting.  Id. at 169-70 (Read); JX 10, JX 11; see also Tr. 433-34 (McArtor); JX 9.  Present at that meeting was David Swensen, head of the Yale Endowment Fund.  Tr. 170 (Read).  Known as "the Warren Buffett of institutional investing," Mr. Swensen approved of the investment.  Id. at 52-53 (McNamara).

Ultimately, Hampstead invested between $60 and $70 million in Legend and the proposed terminal.  Id. at 187-88 (Read).  That investment was memorialized in a May 27, 1999 agreement, to which Love Terminal Partners was a party.  See JX 9.  Several months later, on August 11, 1999, Legend assigned its interest in the Sublease to Love Terminal Partners.  Jt. Stip. ¶ 8.  That same day, Love Terminal Partners entered into a Gate License Agreement with Legend for the same 9.3 acres covered by the Sublease.  Id.

As noted above, although Hampstead's investment in Legend was based on its interest in Love Field, when it made its investment in 1999, there was still litigation regarding whether Legend could fly.  Tr. 74 (McNamara).  In fact, Hampstead did not learn that Legend would be able to operate out of Love Field until after it had begun construction on the proposed terminal.  Id.  Such a fact was irrelevant to Hampstead because Hampstead's investment plan was broadly focused on using the real estate to build and then expand an airline terminal, irrespective of

Legend's success or failure as an airline.  Id. at 74, 556-59 (Naul); see also DX 51.  In December 2000, shortly after Hampstead's acquisition of Legend, Legend filed for bankruptcy.  Tr. 231 (Plaskett).

### C.      Hampstead's Construction of the Lemmon Avenue Terminal and the Master Plan

Initially, Hampstead hired the McClier Corporation to design and build the proposed Lemmon Avenue terminal.  Tr. 993 (Cullum).  However, following concerns that the project was falling behind schedule and was over budget, Hampstead hired Mr. Cullum, an outside manager, to oversee the project.  Id.  When Mr. Cullum assumed control, construction of the terminal was already in progress and construction of the parking garage was about to begin.  Id. at 994.  In 2000, the Lemmon Avenue terminal, with its six gates and adjacent parking garage, was completed.  Id. at 1004.  The total cost to build the terminal was $17,377,883.  Id. at 1000.

That same year, Dallas and numerous other parties (including, inter alia, Hampstead, Legend, Southwest, American, other airport tenants, neighborhood organizations, and local businesses) met to develop a plan for Love Field ("Master Plan").  Id. at 457-58 (Naul); 1435-38 (Sleeper); JX 17 at 811-12.  The process was overseen by Mr. Gwyn, Dallas's director of aviation.  Tr. 1823 (Gwyn).  Mr. Sleeper, the president of Love Terminal Partners from late 1999 to early 2006, served as Hampstead's representative at Master Plan meetings.  Id. at 1432-38 (Sleeper).

The resulting Master Plan envisioned Love Field as a thirty-two gate airport.  Id. at 1823-24 (Gwyn).  The preferred allocation of the thirty-two gates was twenty-six gates at the main terminal and six gates at the Lemmon Avenue terminal.  Id. at 1825; see also id. at 2128-29 (Clark).  According to Mr. Naul, a principle with Hampstead, the Master Plan was extremely beneficial to Hampstead's marketing plan because it specifically referenced the Lemmon Avenue terminal and allowed for the possibility of ten additional gates.  Id. at 459-61 (Naul).  However, following the events of September 11, 2001 ("9/11"),[5] Hampstead suspended all marketing efforts for the Lemmon Avenue terminal.  Id. at 461-62.

### D.      Legend's Bankruptcy and Hampstead's Subsequent Management of Operations at Love Field

From April until December 2000, Legend was actively engaged in providing scheduled commercial air passenger service from the Lemmon Avenue terminal.  Jt. Stip. ¶ 14.  However,

---

[5]  Pursuant to Rule 201 of the Federal Rules of Evidence, the court takes judicial notice of the events that occurred on September 11, 2001:  "On September 11, 2001, 19 militants associated with the Islamic extremist group al-Qaeda hijacked four airliners and carried out suicide attacks against targets in the United States.  Two of the planes were flown into the towers of the World Trade Center in New York City, a third plane hit the Pentagon just outside Washington, D.C., and the fourth plane crashed in a field in Pennsylvania."  History, http://www.history.com/topics/9-11-attacks (last visited Feb. 2, 2016).

although Legend was popular with the flying public, it was unable to raise necessary capital and on December 3, 2000, was forced to file for bankruptcy.  Id. ¶ 16; Tr. 417-19 (McArtor).  On April 24, 2001, Legend converted its Chapter 11 bankruptcy filing to a Chapter 7 filing.[6]  Id.

After Legend filed for bankruptcy, Mr. Naul began to oversee Hampstead's real estate assets and to act as an asset manager for the terminal.  Tr. 450-51 (Naul).  In this capacity, he led Hampstead's efforts to find additional users for the terminal and to devise a strategy for going forward.  Id. at 451.  To that end, Hampstead retained the Seabury Group.  Id. at 452.  It recommended, and Hampstead agreed, to maintain a flexible strategy for using the property and to offer the property to as many potential users as possible.  Id.  In May 2002, as part of this marketing strategy, Hampstead commissioned a series of sketches showing possible alternative layouts and expansions of the Lemmon Avenue terminal, to include the addition of more gates.  Id. at 472-75; PX 107C.

Up to this point, Atlantic Southeast, a Delta affiliate, had remained a tenant at the Lemmon Avenue terminal.  Tr. 456 (Naul).  However, because Legend had also provided additional routine services such as cleaning, security, and landscaping, Hampstead decided that, rather than keep the Lemmon Avenue terminal open and charge Atlantic Southeast for these services, Atlantic Southeast should move to the main terminal.  Id.  This decision was consistent with Hampstead's overall marketing plan because it never intended to use the Lemmon Avenue terminal solely for the purpose of housing numerous smaller tenants.  Id. at 457.

As a result of Hampstead's decision, Atlantic Southeast moved its operations from the Lemmon Avenue terminal to the main terminal at Love Field.  Id. at 1813-16 (Gwyn).  In 2001, Atlantic Southeast paid $28,191 per year to lease two gates at the main terminal at Love Field.  Id. at 1815; DX 31; see also Tr. 2085-90 (Anastas).  In 2002, Dallas raised the rent for those two gates to $72,306.30 per year.  Tr. 1817-18 (Gwyn); DX 39.  In 2003, Atlantic Southeast informed Dallas that it was terminating its lease at Love Field.  Tr. 1860-61 (Gwyn).

### E.    Hampstead's Acquisition of the Master Lease

In 2003, given the fact that the aviation industry was slow to recover after 9/11, and given the fact that Hampstead believed that the Wright Amendment would be repealed, Hampstead began to look into different investment opportunities at Love Field.  Tr. 464-65, 485 (Naul).  As a result, on December 24, 2003, Hampstead (through Virginia Aerospace) acquired the Master Lease from Dalfort Aerospace.  Jt. Stip. ¶ 9.  In so doing, Hampstead achieved its original investment objective, which was to acquire the entire 26.8-acre leasehold.  Tr. 79 (McNamara).

---

[6]  Chapter 11 bankruptcy filings are "rehabilitation cases" whereby "creditors look to future earnings of the debtor, not to the property of the debtor at the time of the initiation of the bankruptcy proceeding, to satisfy their claims," whereas chapter 7 bankruptcy filings are "liquidation cases" whereby "the trustee collects the non-exempt property of the debtor, converts that property to cash, and distributes the cash to the creditors."  David G. Epstein et al., Bankruptcy § 1-5, at 8-9 (1st ed. 1993).

In order to complete the deal, however, Hampstead had to sell some land located across the street from the Lemmon Avenue terminal to a car dealership.  Id. at 467 (Naul).

As a result of obtaining the Master Lease, Hampstead was able to move quickly to demolish Dalfort Aerospace's hangar facilities and start construction on parking and additional gates, if a new user for the Lemmon Avenue terminal was found.  Id. at 467-69.  Hampstead remained bound, however, by a contractual term in the Master Lease previously negotiated by Legend and Dalfort Aerospace—that heavy aircraft maintenance could not be performed on the site.  Id. at 468-71; JX 4.

## F.  Hampstead's Attempts to Amend the Leases and Disagreements With Dallas Over the Terms of the Leases

In 2004, in an effort to attract additional subtenants, such as aircraft manufacturer Adam Aircraft, Hampstead petitioned Dallas for amendments to the Master Lease.[7]  Tr. 1782-84 (Poole); DX 51.  First, Hampstead sought to eliminate the fifty percent rent-sharing provision, which it believed was not imposed on the other tenants at Love Field.  DX 51.  Second, Hampstead sought to have the Master Lease amended to include a ten-year renewal option, which it claimed was typical of the other leases on the property.  Id.  Although Dallas did not object to extending the lease—it agreed to a forty-year extension—it did not agree to eliminate the rent-sharing provision.  Tr. 1782, 1785 (Poole); DX 52.  In other words, while Dallas believed that the addition of Adam Aircraft at Love Field would be a source of good jobs for the city, it was not willing to forgo the revenue derived from the Master Lease's rent-sharing provision.[8]  Tr. 1782 (Poole).

In addition to refusing to eliminate the Master Lease's rent-sharing provision, Dallas expressed its concern to Hampstead that the rent-sharing provision was in fact being violated.  DX 62.  In a November 15, 2005 letter written by Mr. Gwyn to Mr. Grayson, president of Virginia Aerospace, Mr. Gwyn stated:

> [I]t was our understanding that use of the sublease premises parking garage for a non-aviation use was a temporary solution while the sublessee's parking garage was being built.  Once the sublessee's parking garage was completed, we expected the sublease and their use of Love Field aviation facilities to terminate.  Please be reminded . . . [that] Lessee's primary business shall be

---

[7]  If a tenant wanted to amend or extend its lease with Dallas, the tenant would first negotiate the amendment with Dallas's director of aviation.  Tr. 1758 (Poole).  The director of aviation would then recommend the amendment to the city manager, who would then recommend it to the city council for consideration.  Id.  The city council, of which the mayor of Dallas was a voting member, then voted on the proposed amendment.  Id. at 1846 (Gwyn).

[8]  Ultimately, Adam Aircraft located its manufacturing facilities elsewhere in the United States.  Tr. 556-58 (Naul).

> aviation-related.  This letter shall serve as notice that all non-
> aviation use of the leased premises must be terminated
> immediately.

Id.  In his December 1, 2005 letter of response, Mr. Grayson first indicated that he was surprised by the city's concerns since various subtenants had been operating on the property without objection for several years.  Id.  He then stated that Love Terminal Partners had been notified and that it would, in turn, notify subtenant Sewell Motors ("Sewell") of the city's concerns.  DX 66.  Finally, Mr. Grayson stated his belief that Premiere Limousine, one of the other subtenants, was providing "aviation related services as a transporter of airplane owners, operators, and passengers," and that, therefore, its use of the property was permissible under the lease.  Id.

In his December 16, 2015 reply to Mr. Grayson's letter, Mr. Gwyn stated:

> In regards to the use of the facility, when Sewell Village Cadillac
> ("Sewell") began using the facility, I was told that this use would
> be on a temporary basis while their parking garage was being
> constructed and that they would vacate the facility upon
> completion of their garage.  This did not occur and was one of the
> reasons for our previous letter. . . . I have agreed to Sewell's
> request to continue their use of the facility, subject to the above
> reference Lease and while the additional parking structure is being
> constructed. . . . As for the limousine service, I do not object to
> their use at this time, however, this is not to be interpreted or
> construed as a consent to any agreement between the limousine
> service and Love Terminal Partners, L.P. nor a waiver of the City's
> rights and privileges under the Lease.
>
> As for the Sublease rentals, it is our interpretation of the Lease that
> any rentals receive[d] under a sublease, including any other
> business agreement holding under the Lease, (i.e., sub-sublease,
> license, etc.) will be subject to the 50% rent share provision as
> stated in Article XX of the Lease.  In fact, Section 13[,]
> Assignment and Sub-letting of the Sublease between Virginia
> Aerospace and Love Terminal Partners, L.P. (["]Sublessee")[,]
> states that
>
> "…SUBLESSEE SHALL BE RESPONSIBLE TO PAY ANY
> AND ALL AMOUNTS, IF ANY, WHICH SUBLESSOR IS
> OBLIGATION TO PAY TO LANDLORD IN CONNECTION
> WITH SUCH REVENUES AND INCOME UNDER ARTICLE
> XX OF THE MAIN LEASE IN CONNECTION WITH ANY
> SUB-SUBLEASE…"

> As you can see from the above, this 50% rent share was
> contemplated when the sublease was executed by your
> predecessor.  The fact that the City has not pursued these excess
> revenues during the temporary sub-sublease/sub-sublicense
> agreements does not mean that the City has waived its right to
> pursue these revenues in the future.

DX 68 (DAL-CFC-002182-83).

### G.   Hampstead's Income From Subtenants, Valuation of the Leases, and Attempts to Sell the Leases

Following Legend's bankruptcy, Hampstead was still able to earn income from its subtenants.  Tr. 2097-98 (Naul).  From 2002 to 2008, the largest payments were from Sewell, although Hampstead also received payments from the car dealership from 1999 to 2001.  Id. at 2098-99.  Other revenue came from an aviation freight company, a limousine company, two automobile dealerships, an aviation reservation service, and several wireless telecommunications companies.  Id. at 518-20; DX 105.  From 2004 to 2008, however, Hampstead's income from these properties did not cover their annual rental payment, which was approximately $537,000.  Tr. 2100-02 (Naul); DX 105.

In the 2005 and 2006 financial reports for Hampstead Investment Partners III, L.P., the value of the assets owned by Love Equity Partners III was listed as approximately $17.1 and $17.2 million, respectively.  DX 76; DX 91.  In the 2006 report, an additional caveat as to the valuation of the assets was provided:

> In the absence of better information, the general partner has
> continued to value the investment at the appraised values from
> March 2005.  Such appraised values considered the flight
> restrictions in [effect] at the time that precluded long-haul flights
> out of Love Field.  Thus, the appraised values did not assume a
> best-case (no flight restrictions) scenario and the general partner
> continues to believe those appraised values represent the best
> information currently available.

DX 91.  According to Ms. Moog, Hampstead's accountant, the financial reports provided only the property's book value, not its market value:

> Q      Is it possible that book value would not reflect the current
>        market value of assets?
>
>                            * * *
>
> A      Yes.  Book value - - there's no – you could make no
>        assertion as to whether book value equaled market value.

\* \* \*

Q       They're not the same thing.

A       They're not the same thing.

\* \* \*

Q       Based upon your review of Defense Exhibit 91, is it your
        understanding that the auditors considered the appraisal
        reports that they reviewed to be a reliable indication of the
        value of the assets themselves?

A       It's my opinion that they did not consider them to be
        valuable - - they didn't consider them to be a true valuation,
        which was the reason for the significant caveats included in
        the second paragraph that describes the valuation.

Tr. 1692-64 (Moog).

In early 2006, Hampstead held discussions with Pinnacle Airlines ("Pinnacle") regarding a possible sale of the Master Lease. Id. at 85 (McNamara), 486 (Naul). According to Mr. Naul, Pinnacle was extremely interested in the property and on April 28, 2006, Hampstead sent Pinnacle a proposal. Id. at 486-88 (Naul). According to the terms of the proposal, Hampstead agreed on a price of $100 million for the entire property (the Master Lease) or $85 million for just the existing gates (the Sublease). Id. at 489-90; JX 32. However, the sale to Pinnacle was never consummated. Tr. 491 (Naul). Hampstead also engaged in preliminary discussions with JetBlue, but nothing ever came of them. Id. at 486, 514-15.

## H.    Hampstead's Cessation of Operations at Love Field

For fifteen months following the WARA's enactment, Hampstead continued to pay the rent on the Master Lease. Id. at 80 (McNamara). However, in March 2008, Hampstead informed Dallas of its intent to cease rental payments on the Master Lease and Sublease. Jt. Stip. ¶ 12. Subsequently, on November 20, 2008, Dallas informed Hampstead that it was in default under both leases. Id. Dallas then instituted eviction proceedings and in December 2008, was granted possession of the leaseholds. Id. Demolition of the Lemmon Avenue terminal, which had begun on July 20, 2009, was completed by September 29, 2009.[9] Id. ¶ 9.

---

[9]  The court, accompanied by counsel, party representatives, and city officials, toured the Lemmon Avenue terminal on March 25, 2009, prior to its demolition. The site visit also included a tour of other facilities at Love Field.

Between 1999 and 2008, Hampstead invested between $60 and $70 million in Legend and the Lemmon Avenue terminal.  Tr. 77 (McNamara).  Over the course of its existence, Love Terminal Partners lost more than $25.5 million in income plus an additional $8.5 million due to depreciation and abandonment of assets.  Id. at 1712 (Wetzel).  Similarly, Virginia Aerospace, over the course of its existence, lost over $12 million in income plus an additional $5.5 million due to depreciation and abandonment of assets.  Id. at 1713-15.  Moreover, at no time did Hampstead earn enough rental income to cover the monthly payments on the Master Lease.  Id. at 2101-02 (Naul).

I.      **Hampstead's Plans for a Sixteen-Gate Terminal**

In 2012,[10] Hampstead commissioned a set of architectural plans from the firm of Good Fulton Farrell ("GFF") for the expansion of the six-gate Lemmon Avenue to a sixteen-gate terminal.  Tr. 1015 (Cullum); PX 107G.  Hampstead never discussed these plans with Dallas, Tr. 531 (Naul), or the Federal Aviation Administration ("FAA"), id. at 1760 (Poole).

**THE GOVERNMENT'S LIABILITY FOR FIFTH AMENDMENT TAKINGS**

I.      **Legal Standards**

A.      **Fifth Amendment Takings Generally**

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  This clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Armstrong v. United States, 364 U.S. 40, 49 (1960).  "The chief and one of the most valuable characteristics of the bundle of rights commonly called 'property' is 'the right to sole and exclusive possession—the right to exclude strangers, or for that matter friends, but especially the Government.'"  Mitchell Arms, Inc. v. United States, 7 F.3d 212, 215 (Fed. Cir. 1993) (quoting Hendler v. United States, 952 F.2d 1364, 1374 (Fed. Cir. 1991)).  The Takings Clause does not prohibit the taking of property.  Brown v. Legal Found. of Wash., 538 U.S. 216, 235 (2003).  Rather, it proscribes a taking without just compensation.  Id.; see also First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A., 482 U.S. 304, 315 (1987) (providing that the Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking").

Traditionally, "[p]roperty has been well defined to be a person's right to possess, use, enjoy, and dispose of a thing not inconsistent with the law of the land."  Peabody v. United States, 43 Ct. Cl. 5, 16 (1907).  "Real property, tangible property, and intangible property all may be the subject of takings claims."  Conti v. United States, 291 F.3d 1334, 1338-39 (Fed. Cir.

---

[10]  Previously, in 2002 and in 2005, Hampstead commissioned a series of architectural sketches from the Dallas firm of HKS, regarding possibilities for expansion on the 26.8 acres covered by the Master Lease.  Tr. 471-75, 532-34 (Naul); PX 107C; DX 64.

2002) (citations omitted).  Included in the category of intangible property rights are leases.  See Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978) ("As a general proposition, a leasehold interest is property, the taking of which entitles the leaseholder to just compensation for the value thereof." (citing Lemmons v. United States, 496 F.2d 864, 873 (Ct. Cl. 1974); see also U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); Lynch v. United States, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation.  Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States.").

The United States Court of Appeals for the Federal Circuit "has developed a two-step approach to takings claims." Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002); accord Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009). First, a plaintiff must identify the property interest that was allegedly taken. Nw. La. Fish & Game Pres. Comm'n v. United States, 79 Fed. Cl. 400, 408 (2007); see also Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) ("[A] court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'"). Second, "[o]nce a property right has been established, the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public." Members of Peanut Quota Holders Ass'n, Inc. v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing Conti, 291 F.3d at 1339); see also Karuk Tribe of Cal., 209 F.3d at 1374 ("If a plaintiff possesses a compensable property right . . . a court determines whether the governmental action at issue constituted a taking of that 'stick.'").  Courts "do not reach this second step without first identifying a cognizable property interest." Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005).

Finally, jurisdiction over takings claims against the United States lies in the Court of Federal Claims. Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("[T]he 'just compensation' required by the Fifth Amendment has long been recognized to confer upon property owners whose property has been taken for public use the right to recover money damages from the government."); accord Russell v. United States, 78 Fed. Cl. 281, 289 (2007) ("The Takings and Just Compensation Clauses of the Fifth Amendment do constitute a money-mandating source and claims under these clauses are within the jurisdiction of the court.").

## B.    Two Types of Takings

According to the United States Supreme Court ("the Supreme Court"), the government may effect a taking of such "private property by either physical occupation or regulation." Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1135 (Fed. Cir. 2004) (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014-15 (1992)); see also Yee v. City of Escondido, Cal., 503 U.S. 519, 522-23 (1992) (describing "two distinct classes" of takings:  (1) physical occupation of property; and (2) regulation of the use of property).

### 1.     Physical Takings

A physical taking constitutes "a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property." Boise Cascade Corp., 296 F.3d at 1353; see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982) ("[A] permanent physical occupation authorized by government is a taking . . ."); Hendler, 952 F.2d at 1375 ("A physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking . . ."). A physical taking occurs when "government encroaches upon or occupies private land for its own proposed use." Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001); see also Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 832 (1987) (explaining that a "permanent physical occupation" occurs "where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises"). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner." Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002) (citing United States v. Pewee Coal Co., 341 U.S. 114, 115 (1951)); see also Yee, 503 U.S. at 522 ("Where the government authorizes a physical occupation of property (or actually takes title) the Takings Clause generally requires compensation."). A permanent physical occupation "is a per se physical taking . . . because it destroys, among other rights, a property owner's right to exclude." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1356 (Fed. Cir. 2006), aff'd on other grounds, 552 U.S. 130 (2008).

"In a physical takings case, the inquiry is limited to whether the claimant can establish a physical occupation, not necessarily of infinite duration, of his property by the Government." Applegate v. United States, 35 Fed. Cl. 406, 414 (1996) (citing Loretto, 458 U.S. at 441). "The physical occupation need not occur directly, but can be found in a physical injury to real property substantially contributed to by a public improvement." Id. (citing United States v. Kan. City Life Ins. Co., 339 U.S. 799, 809-10 (1950)); see also Love Terminal Partners, L.P., 97 Fed. Cl. at 424 (describing a physical taking arising from the government's enactment of legislation targeting the plaintiff's six-gate terminal for destruction).

### 2.     Regulatory Takings

A regulation that restricts the use of property or unduly burdens private property interests results in a regulatory, not a physical, taking. Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1378 (Fed. Cir. 2008); accord Tuthill Ranch, Inc., 381 F.3d at 1137. In other words, a regulatory taking is one in which "the government prevents the landowner from making a particular use of the property that otherwise would be permissible." Forest Props., Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999) (citing Lucas, 505 U.S. at 1014).

Originally, the Supreme Court held "that the Takings Clause reached only a 'direct appropriation' of property or the functional equivalent of a 'practical ouster of [the owner's] possession.'" Lucas, 505 U.S. at 1014. However, it later concluded "that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct

appropriation or ouster–and that such 'regulatory takings' may be compensable under the Fifth Amendment." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005); see also Members of Peanut Quota Holders Ass'n, 421 F.3d at 1330 ("While a taking often occurs as a result of a physical invasion or confiscation, the Supreme Court has long recognized that 'if a regulation goes too far it will be recognized as a taking.'" (quoting Pa. Coal v. Mahon, 260 U.S. 393, 415 (1922))).  There are two types of regulatory takings:  categorical and noncategorical.[11] Huntleigh USA Corp., 525 F.3d at 1378 n.2.

### a.        Categorical Takings:  The Lucas Analysis

A categorical taking is one in which "all economically viable use, i.e., all economic value, has been taken by the regulatory imposition." Palm Beach Isles Assocs. v. United States, 231 F.3d 1354, 1357 (Fed. Cir. 2000) (emphasis in original); see also Lucas, 505 U.S. at 1015 (indicating that categorical treatment is appropriate "where regulation denies all economically beneficial or productive use of land").  In other words, "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." Lucas, 505 U.S. at 1019 (emphasis in original).  Such a taking, like a permanent physical invasion of property, is deemed a per se taking under the Fifth Amendment.  See Lingle, 544 U.S. at 538; see also Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 477 (Fed. Cl. 2009) (stating that "[g]overnment regulation goes 'too far,' and effects a total or 'categorical' taking, when it deprives a landowner of all economically viable use of his 'parcel as a whole'" (citations omitted)).

As with all takings, a plaintiff must first demonstrate title to a property right that has purportedly been taken, see Good v. United States, 39 Fed. Cl. 81, 84 (1997), and then the court must determine the extent to which the property has been appropriated, see Members of Peanut Quota Holders Ass'n, 421 F.3d at 1330.  Even where the court concludes, however, that the regulation has taken all economically viable use, no compensation is owed and the state "may resist compensation . . . if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." Lucas, 505 U.S. at 1027.  In other words, a compensable taking does not occur if the government's common law nuisance and property principles prohibit the desired land use:

> Any limitation so severe cannot be newly legislated or decreed
> (without compensation), but must inhere in the title itself, in the
> restrictions that background principles of the State's law of
> property and nuisance already place upon land ownership.  A law
> or decree with such an effect must, in other words, do no more
> than duplicate the result that could have been achieved in the
> courts–by adjacent landowners (or other uniquely affected persons)
> under the State's law of private nuisance, or by the State under its

---

[11]  Although regulatory takings may be temporary or permanent, they "'are not different in kind.'  Both require compensation." Kemp v. United States, 65 Fed. Cl. 818, 823 n.2 (2005) (quoting First English Evangelical Lutheran Church of Glendale, 482 U.S. at 318).

> complementary power to abate nuisances that affect the public
> generally . . . .

Id. at 1029; accord Hendler v. United States, 38 Fed. Cl. 611, 615 (1997) ("Because a property owner does not have a right to use his property in a manner harmful to public health or safety, the government's exercise of its powers to protect public health or safety does not constitute a compensable taking of any of the owner's property rights."), aff'd, 175 F.3d 1374 (Fed. Cir. 1999).  At all times, the government bears the burden of identifying those "background principles of nuisance and property law that prohibit" the plaintiff's intended use of the property. Lucas, 505 U.S. at 1031.

### b.    NonCategorical Takings:  The Penn Central Factors

Unlike a categorical taking, a noncategorical taking "fall[s] short of eliminating all economically beneficial use of property."  Consumers Energy Co. v. United States, 84 Fed. Cl. 152, 156 (2008) (citing Palazzolo, 533 U.S. at 617).  A noncategorical taking is the "consequence of a regulatory imposition that prohibits or restricts only some of the uses that would otherwise be available to the property owner, but leaves the owner with substantial viable economic use . . ." Palm Beach Isles Assocs., 231 F.3d at 1357.  In determining whether a noncategorical taking has occurred, courts look to the factors identified by the Supreme Court in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978):

> In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance.  The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations.  See Goldblatt v. Hempstead, [369 U.S. 590, 594 (1962)].  So, too, is the character of the governmental action.  A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, see, e.g., United States v. Causby, 328 U.S. 256, (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

Id. at 124.

II.     **Analysis**

A.     **Plaintiffs Have Established a <u>Lucas</u> Categorical Taking of Their Leasehold**

1.     **Plaintiffs Possessed Valid Property Interests at the Time of the Taking**

Although the parties dispute the issue,[12] this court previously concluded that plaintiffs have valid property interests:  Virginia Aerospace is the successor in interest to the 26.8 acres at Love Field covered by the Master Lease initially executed in 1955 between Dallas and Braniff, and Love Terminal Partners is a sublessee under the Master Lease.  See <u>Love Terminal Partners, L.P.</u>, 97 Fed. Cl. at 386-87.

Furthermore, the scope of plaintiffs' leasehold interests is clearly defined.  As noted above, Article VIII of the Master Lease provided that Virginia Aerospace's primary business had to be aviation-related.[13]  <u>See</u> JX 1 (LTP-000828-29).  In addition, although not incorporated into the Master Lease, when Virginia Aerospace acquired the Master Lease in 2003, one of the conditions of sale was that the property not be used for the performance of heavy aircraft maintenance.  <u>See</u> Tr. 468-71 (Naul); JX 4 (LTP-011376-77).

Having identified plaintiffs' valid property interests, the court must now determine whether the federal government appropriated those interests for public use.

---

[12]  While defendant concedes that plaintiffs held the right to the 26.8 acres at Love Field covered by the Master Lease as of October 13, 2006, defendant argues that plaintiffs' current claims go beyond the terms of the Master Lease in two respects.  Def.'s Posttrial Br. 47.  First, defendant claims that plaintiffs ignore the fact that the Master Lease expires on September 30, 2023, and does not contain an automatic right of renewal.  <u>Id.</u> at 47-48.  Second, defendant claims that plaintiffs ignore the fact that the Master Lease contains a rent-sharing provision that requires the lessee to pay Dallas fifty percent of any rental income collected from a sublessee.  <u>Id.</u> at 48.  As a result, defendant reasons, plaintiffs (1) valued the Master Lease as if it ended in 2036 rather than 2023, (2) failed to opine as to whether the sixteen-gate terminal would be built without a lease extension, and (3) failed to consider the effect of the Master Lease's rent-sharing provision in their highest and best use valuations.  <u>Id.</u>  These arguments, however, go to the value of plaintiffs' leaseholds, and not to whether plaintiffs have identified valid property interests, an issue which is undisputed.

[13]  Although it is clear that Hampstead used its properties for nonaviation related purposes, the court finds that, based on the language of Article VIII of the Master Lease, it did not have the right to do so, irrespective of the fact that Dallas chose not to enforce that provision.  <u>See</u> DX 66; DX 68.

### 2. The WARA Destroyed All Economically Beneficial and Productive Use of the Subject Property

In assessing whether a categorical taking has occurred, i.e., one in which all economic value has been taken by, in this case, a federal statute—the WARA—the court must review the testimony of the parties' expert witnesses regarding the potential uses for plaintiffs' leaseholds. In support of their argument that the federal government, through the enactment of the WARA, deprived their leasehold of all economically viable use, plaintiffs rely upon the testimony of Messrs. Hazel[14] and Massey.[15]

Mr. Hazel, whom the court qualified as an expert in airport commercial facilities,[16] first testified that following the WARA's enactment, there were "no other economical uses" for the

---

[14] Mr. Hazel is an aviation consultant specializing in commercial facilities. Tr. 1210-11 (Hazel). He studies the operation of airport facilities such as retail businesses, parking, and concessions, compares them to other airports—both domestic and international—and then offers recommendations for improvements. Id. He has worked in the aviation industry since 1983. Id. at 1211-12. He holds a bachelor's degree from Princeton University, a juris doctor from the University of Chicago, and a master of business administration from George Washington University. Id. at 1212. After practicing law for approximately five years, he took a job with U.S. Air. Id. at 1212-13. Although he started as a regulatory attorney at U.S. Air, in 1989, he was promoted to Assistant Vice President of Properties, and became responsible for obtaining lease rights at airports, negotiating leases, and voting on the budgets for over 100 airports along the East Coast, and in Canada, the Caribbean, and Europe. Id. at 1216-17. He was then promoted to Assistant Vice President of Properties and Facilities and subsequently Vice President of Properties and Facilities, and became responsible for overseeing the design, planning, and project management of the airline's facilities. Id. at 1217-20. He left U.S. Air in 2001 to become an aviation consultant, the position he still holds. Id. at 1221-26.

[15] Mr. Massey is a commercial real estate appraiser. Tr. 1334 (Massey). He has a bachelor's degree in business administration from Texas Tech University and an MAI designation, and is licensed in commercial real estate appraisal in Texas. Id. He has been performing appraisals since 1970 and has appraised over 20,000 properties, including properties in almost every state in the United States, the Caribbean, Mexico, and Canada. Id. at 1336. He previously appraised at least ten properties at Love Field, including multiple commercial properties, an airplane overhaul facility, car rental lots, and airplane storage hangars. Id. at 1337-39. He also appraised airport properties elsewhere in Texas, including at Meacham Airport and Alliance Airport in Fort Worth, as well as at airports in Oklahoma City, Oklahoma; Sacramento, California; Arkansas; and New Mexico. Id. at 1340-41. In addition, he served on the board of a regional airport in Collin County, Texas, located just north of Dallas. Id. at 1341-42. He has been qualified as an expert witness in real estate appraisal over 100 times and has testified regarding those appraisals between fifty and sixty times. Id. at 1343-44.

[16] Tr. 1228 (Hazel).

26.8-acre property covered by the Master Lease apart from use as a passenger air terminal.[17]  Id. at 1231-32.  Specifically, Mr. Hazel concluded that little to no income was available from a total of six different categories:  (1) passenger terminal rental fees, (2) passenger landing fees, (3) car rental fees, (4) income from retail as well as food and beverage, (5) cargo rental fees, and (6) income from a hotel.  With respect to passenger terminal rental and passenger landing fees, he testified that these sources were wholly precluded by the WARA:

> So if you look at the major sources of airport revenue, I'll go through them, the biggest source is terminal rental, passenger terminal rental, and that doesn't apply because WARA restricts and prevents this facility from being used as a passenger terminal, so that's off the list.  The next biggest slice is passenger landing fees.  This area can't be used to generate landing fees because it's not a runway.  That's off the list, clearly.

Id. at 1235-36.  With respect to car rentals, he testified this too was not an available source of revenue for plaintiffs:

> Rental car revenue to airports is generated from people who rent cars, and then a percentage of their rental is paid to the airport by the rental car company, typically 10 percent.  There's no way for this site to capture that revenue.  That's revenue paid by the rental car companies to the airport, so it doesn't apply.

Id. at 1237.  He testified that the same was true with respect to income from retail, food, and beverage:

> The third area is food and beverage and retail, and the food and beverage slice is smaller than many people might expect.  It's 2.9 percent, and the retail slice . . . is 3.5 percent . . . Those numbers refer to passenger terminal food and beverage and retail, and we've already been told that we can't operate this as a passenger terminal, so those don't apply either.

Id.  He also testified that there was little demand for additional cargo rental space:

> [W]hat you see is that Love Field generates very, very little cargo.  I mean, it's not in the top 100 of U.S. airports.  The cargo is going to be at DFW, is at DFW and to a secondary extent, at Alliance.  There's limited cargo activity [at Love Field].  There's very little demand for cargo activity there.  I don't see this at all as a potential use of this site.  There's no demand for that.

---

[17]  Mr. Hazel defined economical use as whether revenue would exceed expenses.  Tr. 1258 (Hazel).

Id. at 1239.  Finally, with respect to building a hotel on the site, he testified that the conditions were not optimal:

> I concluded that it makes no sense.  I need to give you a little background again.  All things being equal, businesses prefer to operate off the airport than on the airport, and the reason for that is that off the airport, you can own your property.  You can put a mortgage on it.  You can own it fee simple, number one, whereas on the airport, you just get a lease, and that causes problems.  Two, it's more expensive to be on the airport.  You've got higher cost of security.  You've got to badge your employees.  It's just generally more expensive to be on the airport, and so if you need to be in the airport, if you're operating a terminal concession, you have no choice, but if it's a facility that could be on the airport or off the airport without any significant locational benefit, you're generally going to want to be off the airport.
>
> * * *
>
> Well, there's already two hotels right on Mockingbird, right near the entrance to the airport, off airport, so why would anyone want to drive 2.7 miles to a hotel located on a leasehold at the airport?  It just doesn't make any sense to me.

Id. at 1245-46.

In addition, Mr. Hazel dismissed the two uses suggested by defendant's experts.  With respect to building an additional Fixed Base Operator ("FBO"), he testified that there was simply no demand:

> FBOs provide the fuel and the facilities that private aircraft use when they are at an airport.  Most of their revenue comes from the sale of fuel, but they also charge for parking.  They may provide maintenance services.  They typically have a terminal with some lounge facilities, et cetera, and so Love Field has six FBOs.  One or two of the documents refer to seven, but I observed six FBOs.
>
> * * *
>
> In addition, the corporate operators have learned to improve their fuel procurement, and so what used to be the main source of revenue for FBOs is really getting squeezed.  There used to be very healthy markups on fuel.  If you look at the rack rates for fuel costs at FBOs, they look like high costs, but actually, the corporate

> operators are negotiating deals with the chains, which significantly
> limit markups, so this is a business that is getting tougher and
> tougher, like many businesses at an airport that has a huge number
> of FBOs.

Id. at 1240-41.

He came to the same conclusion with respect to the potential for income from off-airport parking, noting that Love Field already had adequate facilities.  Id. at 1242-44.  In support of his position, he cited the June 2008 Five-Party Agreement for Love Field, which indicated that the airport's 7,000 close-in parking spaces were adequate for the average day.  Id. at 1243.  He also noted that if plaintiffs were to build a parking facility on their property, it would be 2.7 miles away from the main terminal.  Id. at 1244.  He further noted that there already was an off-airport parking facility, as well as a car rental business with additional parking, both of which were located at the entrance to the airport.  Id. at 1244-45.

Finally, Mr. Hazel noted that vacant terminals were typically demolished and that it was extremely difficult to find a tenant looking for a short-term lease that would provide the lessor with a profit.  Id. at 1246.

Ultimately, it was Mr. Hazel's opinion, based on his experience constructing terminals in Boston, New York City, Philadelphia, Phoenix, and San Diego, that Hampstead's proposed plans for a sixteen-gate terminal "show a terminal that [c]ould be successfully used as a passenger airline terminal."  Id. at 1248-49.  Specifically, he noted that (1) the plan allowed for a twenty-seven-foot separation between wingtips, more than the fifteen-foot separation recommended by the FAA, and therefore the terminal was capable of accommodating the widest of the narrow-body fleet aircraft, id. at 1250-51; (2) the sixteen-gate terminal averaged approximately 27,500 square feet per gate, roughly comparable to the renovated Ronald Reagan Washington National Airport, id. at 1252-53; (3) the departure lounges averaged approximately 2,400 square feet, larger than the 1,500 square feet recommended by the FAA, id. at 1253-54; (4) the terminal's spaces were sufficient to accommodate areas for ticketing, lobbies, circulation, baggage claim, airline operations, and short-term parking, id. at 1254-57; (5) the aircraft utilizing the terminal would be able to enter and leave the terminal as well as use the taxiways, id. at 1257; and (6) the terminal was capable of meeting passenger demand, even at peak-hour levels, id. at 1249.

Mr. Massey, whom the court qualified as an expert in commercial real estate appraisal,[18] testified that his conclusions regarding the highest and best use of the 9.3-acre Sublease were based on whether the intended use was (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) designed to allow the maximum potential return.[19]  Id. at 1348, 1352

---

[18]  Id. at 1345 (Massey).

[19]  Mr. Massey defined highest and best use as "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, and financially feasible and that results in the highest value."  PX 90 at 44.  This definition of

(Massey).  With regard to the highest and best use of the property before the enactment of the WARA, he concluded that it was "as a scheduled airline terminal as it was built and designed," and that the highest and best use of the same property after the enactment of the WARA was as "some type of aviation use."  Id. at 1352-53.  He specifically rejected the postenactment use of the leasehold as an FBO because he believed there was not room for another FBO at Love Field. Id. at 1355.  In response to Mr. Perkins's testimony, discussed below, that the highest and best use for the property was as "a high-end" FBO, Mr. Massey testified that the field of FBOs was saturated and that the terminal was too far from the active taxiway and therefore lacked the potential for visibility, good signage, and aircraft storage.  Id. at 1358-59.  In addition, he concluded that using the site for parking would not be financially feasible and therefore not the highest and best use, due to the existence of over 7,000 parking spaces at Love Field.  Id. at 1359-60.  In support of this conclusion, he cited the deposition testimony of Mr. Poole, who stated that Dallas had no plans to build additional parking at Love Field.  Id.

With regard to the fair market value of the property prior to the enactment of the WARA,[20] Mr. Massey concluded that the 9.3-acre leasehold covered by the Sublease was worth $20.5 million.  Id. at 1369-71; PX 90 at 1.  Mr. Massey utilized two approaches to determine the before value of the property.  First, he used the income approach, which he defined as "a forecast of gross income, less expenses, the derived net operating income and then the method of capitalizing it into an indication of value."  Tr. 1368 (Massey).  In addition to conducting his own appraisal using this method, he also relied upon the analysis in a report prepared by the Meehan Group, which included Ms. Meehan,[21] an aviation consultant, and Mr. Anderson, an expert appraiser of aviation-specific assets, whose work was reviewed and corroborated by Mr. Miller.  Id. at 1368-69.  Then, Mr. Massey used the replacement cost approach, which he defined as the cost to recreate the facility less depreciation costs.  Id. at 1371-72.  In determining the replacement value, he relied on a computer-driven program widely used in the industry—the Marshall and Swift Commercial Estimator 7—as well as projections made by Mr. Cullum, another one of plaintiffs' expert witnesses.  Id. at 1372-74.  He then reconciled the values produced by the two methodologies and came up with a final figure of $20.5 million.  Id. at

---

highest and best use is consistent with this court's case law and the Appraisal Institute's definition of highest and best use, of which the court takes judicial notice.  See Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153, 156 (1990) ("Loveladies Harbor I"); Appraisal Institute, The Appraisal of Real Estate 278 (13th ed. 2008).

[20]  At trial, Mr. Massey explained that his assessment of the value of the property before the enactment of the WARA assumed that someone assessing the property before the WARA's passage would have known that the legislation was going to be enacted, but not that it was going to restrict Love Field to just twenty gates and not that it would trigger the complete destruction of the Lemmon Avenue terminal.  Tr. 1398-99 (Massey).

[21]  Ms. Meehan specializes in airport demand.  Tr. 566 (Meehan).  She began her consulting career upon receiving a master's degree in city and regional planning, with a specialization in transportation economics, from Harvard University.  Id. at 573-74.  She has over thirty years of experience in the field.  Id. at 567.

1374-75.  While he noted that real estate appraisers also use a methodology called the simplified market approach, wherein one compares similar properties on the market, he stated that he was unable to use that approach in this case because of the uniqueness of Love Field.  Id. at 1367-68.

With regard to the fair market value of the property following the enactment of the WARA, Mr. Massey concluded that the Sublease had a fair market value of negative $665,000,[22] which was calculated by taking the value of the Sublease after the enactment of the WARA ($0) and subtracting the cost of demolition ($655,000); Mr. Massey recommended demolition so that plaintiffs would not have to pay ad valorem taxes, as well as security, maintenance, and insurance fees.  Id. at 1375-79, 1417-24.  Thus, he calculated that the total amount of damages owed for the physical taking of the terminal and parking garage was $21,165,000.[23]  Id. at 1425.

To counter the testimony of plaintiffs' expert witnesses and support its argument that the WARA did not cause a regulatory taking of plaintiffs' leaseholds because the legislation did not take anything of value, defendant relies upon the testimony of Messrs. Perkins[24] and Reed.[25]

_____

[22]  In his expert report, Mr. Massey concluded that the value of the Sublease after the enactment of the WARA was $419,000.  PX 90 at 57.  At trial, however, Mr. Massey conceded on cross-examination that he made a mathematical error in his expert report, and that the actual after value of the Sublease was $4,000,195.  From his testimony, the court further understood that both figures were based on an assumption that plaintiffs could continue to lease 25% of the parking garage to Sewell for car storage, a use that Mr. Massey acknowledged at trial was not permissible under the terms of the Sublease, thus rendering the parking garage after the enactment of the WARA functionally obsolete.  See Tr. 1414-17 (Massey).

[23]  Mr. Massey derived this figure by adding the value of the property before the taking ($20.5 million) to the cost of demolishing the property after the taking ($655,000).

[24]  Mr. Perkins is an appraiser of aviation-related real estate and other assets, and also develops and leases aviation-related real estate.  Tr. 2450 (Perkins).  Mr. Perkins holds a bachelor's degree from Harvard University, and is a certified appraiser in Texas and New Jersey.  Id. at 2450-51.  He also has a private pilot's license.  Id. at 2466.  Mr. Perkins has more than twenty-five years of experience appraising aviation-related real estate, and over twenty-eight years of experience developing property at airports.  Id. at 2450.  He has been involved in more than 300 aviation-related appraisal assignments and has served as an expert witness in four other cases.  Id. at 2450, 2466-77.

[25]  Mr. Reed is a principal with Reed & Associates, and serves as a management consultant to the aviation industry.  Tr. 2162-63 (Reed).  He holds a bachelor's degree in psychology from Washington and Jefferson College and a master's degree in urban and regional planning, with emphases in transportation and finance, from the University of Pittsburgh.  Id. at 2162.  He has over twenty-five years of experience as a management consultant to the aviation and transportation industries and has worked with a diverse group of airports in the United States, Europe, and Asia.  DX 108 at 44.  He has assisted in over fifty airport and airline lease negotiations at over fifteen airports, involving assessments of airport cost, revenue structures,

Mr. Perkins, whom the court qualified as an expert in the appraisal of aviation-related real estate,[26] testified that the highest and best use of plaintiffs' leaseholds—the entire 26.8-acre property—both before and after the enactment of the WARA, was as "a general aviation phased development of hangars that served high end aircraft, turbine aircraft,"[27] a use unlike that of a typical FBO.  Id. at 2491-92, 2508 (Perkins).  According to Mr. Perkins, a general aviation hangar operated differently than a typical FBO, which he described as being heavily dependent upon fuel sales:

> A fixed based operation in this case will be a subtenant of the developer or the owner of the property.  The owner doesn't necessarily have a stake in his fuel sales insofar as his ability to make his rent, but he offers the owner the opportunity to have a fuel handling agent on the premises.  As I said before, oftentimes in this type of development you're offering the advantageous fuel sale as incentive to pay a fairly desirable rental rate.  And, of course, some of those tenants aren't going to necessarily have the personnel or want to put fuel in the airplane.  So a big part of something like this, you have to have a mechanism by which the airplanes can refuel so the base tenants can avail themselves of a good price that you're offering as incentive.

Id. at 2510-11.  In addition, he identified two other advantages of using the property for a hangar development:  its large square footage and comparatively low rental rate under the existing Master Lease.  Id. at 2499-500.

In assessing the property's highest and best use, he considered the value of the existing improvements, noting that the most valuable improvements were the garage and the apron.  Id. at 2500-04; see also DX 109 at 115 ("The ramp, supporting utilities and drainage infrastructure and, to a somewhat lesser extent, the automobile parking lot along Lemmon Avenue cannot produce revenue by themselves, but are . . . the most valuable improvements present on the

---

and airport lease agreements.  Id.  For twenty-one years, he provided financial and management consulting services to the Detroit Metropolitan Wayne County Airport as its principal consultant. Tr. 2164 (Reed).  During his career, he "has supervised and prepared more than 20 financial feasibility studies in support of the sale of airport revenue bonds" at several airports, another "20 detailed financial plans for construction of [major airport] facilities, and more than 30 detailed annual cost allocations and rate setting studies in support of airport fees and charges."  DX 108 at 44.

[26]  Tr. 2472 (Perkins).

[27]  In conducting his highest and best use analysis, Mr. Perkins considered the same four criteria as Mr. Massey—whether the intended use was legal, physically possible, financially feasible, and likely to result in the highest value.  Tr. 2489 (Perkins).

subject [property] as improved."). Ultimately, while Mr. Perkins concluded that the terminal facility and the Dalfort Aerospace maintenance hangar were capable of producing some revenue to offset costs, he did not believe that the potential revenue would exceed the financial benefit of demolishing and then redeveloping the site. DX 109 at 115.

Notwithstanding his assessment of the property's highest and best use as a hangar development, Mr. Perkins conceded that there were two major obstacles to plaintiffs' use of the property as such. Tr. 2492-93 (Perkins). First, he noted that the seventeen-year lease term available under the Master Lease made it difficult to recover the cost of financing the property if, for example, the bank required a ten-year amortization period. Id. Second, he noted that the rent-sharing provision of the Master Lease would have prevented any new construction. Id. at 2493-94. He therefore explained that any party contemplating an investment in the leasehold in 2006 would have to get a lease extension as well as relief from the rent-sharing provision. Id. at 2493-94.

With regard to the fair market value of the Sublease, both before and after the enactment of the WARA, Mr. Perkins concluded that it was worth $10,850,000. Id. at 2513; DX 109 at 145. Finding that the unique character of the property precluded the use of the sales comparison approach and that the income approach "produced a value that clearly was below the approach that recognized the highest and best use," he used the cost approach to value the property. Tr. 2514 (Perkins). He noted, however, that his appraisal did not take into account (1) the cost to build the proposed hangar development, id. at 2550; (2) the demand for general aviation hangars and associated services at Love Field, id. at 2559, 2569; or (3) the number of flights serviced by Love Field's existing FBOs, finding the number of take-offs and landings to be irrelevant, id. at 2560. Instead, he stated that the more appropriate metric to review when assessing "the health of FBOs or general aviation" was to look at the amount of fuel that was burned at the airport, noting further that when, in 2002, Love Field went from two to four FBOs, the total volume of fuel sold actually increased. Id. at 2663-64. Finally, Mr. Perkins conceded that the enactment of the WARA made no difference in his valuation of the property. Id. at 2555.

According to Mr. Reed, whom the court qualified as an expert in airport management and airport finances,[28] although the Lemmon Avenue terminal was constructed to provide airline passenger service, the Master Lease had other potential economically beneficial uses, both before and after the enactment of the WARA. See Tr. 2444 (Reed); DX 108. When overseeing a financial feasibility study, Mr. Reed first examines the airline's use and lease agreement. Tr. 2168-69 (Reed). From this document, he learns how the airport's tenant airlines are expected to do business, pay for such facilities, abide by restrictions, and in some cases, cover the airport's losses. Id. at 2168. He then reviews all of the other operations within the airport complex, including operations on the airfield side, in the terminal building, and in the automobile parking area. Id. at 2170. He specifically examines the revenues derived from parking, concessions, advertising, and news and gift vendors. Id. at 2170-71. He then factors in all of these revenues and expenses to model the financial operation of the airport. Id. at 2171. Finally, he evaluates

---

[28] Tr. at 2177 (Reed).

the number of people that will use the airport, or "in-planed passengers," and from that figure, estimates the number of passengers who will use the airport's parking facilities.  Id. at 2172.

Applying this methodology, Mr. Reed assessed the potential uses of plaintiffs' leaseholds, beginning with an examination of their use of the property as a terminal.  Id. at 2179-80.  First, he considered the Lemmon Avenue terminal's airside location, focusing on the size of the hold rooms, the passenger corridors, the gates, the jet bridges or attachments, and the baggage systems.  Id. at 2179-80.  Second, he examined the terminal's roadside location, which includes the roadways and everything involved in a passenger's movement from a car, taxi, or bus into the terminal building and toward an airplane.  Id. at 2183.  Third, he assessed the yearly trends in passenger traffic at Love Field, beginning in 2002.  Id. at 2199.  Finally, he made projections regarding future demand for parking, revenue from parkers, depreciation of capital improvements, and costs to operate a parking business.  Id. at 2201-15.  Upon concluding this review, Mr. Reed made the following determinations:  (1) using the leaseholds as a commercial aviation terminal would be difficult given the layout of both the airside and roadside of the Lemmon Avenue terminal, and expansion of the building to meet demand would only exacerbate the problem, id. at 2181-87; (2) using the leaseholds as a parking facility would be profitable, producing a net revenue of $31,000,453 from 2007 to 2023, given the increase in passenger activity at Love Field after the passage of the WARA, id. at 2199-2001, 2219; DX 108 at 4; and (3) allowing communications antennae to be placed on top of the parking structure would also be profitable, yielding an additional $653,000 (in current-year dollars) in revenue from 2007 to 2023, DX 108 at 4.

In this case, the court concludes that plaintiffs have established a Lucas categorical taking as to the entirety of their leasehold.  In so concluding, the court is persuaded by the testimony of Messrs. Hazel and Massey and unpersuaded by the testimony of Messrs. Perkins and Reed, as explained below.

Significantly, both Messrs. Hazel and Massey testified that the highest and best use of plaintiffs' leasehold, following the enactment of the WARA, was as a passenger air terminal, the one use expressly forbidden by the WARA.  Mr. Hazel came to this conclusion after reviewing all available sources of potential revenue, to include (1) passenger terminal rental fees, (2) passenger landing fees, (3) car rental fees, (4) income from retail as well as food and beverage, (5) cargo rental fees, (6) income from a hotel, (7) income from FBOs, and (8) income from additional off-airport parking.  Mr. Hazel also reviewed Hampstead's plans for a 16-gate terminal.  Mr. Massey came to this same conclusion after considering whether the intended use was (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) allowed the maximum potential return.  In addition, both experts also testified that while plaintiffs could expect to receive some revenue from the property if it was utilized as a site for parking, it would not be an economical use of the property.  Finally, the court notes that both experts' testimony that the WARA destroyed all economically beneficial and productive use of the subject property echoes Mr. Naul's testimony that although plaintiffs initially believed the enactment of the WARA would be beneficial to them, upon its enactment, they realized it "had the effect of taking [their] gates away" and was in fact "devastating for [them]."  Tr. 501 (Naul).  In summary, because the WARA contained explicit language that completely precluded plaintiffs from

36

utilizing the property as a commercial airline terminal, which is the property's highest and best use, the court must conclude that no economic value remained following the legislation's enactment, thus constituting a categorical taking.

Contrary to plaintiffs' experts, who both agreed that the property's highest and best use was as a passenger air terminal, recognized that such use was the only use permitted under the Master Lease, and noted that such use was directly precluded by the enactment of the WARA, defendant's experts offered inconsistent views on the property's potential uses.

Mr. Perkins, the only defense expert who offered testimony as to the property's highest and best use, concluded that the property could be used as a phased general hangar development. However, there are numerous reasons why the court is unpersuaded by his conclusion.

First, and foremost, the court discounts Mr. Perkins's premise that the WARA would not be a significant factor in a potential buyer's decision to purchase the property:

> Q So in your opinion, a buyer, for example, would not ascribe much priority to the anticipated immediate bump in passenger traffic on Southwest Airlines as soon as those single ticketing restrictions were lifted.
>
> A Yes, sir, he might think of that, but I think also the buyer would think that, well, how is that to benefit this property? Southwest is already entrenched in the terminal owned by the city. Is it reasonable to assume that the buyer for this property believed that he could somehow benefit by that?
>
> Q So you didn't see any way a buyer of this property could benefit from repeal of the single ticketing restrictions of the Wright Amendment?
>
> A I think the buyer would evaluate it, but there are other factors connected with terminal operation that the buyer would also be aware of. The fact that the Wright Amendment perhaps is subject to outright repeal or some modification is indeed a consideration, but I think also that there's other evidence to suggest that no matter what happens to the Wright Amendment, the future of alternative terminal development at Love Field is at least somewhat cloudy as of the point in time I think this evaluation would be happening.

Id. at 2553-54 (Perkins). In this respect, the court further notes that none of the other experts conceded, as did Mr. Perkins, that the WARA played no role whatsoever in their overall assessment of the property:

> Q       So, in effect, you determined that the Wright Amendment
>         Reform Act made no difference whatever in the value of
>         this property, right?
>
> A       Once, in my own mind, that I was certain that in terms of
>         size, location and the market at Love Field that general
>         aviation was a more promising long-term development
>         option, I didn't consider the Wright Amendment as a
>         factor.
>
> Q       So the Wright Amendment Reform Act made absolutely no
>         difference in the value of this property?
>
> A       That's correct.

Id. at 2555.  However, as detailed above, significant plans were made by the aviation industry in anticipation of the passage of the WARA.  For example, pursuant to the Five-Party Agreement, plans were made to tear down the Lemmon Avenue terminal, phase out restrictions on service from Love Field, and reduce the number of gates available for passenger service at Love Field from thirty-two to twenty.  In sum, it is inconceivable to the court that such dramatic changes to the air passenger service operations at Love Field would have no impact whatsoever on an expert's assessment of the highest and best use of a piece of property directly affected by those plans.

Second, the court is unpersuaded by Mr. Perkins's finding that the highest and best use of plaintiffs' property was as a phased general hangar development for the simple reason that he failed to consider the profitability of using the property as such.  Although he stated that he had a general sense of what it would cost to build the hangars on the leasehold, he admitted that he never actually prepared an estimate of those costs:

> Q       Okay.  Now, did you prepare some sort of design or master
>         plan for the [phased general hangar] development here?
>
> A       Not from a standpoint of actually physically locating
>         hangars.  What I did is an analysis based on the capacity
>         of the site to support a certain amount of hangar space and
>         other elements, some buildings, based on its size and
>         configuration.  I think I explained it earlier as a percentage
>         of the size of the site.
>
> Q       Right.  So you, apart from just assuming that a percentage
>         of the site will be consumed in custom built hangars for
>         somebody, you don't have an actual design that you have
>         drawn out on a map or on a plot plan.

* * *

A       Not in a finished form.  What I did is sort of look at the plan and put some areas to it, but I didn't really draw specific buildings.  I kind of made some assumptions, recognizing that there might be, in fact, an FBO on the property and that has a little different configuration.  I did think about positioning buildings on the property as far as being closer to Lemmon Avenue or closer to the taxiway.

Q       It's pretty hard to figure out how much it's going to cost to construct all of this if you haven't drawn anything out, isn't it?

A       Well, I did an analysis where I assumed there was a certain amount of a type of hangar space, for instance, a couple hundred thousand square feet of corporate hangar space, 50,000 square feet, maybe, of a potential fixed base operation, and then essentially made an estimate based on what I think that should cost in Dallas at that time.

* * *

Q       Okay.  So you don't really know what it would cost because you don't really know what you're going to build, right?  Fair enough?

A       That's correct.

Id. at 2548-50.  Mr. Perkins also never estimated how much revenue would be generated by his proposed FBO.

    In addition, while Mr. Perkins conceded that Love Field had more FBOs than any other airport in the top 100 major airports in the United States, he failed to explain why the owner of an airplane currently being housed at Love Field would move their plane to this new FBO:

Q       And how many major airports in this country have six or seven FBOs already?

A       Only Dallas Love, to my knowledge.

Q       Right.  The other 99 have fewer, correct?

A       Yes.

* * *

Q      And the airplanes that are going to be housed in those
       hangars, they're going to have to come from where they're
       now being housed at other FBOs, right?

A      Some of them will.

Id. at 2559-60, 2569.

Ultimately, Mr. Perkins's conclusion that the leasehold was worth $10,850,000 was
derived from adding the total depreciated value of the existing improvements (the apron,
approaches, parking lot and structure, engineering, overhead minus the terminal) to the total
capitalized leasehold advantage (the difference between the market rent and the contract rent), id.
at 2528, a calculation that fails to assign any value to use of the property as an FBO.

By comparison, Mr. Hazel's conclusion that there was no demand for an additional FBO
at Love Field was supported by his review of the market at Love Field:

> With six FBOs, Love Field has excess FBO capacity in what has
> become a slow or no-growth business.  No new FBOs have entered
> Love Field in many years, and it is likely that at least one of the
> current FBOs is interested in exiting the market.  In general, FBO
> margins are being reduced as corporate jet operators pressure
> FBOs to cut their fuel margins, which have historically been the
> primary source of FBO profitability.  The number of smaller
> general aviation aircraft using Love Field has dropped substantially
> in recent years.  As with cargo facilities, to convert the existing
> facilities on the Site to FBO use would involve demolition, sit
> remediation, and rebuilding, and would make no economic sense.

PX 91 at 10; see also PX 95 at 9-10.

Mr. Anderson,[29] whom the court qualified as an expert in aviation asset valuation,[30] had a
similar view regarding the market for additional FBOs at Love Field:

---

[29] Mr. Anderson is an aviation financial analyst and appraiser. Tr. 859 (Anderson).  He
has a bachelor's degree from Rutgers University and a master of business administration from
the Massachusetts Institute of Technology.  Id. at 859-60.  He has over fourteen years of
experience valuing tangible aviation assets such as "aircraft, aircraft parts, aircraft engines,
ground equipment" as well as intangible aviation assets, such as airport landing and takeoff slots
and airport terminal leases.  Id. at 861-63; PX 88 Appendix B.

[30] Tr. 868-69 (Anderson).

Q      Mr. Anderson, how competitive is the general aviation
market at Love Field?

A      Hypercompetitive.

Q      Hyper?

A      Extreme.  At the time it had six or seven FBOs serving that
market and serving that one airport.  There's no other
airport in the United States that has that level of a crowded
marketplace.  And what that does is reduces the amount of
activity and revenue that each individual FBO can generate,
. . . given the fairly fixed cost structure of an FBO . . . .

Tr. 2592 (Anderson).  Mr. Anderson further noted that in 2006, Love Field averaged twenty-one
daily departures per FBO, a figure which placed Love Field 85 out of the top 100 airports in the
country—the higher the ranking, the greater the number of departures per FBO.  Id. at 2593-94.
According to Mr. Anderson, this figure is significant because it demonstrates that the market for
FBOs at Love Field was saturated:

Just based on my experience working with FBOs, [the number of
daily departures per FBO] is a key operational metric at which you
look.  It drives how many gallons of fuel you sell.  It accounts for
two-thirds, or 75 percent, of an FBO's revenue.  It can drive how
much line maintenance you perform and it can drive certain other
ancillary type services, so the more aircraft you handle, the more
departures, the greater revenue you will generate.

Id. at 2595.

Nor is the court persuaded by Mr. Reed's conclusion that the leasehold could have been
used for an airport parking operation.  First and foremost, Mr. Reed admitted that he never
opined on the highest and best use of the property but instead concluded that the property could
support multiple uses:

Q      So who's correct about the highest and best use of the
property, you or Mr. Perkins?

A      I believe we're both correct in our own way.  There can be
multiples uses on a property.  In fact, this property during
its history has had multiple uses.  The garage has been used
by parking passengers of the Lemmon Avenue terminal,
it's been used by a[n] automobile dealership, it's been used
by a limousine company.  There [have] been many different

41

uses of the garage.  There [have] also been many different
uses of the aviation side of the property.  I believe all of
those uses can be permitted.  Are permitted.

Q       So by your analysis are you saying the parking structure
        and parking lot, for example, can be both used as an
        amenity for Mr. Perkins's proposed development of high
        end airplane hangars and for a parking business for the
        main terminal?

A       I'm not aware of the details of what he was conceiving of,
        but there's certainly plenty of area on that property to
        provide parking for hangars in the immediate proximity to
        those new hangars.  The parking structure is on one corner
        of the property.

Q       That wasn't my question.  If the parking structure is used as
        an amenity for the hangars, that is, as a place for people to
        park their cars when they go to the hangars, it can't also be
        used for a parking business, as you propose, can it?

A       Depending how many cars, you would simply allocate a
        number of spaces to that use and that would reduce . . . the
        number of cars you could park in there for people who are
        going to the main terminal.

                                *  *  *

Q       And did you make a highest and best use determination?

A       I did not.

Id. at 2442-45 (Reed).

        In addition, Mr. Reed conceded that the success and therefore the profitability of the
parking facility he envisioned was based on an unsupported assumption that individuals currently
parking their cars either in Dallas's facility or in one of the private facilities would transfer their
business to a parking lot on Lemmon Avenue:

Q       Surely the City of Dallas doesn't want to empty its own
        parking lot in order to fill the Lemmon Avenue parking lot?

A       I don't believe they would empty it.  I believe what they
        would do is simply better utilize it.  Structure A, which is
        the closest, could be purely for short term, people who are

called meters and greeters, people who come to the airport
to meet and pick up somebody.  Thereby, you'd get very
high turnover and very high daily revenue off of that
parking garage.

Q       But they already get that revenue, presumably, right?

A       They are getting mostly long-term parking.  People are
paying the rate because it's relatively low.  At $14 a day it
is a fairly low rate.

Q       Right, but back to my point.  If you're going to capture 22
percent of the market, you're going to have to get, you're
going to have to take those cars out of someone else's lot
because we already have ample parking today, right?

A       Yes.  They will be taken out of both types of parking
products, either the structured parking or the surface lots.

Q       Got it.  It's a fact, though, isn't it, that you've done no
market study that would support your assumption that
either those who park at the city lots would move to this
remote parking or those who park at the existing remote
parking lots would move to the Lemmon Avenue parking
business?

                          * * *

A       I have not[.]

Id. at 2425-27; see also id. at 2428-29.

       Finally, Mr. Reed admitted that rather than estimate how much it would cost to shuttle
passengers back and forth from the proposed parking garage to the main terminal, he relied upon
figures devised by Love Terminal Partners to shuttle passengers from a garage it planned to build
across the street from the Lemmon Avenue terminal to the terminal:

Q       Let's talk now about how people get from the parking
structure to the main terminal.  As I understand it, you
anticipated running a van service, correct?

A       That's correct.

Q      And that would be a van that does a circular route from the
       parking lot, or the parking structure, over to the main
       terminal and back again, right?

A      That's correct.

Q      About how many vans would you need to conduct that
       service?

A      I believe the original estimates by the Love Terminal
       Partners were five vans.

Q      I'm a little confused.  The Love Terminal Partners were not
       sending passengers over to the main terminal, were they?

A      There was a plan to shuttle across the street to the garage
       that was planned to be built, so my understanding was, as I
       looked at the document, that they had estimated what the
       cost was to operate that would be.

                        * * *

Q      Okay.  And you didn't make any effort to determine how
       much it would cost, how many vans you'd need, in order to
       take people from Lemmon Avenue all the way over to the
       main terminal and to run that shuttle service, right?

A      I didn't adjust their numbers.  No.

Id. at 2435-37.

By comparison, Mr. Hazel's conclusion that the site could not be profitably used for
parking was based not on unsupported assumptions, but rather on city-prepared planning
documents for Love Field:

        So the TARP, which is [a] planning document for Love Field[,]
        has a detailed analysis of parking in the document and in the
        appendix, and what the TARP concludes, and you can read the
        words yourself, is that Love Field, which added 4,000 parking
        spaces right close to the terminal in 2002 and 2003 and already had
        parking spaces, so it now has about 7,000 really close-in parking
        spaces, if you read the TARP, what the TARP says, is that we have
        adequate parking for the future.  We have adequate parking for the
        average day.  We have adequate parking for the typical peak day.

44

Id. at 1243 (Hazel).  In addition, Mr. Hazel focused on the significant competition for parking, from operations closer to the main terminal that already existed:

> One of those, The Parking Spot, is a national chain, and so it has advantages already compared to anyone who's starting from scratch in a remote location because it has some corporate customers with big discounts, et cetera.
>
> The other one, Thrifty Park, is simply a car rental place that's operating parking on the other side, but [its] right at the entrance as well.

Id. at 1245.

Like Mr. Hazel, Mr. Anderson also discounted Mr. Reed's proposed parking business. According to Mr. Anderson, at 2.6 miles from the main terminal, the Lemmon Avenue terminal was simply too far for passengers to go for parking when they could currently find parking between 0.9 and 1.1 miles from the main terminal.  Id. at 2599 (Anderson).  In addition, Mr. Anderson questioned Mr. Reed's pricing and revenue assumptions:

> A    In essence, for the period of 2007 through 2015 he has projected rates for the city garages that . . . grow at an average annual rate of 4.3 percent per year.
>
> Q    And how does that compare with his projections for increases at his proposed Lemmon Avenue parking structure?
>
> A    During the same period he's assuming that prices would increase at an average annual rate of 10.7 percent . . . for the two facilities, the garage and the surface lot.  So, in essence, he's assuming that prices would increase . . . more than twice as fast at the Lemmon Avenue terminal [than they] would at the primary competitor, which would be the city garage.
>
> Q    Are you aware of any reasoning that would support that assumption?
>
> A    I'm not.  I think that with a clearly deficient product relative to the city garages, you would need to maintain a very substantial price discount to be able to attract customers.

* * *

Q      Okay.  And what percent of market share does Mr. Reed project that the Lemmon Avenue parking business would garner?

A      . . . . If you look at the year 2013, which is, again, when they . . . would only have one garage and one parking spot on the envisioned site, . . . they would be accounting for 12 percent of capacity, but Mr. Reed indicates that he's assumed this facility would capture 22 percent of the market, so that seems to be quite a variance between the share of capacity and the share of the market.  And if you couple that with the strong price increases that are envisioned in his projections, it just seems implausible.

Q      Okay.  Based on those calculations, what is your opinion of the revenue projections that Mr. Reed makes?

A      I believe the revenue projections are wildly overstated.

Id. at 2600-03.  In addition, Mr. Anderson concluded that Mr. Reed failed to either wholly or adequately consider expenses such as taxes, ground rent, and capital expenditures when calculating the parking business's operating costs.  Id. at 2603-05.  Correcting for these errors, Mr. Anderson concluded that the nominal value of the property, if used as a parking business, was $1.1 million, as opposed to Mr. Reed's estimate of $31 million.  Id. at 2605.  When Mr. Anderson further refined his figure by discounting the cash flow value, his $1.1 million figure was reduced to negative $1.9 million.  Id. at 2606.  Ultimately, Mr. Anderson concluded that using the property for a parking business was "not an economically viable use."  Id.

Finally, the court notes that even though the proposed sixteen-gate terminal was never built, the evidence demonstrates that there was a market for plaintiffs' property at the time of the taking.  As explained by Ms. Meehan, whom the court qualified as an expert in forecasting airport passenger demand,[31] the airline industry suffered a deep recession from 2001 to 2005:

. . . The significance of this period is that for the network carriers, which are most of the industry, . . . during that four and a half 2001 to mid-2005 period, they actually lost more money than they had ever made, so it was a startling period for the network carriers.  It wasn't just caused by 9/11.  It was a recession that started in the spring of 2001, but 9/11 was the nail in the coffin.

---

[31]  Tr. 585-86 (Meehan).

Id. at 603 (Meehan).  By 2006, however, the industry had recovered.  PX 89 at 35.  As a result, and in anticipation of the Wright Amendment being repealed, plaintiffs began to engage in discussions with carriers such as Jet Blue and Pinnacle about acquiring the leasehold.  Tr. 84-87 (McNamara); 485-87 (Naul).  Had the WARA not been enacted, plaintiffs would have been able to realize the value of their leasehold.  Instead, following the enactment of the WARA, the value of plaintiffs' property was reduced to zero.  Id. at 1424-25 (Massey).

In conclusion, the court determines that the expert testimony of Messrs. Hazel and Massey was, unlike the testimony offered by the defense witnesses, highly reliable and persuasive.  Accordingly, based upon plaintiffs' experts' testimony, the court finds that the highest and best use of plaintiffs' leasehold before the enactment of the WARA was as a passenger airline terminal.  In addition, the court determines that, following the enactment of WARA, such use was completely prohibited.  As a result, plaintiffs were deprived of all economically viable use of the property by a regulation—a Lucas categorical taking.

**B.      In the Alternative, Plaintiffs Have Established a Taking of Their Property Under the NonCategorical Penn Central Factors**

As noted above, under Penn Central, the court must consider the following three factors: (1) the economic impact of the regulation on the plaintiff; (2) the extent to which the regulation has interfered with the plaintiff's distinct investment-backed expectations; and (3) the character of the governmental action.[32]  Penn Cent. Transp. Co., 438 U.S. at 124.  In this case, all three factors weigh in plaintiffs' favor.

**1.      The Economic Impact of the WARA Was Absolute; No Economic Value Remained After Its Passage**

The economic impact factor is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners [will] result in a takings claim."  Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1176 (Fed. Cir. 1994) ("Loveladies Harbor II").  Clearly, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."  Pa. Coal Co., 260 U.S. at 413.  Although there is no "automatic, numerical barrier preventing compensation," Yancey v. United States, 915 F.2d 1534, 1541 (Fed. Cir. 1990), plaintiffs must show that the regulation caused a "serious financial loss," Loveladies Harbor II, 28 F.3d at 1177.  Thus, an analysis of the economic impact of the governmental action requires "a comparison of the market value of the property immediately before the governmental action with the market value of that same property immediately after the action."  Cane Tenn., Inc. v. United States, 57 Fed. Cl. 115, 123 (2003); see also Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987); Walcek v. United States, 49 Fed. Cl. 248, 258, 267 (2001).  This fair market value, in the context of a taking, is based on the property's highest and best use.  See Olson v.

---

[32]  "The Penn Central factors–though each has given rise to vexing subsidiary questions– have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules."  Lingle, 544 U.S. at 539.

United States, 292 U.S. 246, 255 (1934).  Finally, "[t]he economic analysis is often expressed in the form of a fraction, the numerator of which is the value of the subject property encumbered." Id. at 258; see also Fla. Rock Indus., Inc. v. United States, 18 F.3d 1560, 1567 (Fed. Cir. 1994).

Plaintiffs argue that the enactment of the WARA destroyed "all profitable use" of their property.  Pls.' Posttrial Br. 33.  According to plaintiffs, even if they had been able to profit from utilizing the property for automobile parking or as an FBO, those "nominal uses" would not have provided enough revenue for plaintiffs to cover their approximately $1.8 million annual rent and carrying expenses.  Id. at 33-34.  In addition, plaintiffs argue that as a result of the passage of the WARA, they were unable "to recoup any of [their] investment through operation or sale of the leasehold."  Id. at 34.

Defendant counters that the enactment of the WARA had absolutely no economic impact on the market value of plaintiffs' leasehold.  Def.'s Posttrial Br. 65.  Specifically, defendant claims that (1) plaintiffs lost millions in the years before the passage of the WARA and had no agreements in place at the time the legislation was enacted that would have reversed that loss; (2) plaintiffs offered no evidence as to the value of their leasehold immediately before the enactment of the WARA, thus rendering their valuations meaningless; and (3) plaintiffs' leasehold was worth the same amount before and after the WARA passed.  Id. at 67-83.

In resolving this issue, the court is again persuaded by the well-reasoned testimony of Messrs. Hazel and Massey.  Mr. Hazel stated unequivocally that the Master Lease lacked any pecuniary value following the enactment of the WARA:

> First, no economically beneficial uses remained for the 26.8-acre site covered by the Virginia Aerospace lease following the determination that it could not be used as a passenger airline terminal.  The prohibitions against the use of the Site for either a passenger terminal or aircraft maintenance meant that the leasehold for the Site had no economic value.  The cost of facilities demolition and site remediation, the lease requirement that the lessee invest a minimum of $5 million in capital improvements, and the payment of ground rent all combine to render this Site of no economically beneficial use.

PX 91 at 20.  Mr. Massey, testifying as to the value of the Sublease, went even further, concluding that it had a negative value following the WARA's passage.  Thus, based on the testimony of Messrs. Hazel and Massey, the court concludes that plaintiffs suffered a serious financial loss.[33]  As there can be no greater diminution in value than 100% to qualify for compensation as a noncategorical regulatory taking, this factor weighs entirely in plaintiffs'

---

[33]  While Mr. Perkins testified that the value of the Sublease remained the same before and after the enactment of the WARA, thus resulting in a 0% diminution in value, the court is not persuaded by his testimony because his assessment was not based on the property's use as a commercial aviation terminal, its highest and best use.

favor.  Furthermore, although Hampstead was able to continue to pay the $3.8 million in carrying costs for 2.5 years while engaged in litigation over the WARA, because the statute's economic impact was so complete in that there was no hope of using the property in any economically viable way, Hampstead was forced to cease paying rent, resulting in its ultimate eviction from the site.

## 2. The WARA Destroyed Plaintiffs' Distinct Investment-Backed Expectations

Consideration of this factor is intended "to limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'"  Cienega Gardens v. United States, 331 F.3d 1319, 1346 (Fed. Cir. 2003) (quoting Loveladies Harbor II, 28 F.3d at 1177).  In order to satisfy this criterion, plaintiffs must demonstrate that their investment-backed expectations were objectively reasonable.  Id. (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984)).  In other words, such an expectation "must be more than a 'unilateral expectation or an abstract need.'"  Ruckelshaus, 467 U.S. at 1005 (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)).

Defendant advances three arguments in support of its position that plaintiffs lacked distinct investment-backed expectations.  First, according to defendant, plaintiffs could not have had a reasonable investment-backed expectation that they would be able to build a sixteen gate terminal on their property at the time they acquired their leasehold because the plans for the sixteen-gate terminal were not created until 2012.  Def.'s Posttrial Br. 83.  Second, defendant argues that when Love Terminal Partners acquired the Sublease in 1999, it was for continued use as a terminal by Legend and other airlines as well as for parking, id. at 84-85, and that when Virginia Aerospace acquired the Master Lease in 2003, it was "for auto parking and plane storage," id. at 86.  Third, defendant argues that when plaintiffs acquired their leasehold interests, they would not have been able to build a 16-gate terminal on the property.  Id. at 87.  According to defendant, the proposed 16-gate terminal was designed to offer "regularly scheduled passenger service to destinations throughout the United States, on aircraft holding 140 or more passengers, from mid-2008 onward," service that would not have been permitted in 1999 and 2003.  Id.

Plaintiffs counter that at the time they acquired their leasehold, they did have a reasonable investment-backed expectation that they would use their property for commercial passenger services.  Pls.'s Posttrial Br. 43.  In support of their contention, plaintiffs noted that as part of its due diligence, Hampstead did the following:  (1) examined all legal issues surrounding Love Field, including the Wright Amendment; (2) created financial models reflecting the profitability of Legend or any other airline flying out of the Lemmon Avenue terminal; (3) surveyed the real estate surrounding Love Field; (4) evaluated the demand for 56-seat aircraft; and (5) considered the value of gate rentals at the Lemmon Avenue terminal.  Id. at 35-37.  As a result of these efforts, plaintiffs contend, they went ahead with their investment of $60 million in the Lemmon Avenue terminal, plus an additional $6.5 million to purchase the Master Lease, believing that the investment would be profitable irrespective of Legend's success or failure.  Id.

at 38-40.  Finally, plaintiffs argue that no amount of due diligence could have predicted the complete destruction of the Lemmon Avenue terminal, as specified by the WARA.  Id. at 40.

The first step in the court's analysis is to determine whether plaintiffs actually expected or actually relied upon the repeal of the Wright Amendment.  See Cienega Gardens, 331 F.3d at 1346.  In other words, did plaintiffs expect that they would be able to use their property for commercial aviation services?  In this case, it is abundantly clear that they did.

The strongest proof of plaintiffs' plans for the leasehold is the extent to which Hampstead engaged in due diligence prior to acquiring the property.  As detailed above, such efforts included extensive internal reviews of real estate, legal, and financial issues by Mr. Read and his team, as well as the hiring of various external consultants to review Legend's business plans and examine data Legend had gathered as part of its own due diligence efforts—even though Hampstead's plans for the terminal were not tied to Legend's success as an airline.

In addition, according to Mr. Read, Hampstead accorded great weight to the 1992 DOT study.  The DOT study found that there would be tremendous benefit to consumers if the Wright Amendment was abolished, because of increased competition: [34]

> A change to the Wright Amendment will result in more service, more competition, lower fares, and more traffic for the Dallas-Fort Worth Metroplex and the region.  Travellers to or from the Metroplex region will save an estimated $183 million per year in air fares.  The amount of additional service that can be provided at Love Field beyond the 214,000 annual operations today will be limited by airspace interactions caused by Love Field's proximity to Dallas-Fort Worth Airport and the orientation of its runways in relation to those at Dallas-Fort Worth Airport.  Safety will be maintained by FAA-imposed procedures, and noise impacts on the region will continue to decline as older "Stage 2" aircraft are phased out.  Aircraft delays would become a significant problem only if operations reach the unlikely level of 360,000 operations annually.  Under all possible scenarios, Dallas-Fort Worth Airport will continue to grow and remain the region's dominant airport.

PX 9 (LTP-020284); see also Tr. 633 (Meehan); PX 89 at 11-13.

---

[34]  Movement to repeal the Wright Amendment began as early as 1987, when Senator Robert Dole of Kansas introduced an amendment to an appropriations bill proposing a modification of the Wright Amendment to permit Southwest to fly to Witchita, Kansas from Love Field.  PX 9 (LTP-020310).  Two years later, in 1989, Congressman Dan Glickman of Kansas, along with sixteen original cosponsors, introduced a bill calling for the total repeal of the Wright Amendment.  Id.  No action was taken.  Congressman Glickman along with seventeen cosponsors reintroduced the bill in 1991 but again, no action was taken.  Id. (LTP-020311).

Finally, Mr. McNamara, Hampstead's founder, testified that Hampstead acquired the Legend Avenue terminal specifically because it believed that the Wright Amendment would be repealed:

A       In the Legend terminal we looked at it as if all the signs were that the Wright Amendment was going away.  The terminal itself, we knew that the underlying lease had all these rights to fly, and that was a major advantage to have an airport that was so strategic that you could . . . own this leasehold real estate in a place that was such a dominant airport.

*  *  *

Q       Now, you've talked a bit about the Wright amendment.  I'd like to go back to that discussion for a moment and ask how did the existence of the Wright Amendment affect Hampstead Group's decision to acquire the subject property back in 1999?

A       Well, it was clear that the Wright Amendment was on its way out and that early on Southwest was a - - you had a very unusual circumstance because you had Southwest at Love Field and you had DFW, two major airlines at DFW. And so gradually Southwest was moving toward a decision to fight to open up the Wright Amendment, and Southwest was really the one who could have helped pull it off.  And we believed that.

There was congressional pressure from primarily Jeb Hensarling and one other congressman there to try to open up the Wright Amendment because Dallas itself had the highest airfares in the nation because DFW was basically a monopoly for American Airlines.  They didn't want to lose their pricing power with a competitor at Love Field.

Q       Did you ever express to anyone your belief that the Wright Amendment was on its way out, was going to be repealed?

A       Oh, yes.  Anyone who would ask me.

Q       Okay.

> A I mean, it was the talk of everywhere in Dallas.  I mean, people believing this thing was going away.

Tr. 67, 81-82 (McNamara).

Mr. McNamara also indicated that Hampstead put a great deal of stock in Mr. Swensen's belief, following Mr. Swensen's attendance at the one-day investor's meeting,[35] that the investment was sound:

> A . . . . Coincidentally, David Swensen was in town on some of the Yale related activity and I said look, why don't you come in and sit down with us while we go through the due diligence and just watch us in action.  You know, just take a look at it and see what you think.
>
> Q See what we're doing with your money?
>
> A Yeah, exactly.  Which he did.  So he sat in for the whole five hours of our due diligence session.
>
> Q And at the conclusion of that due diligence session did Mr. Swensen express any opinion as to his state of mind regarding this potential investment?
>
>        * * *
>
> A . . . . Yes.  David said it looks like you've covered all the bases, and I see no reason why you shouldn't do this. Furthermore, just an aside.  If he had even winked that he didn't think we should do this I wouldn't have done it.  I mean, here you have this guy in the room with you at the time, that he's gone through the whole process you've gone through, and if there was any thought that [it] was imprudent of us to do I wouldn't have done it.

Id. at 76-77.  Thus, plaintiffs have proven that they actually expected or actually relied upon the repeal of the Wright Amendment.

Turning to the second step in the court's analysis, determining whether a reasonable investor in Hampstead's position would have believed that the Wright Amendment would be

---

[35]  Although Mr. Read, in a June 23, 1999 memorandum from Hampstead to its investors regarding Legend Airlines, does not reference the Wright Amendment, the court does not find that this document stands for the proposition that Hampstead did not consider its repeal a significant factor in its decision to invest in Legend.  See JX 11.

repealed, thereby opening up the market at Love Field, see Cienega Gardens, 331 F.3d at 1348, the court is persuaded by the testimony of Ms. Meehan. Significantly, in this case, it is clear that Hampstead's belief that the Wright Amendment would be repealed was reasonable for the simple fact that Hampstead was not alone in believing that the repeal would happen.

Ms. Meehan, who specializes in forecasting passenger demand, described what would occur at Love Field following the repeal of the Wright Amendment:

> . . . Love Field non-stop airline schedules would expand to include many locations outside the nine states allowed by the Wright Amendment. Repeal would require longer-haul aircraft, and a terminal facility able to accommodate them. [Love Terminal Partners/Virginia Aerospace ("LTP/VA")] would therefore reconfigure the existing Lemmon Avenue facility from the 6 gates, designed for smaller regional aircraft, to a facility that would accommodate the aircraft preferred by Love Field's existing and prospective customers: the narrow-body (single aisle) aircraft. Examples of those aircraft are the Boeing 737-700 (used by Southwest Airlines) or the A320 (used by JetBlue).

PX 89 at 1.

She then described Southwest's efforts to repeal the Wright Amendment, local support for Southwest's campaign, and the resulting concern on the part of American and DFW:

> In November 2004, Southwest began an aggressive campaign to repeal the Wright Amendment. As part of the "Wright is Wrong" campaign, Southwest developed a website, www.SetLoveFree.com, and released a 4-page press packet detailing its opposition to the Wright Amendment. Southwest argued that after 26 years "the Wright Amendment is an anti-competitive relic."

> * * *

> Nor was Southwest the only one pushing for repeal of the Wright Amendment. Local citizen groups and individuals also lobbied for the repeal of the Wright Amendment. Many brought their support directly to Southwest—in October 2005, Southwest sent over 200,000 signatures it had collected through a petition drive, and 40,000 messages from the SetLoveFree website to Congress.

> * * *

> In response to Southwest's lobbying, American Airlines and DFW both retained expert consultants to examine the impact of the repeal of the Wright Amendment. The conclusions of both studies were that Congress should maintain the restrictions of the Wright Amendment because doing otherwise would have severe implications for DFW and American Airlines.
>
> * * *
>
> With repeal of the Wright Amendment becoming inevitable, American Airlines began to plan for change. In February of 2005, American Airlines Chairman and CEO Gerard Arpey said, "Were the Wright Amendment to be repealed, we would have to build an operation at Love Field because that is where the customers are going or want to go." In December of 2005, American announced that it was returning to Love Field, signaling the airlines' belief that the Wright Amendment was close to being repealed.

PX 89 at 10-13.

Ms. Meehan also commented on the reaction by Dallas to the likelihood that the Wright Amendment would be repealed:

> Knowledge of the imminent repeal of the Wright Amendment is evident in the premise for the report prepared for Dallas Love Field entitled, "Dallas Love Field Impact Analysis in the Absence of the Wright Amendment", May 31, 2006. . . . The City of Dallas prepared the report to develop future air service scenarios at Dallas Love Field that could realistically result if the Wright Amendment is repealed and compare those results to the environmental results that were contained in the 32-gate full build-out scenario included in the 2001 Dallas Love Field Master Plan (unanimously approved by the Dallas City Council and based on the assumed existence of the Wright Amendment). The very comparison conducted in the report provides further evidence of the market's perspective—the Wright Amendment would be repealed in favor of more competition.

Id. at 13-14. Like the report prepared by Dallas, the DOT study referenced above further demonstrates that it was reasonable for an investor in Hampstead's position to believe that major changes were coming to Love Field.

Finally, the court notes that no amount of due diligence on Hampstead's part, or on the part of any investor in its position at the time, could have predicted the devastating effect the WARA would ultimately have. According to Mr. McNamara, had he had any idea about the

way in which the Wright Amendment would be repealed, Hampstead would not have acquired
the leasehold:

> Q    Mr. McNamara, as you sit here today how do you evaluate
>      Hampstead's decision to invest in Love Terminal back in
>      1999?
>
> A    Well, needless to say if when we did our underwriting,
>      when you go back and look at our underwriting of all the
>      threats of the regulatory change – Wright Amendment, no
>      Wright Amendment, all those issues – we did not analyze
>      that the federal government would pass a law at the
>      [behest] of the City of Dallas, the City of Fort Worth,
>      DFW, American Airlines and Southwest, and they would
>      all get together and go pass a law and take that terminal
>      from me.  That was not in our analysis.  Had I known that,
>      obviously I would not have made the investment, right,
>      knowing that it's going to be taken from you without
>      payment of any kind.  However, I didn't know that.  And
>      knowing what I know about the value of that terminal, but
>      for that fact I would be very happy to make that investment
>      again.

Tr. 90 (McNamara).  Therefore, the court concludes that plaintiffs acquired their leasehold
interests in reasonable reliance on the repeal of the Wright Amendment.

> **3.    The WARA Destroyed Plaintiffs' Property Rights for the Sole Benefit
> of the Signatories to the Five-Party Agreement**

When reviewing the character of the governmental action, the "reviewing court [must]
consider the purpose and importance of the public interest reflected in the regulatory imposition.
In effect, a court [must] balance the liberty interest of the private property owner against the
Government's need to protect the public interest through imposition of the restraint."  Loveladies
Harbor II, 28 F.3d at 1176.  The court does so by considering "the actual burden imposed on
property rights, [and] how that burden is allocated."  Lingle, 544 U.S. at 543.

Defendant argues that "Congress enacted WARA to effect the orderly removal of the
Wright Amendment's restrictions on scheduled air passenger service at Dallas Love Field," and
that the "WARA's text shows Congress's intent to strike a balance between introducing forms of
scheduled air passenger services that had not been offered at Love Field since the construction of
DFW Airport, and minimizing the burden of those services on the surrounding environs."  Def.'s
Posttrial Br. 88.  Defendant argues further that "Congress's goal of authorizing service from
Dallas Love Field that had not been offered there since the creation of DFW Airport, while
minimizing the community and environmental impacts of such an increased range of services, is
an important one, and [ ] should be respected."  Id. at 89.  Finally, defendant argues that the

WARA's cap on gates at Love Field applied to all parties equally: "[T]he statute equally restricts the City of Dallas, Plaintiffs, and anyone else from exceeding the 20-gate limit, regardless of the number of gates they might have had the right to construct before the WARA." Id.

Plaintiffs, on the other hand, characterize the enactment of the WARA as follows:

> Ouster of LTP/VA, akin to a physical taking, is exactly what the [WARA] accomplished here. The statute required demolition of LTP/VA's airline gates and prohibited them from ever again using this property for air passenger service. The purpose of this provision was to clear the way for Southwest and American airlines to divide up the Dallas market by limiting Love Field to 20 airline gates (thus limiting the number of commercial airline flights at Love Field), protecting DFW's interest in keeping flights coming in to that airport rather than the much more convenient Love Field. LTP/VA's air passenger business, which stood in the way of this plan, had to be eliminated—both physically in the case of the terminal gates and economically by the prohibition on air passenger service.

Pls.' Posttrial Br. 42.

The court agrees with plaintiffs' assessment of the character of the government's action. While, as defendant argues, the stated goal of the WARA may have been to strike a balance between the need to increase air passenger services from Love Field while minimizing the burden on the surrounding community, the way in which this stated goal was accomplished did not treat all parties equally. The WARA, which was the codification of the Five-Party Agreement, was enacted solely to protect the interests of two cities (Dallas and Fort Worth), two airlines (Southwest and American), and a competing airport (DFW), all to the detriment and expense of plaintiffs. Indeed, the statute was clearly anticompetitive, a fact acknowledged by the United States District Court for the Northern District of Texas:

> By reducing the flight output at Love Field through a 20-gate restriction, allocating the gates at Love Field to uphold Southwest's dominance over the short-haul market, and requiring that the LTP Terminal be demolished, the [WARA] almost undoubtedly conflicts with the Sherman Act. . . . But in the case of airline competition in the North Texas region, Congress is willing to tolerate and sanction some anticompetitive behavior as a means of effecting the eventual end to the Wright Amendment restrictions that hamstring domestic flights to and from Love Field.

Love Terminal Partners, L.P. v. City of Dallas, Tex., 527 F. Supp. 2d 538, 560 (N.D. Tex. 2007).

In addition, because the WARA not only called for the destruction of the Lemmon Avenue terminal gates but prohibited plaintiffs from ever again using the property as a commercial passenger air terminal, the impact of the WARA was akin to a physical taking.  As noted by the court in its previous opinion, "[w]hile the Supreme Court's regulatory takings jurisprudence cannot be characterized as unified, courts aim[] to identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain," Love Terminal Partners, L.P., 97 Fed. Cl. at 376 (internal quotation marks omitted), and such a regulatory action is exactly what occurred in this instance.

In short, as part of its ad-hoc, circumstances-specific analysis, the court concludes that plaintiffs have also demonstrated a taking of the entire 26.8-acre leasehold under the Penn Central factors.

## RELIEF TO BE AWARDED TO PLAINTIFFS

### I.      Just Compensation

The task of determining what amount of money a plaintiff is owed for a Fifth Amendment taking of its property falls exclusively to the judicial branch:

> [Inverse condemnation] suits [are] based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain.  That right was guaranteed by the Constitution.  The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim.  The form of the remedy did not qualify the right.  It rested upon the Fifth Amendment.  Statutory recognition was not necessary.  A promise to pay was not necessary.  Such a promise was implied because of the duty to pay imposed by the amendment.  The suits were thus founded upon the Constitution of the United States.

Jacobs v. United States, 290 U.S. 13, 16 (1933).

Having concluded that plaintiffs are entitled to just compensation for the per se physical taking of the six passenger gates at the Lemmon Avenue terminal and for the regulatory taking of the entire 26.8-acre leasehold, the court must therefore now determine the amount for which the federal government is liable.

A.      **Fair Market Value**

1.      **Legal Standard**

When property has been taken, the owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken.  He must be made whole but is not entitled to more."  Olson, 292 U.S. at 255; accord Ga.-Pac. Corp. v. United States, 226 Ct. Cl. 95, 105 (1980) ("In the context of a fifth amendment taking, just compensation has been interpreted to mean 'the full monetary equivalent of the property taken.  The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.'" (quoting Almota Farmers Elevator & Whse. Co. v. United States, 409 U.S. 470, 473-74 (1973))).  Just compensation "means in most cases the fair market value of the property on the date it is appropriated."  Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984) (citation omitted).  "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of taking."  United States v. 564.54 Acres of Land, 441 U.S. 506, 511 (1979) (quoting United States v. Miller, 317 U.S. 369, 374 (1943)).  The Supreme Court defined the standard as follows:

> Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable.  The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.

Olson, 292 U.S. at 255; see also Miss. & Rum River Boom Co. v. Patterson, 98 U.S. 403, 408 (1878) ("The inquiry . . . must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what is it worth from its availability for valuable uses.").  "Highest and best use has been defined as [t]he reasonably probable and legal use of [property], which is physically possible, appropriately supported, financially feasible, and that results in the highest value, including those uses to which the property may be readily converted."  Brace v. United States, 72 Fed. Cl. 337, 350 (2006) (quoting Loveladies Harbor I, 21 Cl. Ct. at 156) (internal quotation marks omitted); accord Appraisal Institute, supra, at 278.

In addition to the fair market value, an award of just compensation necessarily includes interest.  Miller v. United States, 223 Ct. Cl. 352, 399 (Ct. Cl. 1980) ("Where there has been an appropriation of private property for public use within the meaning of the fifth amendment, 'the right to interest[,] or a fair equivalent, attaches itself automatically to the right to an award of damages.'" (quoting Shoshone Tribe v. United States, 299 U.S. 476, 497 (1937))).  That interest accrues from the date of the taking until the date the government disburses payment.  See Kirby

Forest Indus., Inc., 467 U.S. at 10.  Furthermore, where an inverse condemnation has occurred, resulting in a delay of payment, such interest must be compounded.  See Whitney Benefits, Inc. v. United States, 30 Fed. Cl. 411, 415 (1994) ("[B]ecause of the long delay since the date of taking in this case, the award of compound interest is not only proper, but its denial would effectively undercut the protections of the fifth amendment to our Constitution."); see also Vaizburd v. United States, 67 Fed. Cl. 499, 504 (2005) ("Compounding we view as a routine means by which a reasonable person would protect themselves, over an extended period of time, from erosion of their investment."); Bowles v. United States, 31 Fed. Cl. 37, 52-53 (1994) ("[P]rohibiting the landowner from recovering compound interest acts to retroactively reduce the value of just compensation at the time of the taking by undervaluing its present worth." (citation omitted)).

Ultimately, the determination of just compensation "should be carefully tailored to the circumstances of each particular case."  Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1368 (Fed. Cir. 2012).  In "dealing with a thorny issue of valuation, it is for this court to 'synthesize in its mind the . . . record before it, determine to what extent opinion evidence rested on facts, consider and weigh it all, and come up with figures supported by all the evidence . . . .'"  Wash. Metro. Area Transit Auth. v. United States, 54 Fed. Cl. 20, 36 (2002) (quoting United States v. N. Paiute Nation, 183 Ct. Cl. 321, 346 (1968)).  As the Court of Federal Claims has explained, "in the context of setting just compensation . . . valuation transcends mere mathematical calculation, and involves the exercise of judgment–first by the experts and ultimately by the court."  Wash. Metro. Area Transit Auth., 54 Fed. Cl. at 36 (citing Standard Oil Co. of N.J. v. S. Pac. Co., 268 U.S. 146, 156 (1925) ("It must be remembered in condemnation cases valuation is not a matter of mere mathematical calculation, but involves the exercise of judgment.")).

## 2.      Analysis

As stated in Olson, although a property's highest and best use is not necessarily the absolute measure of value, in this case, given the (1) industry-wide expectation that the Wright Amendment would be repealed; (2) restrictions on use imposed by the Master Lease; and (3) fact that the court heard contradictory testimony concerning the profitability of utilizing the property either as a parking garage or as a custom-built hangar development, the court will base its just compensation determination on a valuation of the property as if it was being used as a commercial aviation terminal, its highest and best use.  Because only plaintiffs offered expert testimony on the value of the property if used as a commercial aviation terminal, only the expert valuations provided by Messrs. Miller,[36] and Massey are relevant to the court's analysis.  The

---

[36]   Mr. Miller is an aviation consultant who specializes in the valuation of aviation assets. Tr. 2681 (Miller).  He is the director of public private partnerships at Royal HaskoningDHV, and has also served as president of InterVistas Consulting LLC.  PX 114 at 38.  He has a bachelor's and a master's degree in economics from West Virginia University, and a juris doctor from the University of Tulsa College of Law.  Id. at 2684.  Mr. Miller has almost twenty years of experience valuing assets, including airports, airline assets, and FBOs.  Id. at 2682.  Mr. Miller has performed over 100 airport lease valuations throughout the course of his career, including for

court must still determine, however, whether their reports are worthy of reliance.  See Celsis In Vitro, Inc. v. CelizDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012) (finding "no error in the district court's reliance on [ ] unrebutted expert testimony" because such testimony was reasonable and supported by the record).

### a.    The Entire Leasehold

The court begins its valuation of the entire leasehold by summarizing Mr. Anderson's expert report and then Mr. Miller's expert report, wherein he reviews Mr. Anderson's work and ultimately concludes that it meets industry standards.

Mr. Anderson began his assessment by researching the "general expectations in the industry with regards to the Wright Amendment and how that would impact the value of the lease."  Tr. 878 (Anderson).  Based on the findings and conclusions of a colleague, Ms. Meehan, he noted the following:

> The date of the valuations presented in this report is October 13, 2006, the date on which the Wright Amendment Reform Act was signed into law.  I express my expert opinion of the value of the Subject Asset as of that date assuming no Wright Amendment Reform Act, but otherwise fully reflecting the environment of that time where there was an expectation of the rescission of the Wright Amendment.

PX 88 at 6.  He then concluded, again based on Ms. Meehan's work, that there was demand for additional gates.  Tr. 878 (Anderson).  Next, in order to determine whether and how that demand could be satisfied using plaintiffs' property, he examined three factors.  Id. at 878-79.

First, he calculated what a terminal operator would require in terms of revenue.  Id. at 882.  Specifically, he examined the revenue that plaintiffs would expect to earn in four categories (1) food and beverage concessions, (2) retail concessions, (3) rental car concessions, and (4) car parking—ultimately arriving at a dollar estimate per passenger for each of the revenue streams.  Id. at 883-93.  He then calculated the total amount of revenue that would be generated for each year, beginning in 2008 and ending in 2036.  Id. at 893-94.  He explained that he projected revenues up to 2036 because, although he was aware that plaintiffs' leases expired earlier, he felt that anyone investing in this type of facility would need a longer recovery period than what was allowed under the existing lease and that such lease renewals were typically granted.  Id. at 894-95.

---

three terminals at the John F. Kennedy International Airport ("JFK") in New York City; Chicago Midway International Airport ("Chicago Midway"); Sanford Orlando International Airport in Florida; and the airports in Recifi, Peru, and San Juan, Puerto Rico.  Id. at 2687-88.  Many of these valuations were for large institutional investors.  Id. at 2690-700.

Second, Mr. Anderson examined the types of expenses a terminal operator would likely incur, such as (1) personnel, (2) utilities, (3) supplies, (4) maintenance, and (5) insurance—and determined how much each would cost.  Id. at 895-97.  He then calculated total expenses per passenger, also projecting these figures up to 2036.  Id. at 898.  In this case, his figures included a projected increase of between three and four percent annually early in the forecast and two percent later in the forecast.  Id.

Third, Mr. Anderson looked at related investments, also referred to as capital expenditures.  Id. at 900.  Specifically, he looked at three categories of expenditures:  (1) initial development/redevelopment costs, (2) ongoing and future maintenance costs, and (3) investments in working capital.  Id.  With regard to determining the cost to construct an expanded terminal, he relied on estimates provided by Mr. Cullum,[37] finding them to be reasonable.[38]  Id. at 900-01.  With regard to maintenance costs, he based his calculation on the amount of depreciation that would occur over the twenty-five-to-thirty-year period, assuming a portion of each year's depreciation was reinvested in the facility.  Id. at 901.  Finally, with regard to determining the working capital necessary to operate the terminal, he estimated that plaintiffs would need enough cash to cover six months' worth of expenses and then projected that figure out until 2036.  Id. at 901-02.

After projecting total revenues, total expenditures, and total capital requirements, Mr. Anderson calculated the cash flows year by year using two cash flow metrics:  (1) EBITDA (earnings before interest, taxes, depreciation, and amortization), and (2) net cash flow.  Id. at

---

[37]  Mr. Cullum has been a construction manager and development manager for construction projects for over thirty-three years.  Tr. 980-82 (Cullum).  He has an undergraduate degree in architecture from Stanford University and a Bachelor of Architecture with honors from the University of Texas at Austin.  Id. at 978.  He also has master's degrees in city planning and architecture and urban design from the University of Pennsylvania.  Id.  He has extensive experience overseeing all aspects of construction, including design, financing, general contractor selection, permitting, and assessing cost estimates.  Id. at 983-87.

[38]  Mr. Cullum, whom the court qualified as an expert in construction management, testified that "the estimated cost of the expanded sixteen-gate terminal as of the year 2007 would be $60,675,034."  Tr. 1012 (Cullum); see also PX 87.  In reaching this figure, he first considered the final cost to build the Legend terminal and garage in 1999 and then projected that cost to 2007, Tr. 1013-14 (Cullum), the year after the WARA was passed.  Next, he considered the expansion cost, based on the sixteen-gate plans prepared by the GFF architectural firm.  Id. at 1015.  Then, he asked Denis Curtin, the director of preconstruction estimating with the Dallas-based Rogers-O'Brien Construction Company, to review the cost to build the original terminal and come up with a new cost to build that same terminal in 2007.  Id. at 1017-20.  Finally, he and Mr. Curtin worked together to estimate the cost of building the sixteen-gate expansion in 2007.  Id. at 1020.  In preparing this final estimate, Mr. Cullum also relied on estimates from two additional companies:  (1) Dallas Demolition, which provided a cost estimate for demolition; and (2) Oliver Wyman, Inc., which provided a cost estimate for jet bridges and baggage systems.  Id. at 1022-25, 1040.

903-04.  Finally, he determined the market value of plaintiffs' leaseholds utilizing two methodologies:  (1) the discounted cash flow ("DCF")-based methodology; and (2) the multiples-based methodology.[39]  Id. at 906-08.  Under the DCF-based methodology, using a discount rate of 8.3 percent, Mr. Anderson calculated that the value of plaintiffs' leasehold interest was $118.4 million, whereas under the multiples-based methodology, the value was $148.6 million.  Id. at 906-14.  Giving equal weight to both methodologies, he ultimately concluded that the value of plaintiffs' property was $133.5 million.  Id. at 915.

Mr. Miller, whom the court qualified as an expert in the field of aviation consulting, specializing in the valuation of aviation assets,[40] and whose testimony was offered for the purpose of reviewing Mr. Anderson's expert report, concluded that Mr. Anderson's report "was well done, [and critically for the court,] that it met the industry standards."  Id. at 2711 (Miller); see also PX 114.  Mr. Miller identified numerous reasons why he credited Mr. Anderson's work.  First, Mr. Miller noted that it was common for consultants specializing in aviation asset valuation to use both the DCF-based and multiples-based methodologies, but that the multiples-based methodology was usually reserved for long-term leases, such as a ninety-nine-year lease.  Tr. 2712-13 (Miller).

Second, Mr. Miller concluded that Mr. Anderson had properly employed the DCF-based methodology.  Id. at 2713.

Third, Mr. Miller conducted his own DCF analysis and compared his results to Mr. Anderson's.  Id. at 2714.  In terms of expected revenues, the two had similar figures for the earlier years, but in the later years, Mr. Miller's projected parking revenues were lower.  Id. at 2716-17.  In terms of expected operating revenues, their results were "reasonably close," with Mr. Miller arriving at lower amounts in the initial periods and Mr. Anderson arriving at higher amounts beyond 2030.  Id. at 2719-20.  Finally, in terms of net cash flows, the two were "very close," with Mr. Miller showing lower figures in the latter periods, around 2025.  Id. at 2720-22.  Using his own net cash flow figures and a discount rate of 7.7 percent, Mr. Miller determined that the net present value of plaintiffs' property was $152.1 million.  Id. at 2724.

Fourth, Mr. Miller concluded that his and Mr. Anderson's valuations of $152.1 million and $133.4 million, respectively,[41] were close given the underlying assumptions:

---

[39]  "Under the discounted cash flow-based methodology . . . the value of an asset equals the Present Value of the net cash flows that the asset is expected to generate for its owner."  PX 88 at 4.  "Under the 'Multiples-Based Methodology,' the value of an asset is determined by multiplying the annual earnings (cash flow) by a factor (multiple)."  Id.

[40]  Tr.  2707-08 (Miller).

[41]  Mr. Anderson concluded that the value of plaintiffs' property was $133.5 million but Mr. Miller testified that Mr. Anderson valued the property at $133.4 million.  Tr. 2726 (Miller).

> Q    Okay.  Is this kind of difference in calculation of net
>       present value something you've seen before in other
>       valuations that you've done over the years?
>
> A    Yes, I have.
>
> Q    Okay.  And how common is it?
>
> A    It's very common.  It's what makes the market.  That's why
>       we win some and we lose some in the privatization field.
>       We may come up with a different valuation than what a
>       competitive consortium would put together.  We lose, they
>       win, and vice versa.  Sometime we come up.

Id. at 2727.  In this regard, Mr. Miller noted that (1) had he used Mr. Anderson's 8.3 percent discount rate, his final figure would have been $140 million, id. at 2427; (2) had he used the multiples-based methodology, his final figure would have been $204 million, id. at 2728; and (3) had he averaged the two numbers, his final figures would have been approximately $175 million, id.

Fifth, Mr. Miller concluded, based on his review of Ms. Meehan's report and based on his own experience, that Mr. Anderson properly assessed the property's highest and best use.  Id. at 2730-31.

Sixth, Mr. Miller concluded that Mr. Anderson had properly analyzed the effect of the WARA on the property's highest and best use based on the fact that within the aviation industry, beginning in the early 1990s, it was widely believed that the Wright Amendment would be repealed:

> Q    Okay.  In your opinion, would it have been more
>       reasonable, more appropriate for Mr. Anderson to have
>       limited the highest and best use of the subject property to
>       only the destinations and the types of airplanes that were
>       allowed by the Wright Amendment in 2006?
>
> A    No, it was not.
>
> Q    And why not?
>
> A    Really for the same reason, because it was - - the
>       expectation was the Wright Amendment would be repealed,
>       and therefore the value, and it would start at that time.  That
>       was the take.

Id. at 2732-33.

Seventh, Mr. Miller concluded that it was reasonable for Mr. Anderson to assume that plaintiffs would be able to extend their lease with Dallas until 2036:

> A    First, I did review testimony from City officials, I believe a Mr. Poole, which indicated that it was common practice for the City of Dallas to extend leases based upon getting something back for capital improvements, what we would normally call.
>
> Also, my experience both working at airports as well as in my professional experience since then, it was very common for airports to extend leases for good customers, as long as they're investing in the airport and creating jobs.

Id. at 2733.

Finally, Mr. Miller concluded that it was reasonable for Mr. Anderson to rely on Mr. Cullum's construction cost projections because (1) Mr. Cullum had experience in the Dallas construction market and had been involved in the construction of the Lemmon Avenue terminal, the terminal at issue in this case, id. at 2734; (2) Mr. Cullum's estimates, while lower than those actually incurred at other sites (such as JFK in New York City), were appropriate because the cost to build a terminal at other sites might be much higher due to market differences in passenger volume, soil composition, and unionization, id. at 2736; and (3) Mr. Cullum performed his extrapolations with input from Mr. Hazel, whom Mr. Miller had met in the early 1990s, had worked with on many occasions, and whom, in his opinion, produced a "professionally done" expert report, id. at 2737-38.

Defendant argues that the court should reject Mr. Miller's valuation because it was based on numerous erroneous assumptions. Prior to considering each of defendant's contentions, the court notes that defendant cites no authority, and the court cannot find any, for the proposition that an expert must consider all possible alternatives in order for his opinion to be valid. Rule 702 of the Federal Rules of Evidence, which outlines the permitted scope of expert witness testimony, states the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;

> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Furthermore, the advisory committee's note to the rule adds the following:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 advisory committee's note.  With these principles in mind, the court now considers defendant's arguments.

First, defendant argues that Mr. Miller erroneously assumed that the Wright Amendment would be completely repealed, instead of considering the possibility that the repeal might not be complete or immediate.  Def.'s Posttrial Br. 70.  However, apart from the joint statement issued by the signatories to the Five-Party Agreement, which specified what actions were sought and when they were sought, there is no indication that there was any consensus among those in the aviation industry regarding the exact timing and breadth of the repeal.

Second, defendant argues that Mr. Miller erroneously based his valuation on an assumption that the Master Lease would be extended from 2023 to 2036.  Def.'s Posttrial Br. at 74-75.  However, although the original lease was due to expire on September 30, 2012, several witnesses testified that it was customary for Dallas to extend leases at Love Field.  See Tr. 2733 (Miller) (testifying "that it was common practice for the City of Dallas to extend leases based on getting something back for capital improvements"), 1758-59, 1788-89 (Poole) (testifying that Dallas had an established process for extending leases and that Dallas had extended leases in the past), 2851-52 (Gwyn) (testifying that Dallas was likely to extend a lease for a good tenant at Love Field).  In addition, in its 2004 response to plaintiffs' petition to amend the Master Lease, although Dallas did not agree to forgo the Master Lease's 50% rent-sharing provision, it indicated its willingness to extend the lease for 40 years.  Id. at 1782, 1785 (Poole); DX 52.

Third, defendant argues that Mr. Miller erroneously based his valuation on the assumption that a sixteen-gate terminal could be built on the property between 2007 and 2008 for a cost of $60.7 million, a figure he obtained from Mr. Cullum.  Def.'s Posttrial Br. 79-82.  However, the court credits Mr. Miller's reliance on Mr. Cullum's construction cost projections given Mr. Cullum's general experience in the Dallas market and specific experience with the Lemmon Avenue terminal.  See Tr. 2734 (Miller).  In addition, the court accepts Mr. Miller's conclusion that it is inappropriate to compare the cost to build a terminal at Love Field in Dallas

with the cost to build a terminal at JFK in New York City, given the vast differences between the two markets.  See id. at 2736.

Fourth, defendant argues that Mr. Miller's valuation erroneously failed to take into account the Master Lease's rent-sharing provision.  Def.'s Posttrial Br. 76-77.  According to defendant, not only does the Master Lease apply a 50% rent-sharing provision to the relationship between Virginia Aerospace, the lessee, and Love Terminal Partners, the sublessee, but it also applies a 50% rent-sharing provision to the relationship between Love Terminal Partners, the sublessee, and any sub-sublessee.  Id. at 77 (citing DX 68 at 1).  Defendant's argument lacks merit for two reasons.  First, as noted above, Hampstead's business model was explicitly developed to avoid the payment of rent to Dallas as a result of Virginia Aerospace's leasing of property to Love Terminal Partners and, in fact, no payments were ever made to Dallas pursuant to the rent-sharing provision.  Second, none of the lease provisions cited by defendant supports the proposition that the rent-sharing provision applies to rent received by Love Terminal Partners from a third-party sub-sublessee.  Although Mr. Gwyn's December 16, 2015 letter referenced Article XX in support of his contention that rents from a "sub-sublease, license, etc." were subject to the Master Lease's rent-sharing provision, DX 68 at 1, Article XX does not so provide.  Rather, Article XX only addresses monies owed by the lessor as a result of payments from a sublessee, not a sub-sublessee.  See JX 1 (LTP-000793).

Finally, defendant argues that Mr. Miller erroneously assumed that by mid-2008, the commercial aviation terminal could have been used for flights to any United States destination by airplanes carrying 140 or more passengers.  Def.'s Posttrial Br. 50-51, 70.  However, given Ms. Meehan's forecast of a vast increase in passenger demand following the repeal of the Wright Amendment, and given Hampstead's plans for a sixteen-gate terminal capable of meeting that demand, Mr. Miller's assumption that larger planes would be permitted to fly out of the Lemmon Avenue terminal is not unreasonable.

Thus, contrary to defendant's arguments, the court credits Mr. Miller's testimony and therefore concludes that the value of the 26.8-acre leasehold is $133.5 million.

 **b.**  **The 9.3-Acre Property**

Defendant argues that the court should reject Mr. Massey's appraisal on the grounds that it is neither relevant nor credible.  Id. 93.  In this section, the court will only address those arguments that are novel—those arguments that defendant did not advance in reference to Mr. Miller's testimony.

First, defendant argues that Mr. Massey's cost approach to valuation was flawed because he relied on Mr. Cullum's estimate of the cost to construct the original six-gate terminal, a figure that did not account for depreciation.  Id. at 97-98.  However, as noted above, Mr. Massey's replacement cost approach, which relied both on Mr. Cullum's cost estimate and the Marshall and Swift Commercial Estimator, did take depreciation costs into account.  Tr. 1371-74 (Massey).

Second, defendant argues that Mr. Massey's conclusion that the property in the before condition was worth $20,500,000 was significantly higher than the $12.3 million Hampstead told its investors the property was worth in December 2005.  Def.'s Posttrial Br. 93.  However, as Ms. Moog testified, the book value of plaintiffs' assets is not the same as the market value.

Finally, with respect to defendant's argument that Mr. Massey violated the Uniform Standards of Professional Appraisal Practice by (1) failing to acknowledge that his assessment was based on a hypothetical condition—that the lease would be extended; and (2) committing a "multi-million-dollar multiplication error," the court notes simply that its assessment of Mr. Massey's testimony is not bound by professional standards and that the court has explained above why these alleged violations do not impact the validity of Mr. Massey's overall appraisal.

Thus, contrary to defendant's arguments, the court credits Mr. Massey's testimony. Significantly, Mr. Massey was the only expert who offered a valuation based on what the court has deemed to be the property's highest and best use—as an airline terminal.  Furthermore, although Mr. Massey made a significant mathematical error, in which he erroneously valued the 9.3-acre property after the enactment of the WARA at $419,000 instead of $4,000,195, that calculation had no impact on the court's analysis because it was based on the mistaken assumption that 25% of plaintiffs' parking garage could still be used for car storage when in fact, that use was prohibited under the terms of the Master Lease.  Ultimately, the court accepts Mr. Massey's valuation, and concludes that the property's value at the time of the taking was $21,165,000.

## B.    Interest

In this case, plaintiffs' property was the target of an inverse condemnation.  Thus, plaintiffs are entitled to interest from the date of the taking, October 13, 2006, until the date of judgment.  Furthermore, because a significant amount of time has passed since the date of the taking and the present, just shy of 9.5 years, plaintiffs are also entitled to have that interest compounded.  The only remaining issue therefore is to determine the appropriate interest rate.

Plaintiffs have requested that the court apply the interest rate set forth in the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (2012) ("CDA").  Pls.' Br. 66.  In support of its request, plaintiffs state only that CDA "interest rates have been used several times by this Court to set forth a uniform method of establishing interest rates . . ."  Id. at 67 (internal quotations marks omitted).

Defendant argues that if plaintiffs are entitled to an award of just compensation, to include interest, the court should use the interest rate set forth in the Declaration of Taking Act, 40 U.S.C. § 3116 (2012) ("DTA").  Def.'s Contentions of Fact & Law 39-40.  Defendant contends that the DTA is "a standardized and uniform method for calculating delay compensation in the direct condemnation context, [and] provides the best approximation of delay compensation and preserves uniformity in awards among landowners in both direct and inverse condemnation cases."  Id. at 40.  Furthermore, defendant argues that "[a]bsent special proof that

an award calculated under the [DTA] does not satisfy the just compensation requirement of the Fifth Amendment, this Court should not depart from the [DTA] rate." Id.

In awarding just compensation under the Fifth Amendment, the court emphasizes once more that it is bound only by the Constitution, and therefore not by any statutorily-based rate schedule. Furthermore, "[t]he court's primary goal in determining a correct interest rate is to employ an interest calculation that does not just 'yiel[d] a higher or lower interest payment, but rather . . . is the more accurate measure of the economic harm of the property owners.'" Biery v. United States, No. 07-693L et al., 2012 WL 5914521, at *3 (Fed. Cl. Nov. 27, 2012) (unpublished decision) (quoting NRG Co. v. United States, 31 Fed. Cl. 659, 670 n.8 (1994)). That said, the court will now consider the use of the CDA and DTA interest rates.

CDA interest rates were developed specifically for use "in government contract cases to measure interest to be paid to government contractors on valid claims previously presented by the contractors to government contracting officers." NRG Co., 31 Fed. Cl. at 665. Under the CDA, interest "begins to run on the date the contractor presents a proper claim to the contracting officer and continues to run until the date of payment." Id. "CDA interest rates are calculated based on the applicable private commercial interest rates for new loans maturing in approximately five years." Id. Use of CDA interest rates thus assumes that "(1) the contractor had borrowed in the private commercial market the entire amount of money the government [was] ultimately found to owe the contractor, and (2) the contractor's loan, with interest adjusted every six months, remained outstanding until the date the government made its payment." Id. at 666. Those assumptions may not best approximate the situation faced by a landowner because real property is not typically "covered by outstanding loans equal to 100 percent of the value of the property" and because "real estate loans are collateralized loans [and therefore] often can be obtained on comparatively better terms than an unsecured five-year loan." Id. at 667.

The DTA, on the other hand, was specifically enacted to apply to direct condemnation cases:

> As the Supreme Court noted, the Declaration of Taking Act had a twofold purpose: "to give the Government immediate possession of the property and to relieve it of the burden of interest accruing on the sum deposited from the date of taking to the date of judgment[, and] to give the former owner, if his title is clear, immediate cash compensation to the extent of the Government's estimate of the value of the property."

Tulare Lake Basin Water Storage Dist. v. United States, 61 Fed. Cl. 624, 629 (2004) (quoting Miller, 317 U.S. at 381). Pursuant to the DTA, for a period of not more than one year, "interest shall be calculated from the date of taking at an annual rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System." 40 U.S.C. § 3116(a)(1). For a period of more than one year, interest shall be compounded annually. Id. § 3116(a)(2). Using DTA interest rates thus assumes that the landowner would be able to borrow at the same rate as the government. Pitcairn v. United

States, 547 F.2d 1106, 1122 (1976) ("The yield on a series of hypothetical Government bonds is not relevant in ascertaining the injury plaintiff has suffered.  It measures compensation only according to the point of view of the taker without reference to that of the owner since he is hardly likely to be able to borrow money at the rates the Government can.").  Using DTA interest rates further assumes "that the landowner, on the day of the taking, would have invested the fair-market value of his property in exclusively 52-week T-bills, then rolled them over on the anniversary of the taking each year," thereby "(a) receiv[ing] little interest, (b) [having] no access to the principal; and, (c) [engaging in] zero diversification."  Mark F. Hearne, II et al., The Fifth Amendment Requires the Government to Pay an Owner Interest Equal to What the Owner Could Have Earned had the Government Paid the Owner the Fair-Market Value of Their Property on the Date the Government Took the Owner's Property, 1 Brigham-Kanner Prop. Rights Conference J. 3, 24-25 (2012).

In this takings case, it is the court's view that the best way to determine the proper rate of interest is to utilize the prudent investor rule ("PIR").  "Pursuant to this rule, the appropriate interest rate is calculated based not on an assessment of how a particular plaintiff would have invested any recovery, but rather on how a 'reasonably prudent person' would have invested the funds to 'produce a reasonable return while maintaining safety of principal.'"  Tulare Basin Water Storage Dist., 61 Fed. Cl. at 627 (quoting United States v. 429.59 Acres of Land, 612 F.2d 459, 464-65 (9th Cir. 1980)); accord Independence Park Apartments v. United States, 61 Fed. Cl. 692, 717 (2004) (noting that the PIR "does not require that a reference be made only to a rate of interest on Treasury securities where the United States is the defendant"), rev'd on other grounds, 449 F.3d 1235 (Fed. Cir. 2006).  Thus, the approach is attractive because it does not rely on the court having to perform a "complex factual assessment" of each plaintiff's unique circumstances at the time of the taking, Tulare Lake Basin Water Storage Dist., 61 Fed. Cl. at 628-29 (citing NRG, 31 Fed. Cl. at 668), and because the PIR more accurately reflects a reasonably prudent investor's experience in the marketplace.  Finally, the PIR is especially well suited to the facts of this case.  Plaintiffs Virginia Aerospace and Love Terminal Partners are entities of the Hampstead Group, a sophisticated private equity firm whose clients include large institutional investors such as Yale, Princeton, and Stanford Universities.

There are, however, many indices upon which the court may choose to rely.  In this case, the court will, in an exercise of its discretion, utilize the Moody's Composite Index of Yields on Aaa Long Term Corporate Bonds ("Moody Rate") as the most appropriate measure of interest. As stated by the court in Pitcairn:

> [L]ong-term corporate bond yields are an indicator of broad trends and relative levels of investment yields or interest rates.  They cover the broadest segment of the interest rate spectrum.  The corporate bond market is large, substantially in excess of long-term Government bonds[,] and long-term corporate yields measure basic trends and relative levels of interest rates from one period to another.

69

Pitcairn, 547 F.2d at 1124; see also Sears v. United States, 124 Fed. Cl. 730, 734 (2016) ("[W]here the United States is the defendant, the [PIR does not require] the interest rate to be based on U.S. Treasury securities, particularly when another instrument such as the Moody's Aaa Index can provide a similar 'safety of principal' investment over a period spanning a number of years." (citations omitted)), 736 (discounting use of the Vanguard Balanced Index Fund, a diversified mutual fund, as the best measure of interest due to its 7.4% volatility); Textainer Equip. Mgmt. Ltd. v. United States, 115 Fed. Cl. 708, 718-19 (2014) (exercising discretion to award a combination of the DTA rate and the Moody Rate); Adkins v. United States, No. 09-503L et al., 2014 WL 448428, at *1-2 (Fed. Cl. Feb. 4, 2014) (exercising discretion to award the Moody Rate rather than the DTA rate); Biery, 2012 WL 5914521, at *2-5 (exercising discretion to award the Moody rate rather than the DTA).

## II.     Attorneys' Fees and Costs

Plaintiffs are also entitled to reasonable attorneys' fees, expenses, and costs under section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) (2012).  The court defers determining the amount due under the statute, however, until the completion of litigation.

## CONCLUSION

For the reasons stated above, the court finds that the federal government effected a per se physical taking of the six passenger gates at the Lemmon Avenue terminal and a regulatory taking of the entire 26.8-acre leasehold.  The court further finds that plaintiffs are entitled to just compensation in the amount of $133,500,000 plus interest (based on the Moody Rate) compounded annually from October 13, 2006, the date of the taking, to the date of payment. Judgment to this effect shall be issued pursuant to Rule 54 of the Rules of the United States Court of Federal Claims because there is no just reason for delay.  In due course, plaintiffs may apply for an award of attorneys' fees and all costs, to include appraiser and expert witness fees.

**IT IS SO ORDERED**.

/s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge